Justin S. Pierce (State Bar #022646)
Stephen B. Coleman (State Bar # 021715)
**JACKSON LEWIS LLP**
2398 East Camelback Road, Suite 1060
Phoenix, AZ  85016
Tel. (602) 714-7044
Fax (602) 714-7045
piercej@jacksonlewis.com
colemansb@jacksonlewis.com

Attorneys for Defendants

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Linda Conley; Heriberto Dominguez and Yoami Dominguez, husband and wife; Stephen Frakes; James C. Kemp and Reyna Kemp, husband and wife; Michelle Norris; William Ponce; and Herlan Yeomans and Eloina Yeomans, husband and wife, | Case No. 2:11-cv-01637-PHX-MEA |
| Plaintiffs, | |
| vs. | |
| Town of Quartzsite, a political subdivision; Alex and John Doe Taft; Jeffrey and Jane Doe Gilbert; and Albert and Jane Doe Johnson, | |
| Defendants. | |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Defendants Town of Quartzsite, Alex Taft, Jeffrey Gilbert, and Albert Johnson ("Defendants") move for summary judgment on all claims.[1]

This is an employment case arising from the termination of six employees of the Police Department for making allegations of misconduct by the Chief of Police, Jeff Gilbert, that were found to be recklessly false.  [SOF 3-5, 44, 47, 49, 62, 128-36, 137, 175-77, 178-79, 182, 186-97][2]  All of Plaintiffs' claims fail as a matter of law.

## I.     PLAINTIFFS CANNOT SATISFY THE *MONELL* STANDARD.

Plaintiffs' Section 1983 claims should be dismissed because they cannot, as a matter of law, meet the standard for municipal liability.  A local government may not be held liable under 42 U.S.C. § 1983 based on the theory of respondeat superior or vicarious liability.  Instead, to establish municipal liability, a plaintiff has the burden of proving that (1) the alleged unconstitutional act was committed pursuant to a formal governmental policy or longstanding practice or custom, or (2) the violation was committed or ratified by an official with final policy making authority. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).  Plaintiffs cannot satisfy this requirement.

Here, the record is devoid of any facts even remotely suggesting that the Town has a formal policy or longstanding custom of retaliating against employees for engaging in protected speech.  Thus, the viability of Plaintiffs' First Amendment claims rests on their ability to show that their terminations were committed or ratified by a final policymaker.  Based on the undisputed evidence, Plaintiffs cannot meet this burden.

To qualify as a final policymaker, it is not enough that an individual has authority to make employment decisions, such as terminating employees for misconduct.  As the Ninth Circuit has explained:

> Municipal liability does not attach. . . unless the decisionmaker possesses final authority to establish policy with respect to the action ordered. The fact that a particular official - even a policy-making official - has discretion

---

[1] Because the parties have filed a stipulation to dismiss the claims of Heriberto Dominguez, with prejudice, Defendants have not addressed Dominguez's claims in this motion.

[2] The factual background is described in detail in Defendants' Statement of Facts in Support of Motion for Summary Judgment ("SOF").

1

in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion.

*Gillette v. City of Eugene*, 979 F.2d 1342, 1349 (9th Cir. 1992). In this case, the undisputed evidence shows that the Assistant Town Manager, Al Johnson, was the sole decisionmaker with respect to the termination of Plaintiffs' employment. [SOF 2, 195, 198-99] Plaintiffs' § 1983 claims fail as a matter of law because Johnson did not have final policy-making authority, as defined by the Ninth Circuit. Significantly, there is no evidence that Johnson was empowered to create personnel policies for the Town. Instead, only the Town Council possessed such policy-making authority. [SOF 204]

In fact, the Town Council exercised its authority by adopting, through a resolution, a merit system and a comprehensive Personnel Policy that sets forth the appropriate grounds for disciplinary action and states that employees may only be dismissed "for cause." [SOF 204-05, 207] Furthermore, the Personnel Policy expressly states that it may only be amended by the Town Council. [SOF 206] In other words, Johnson's authority to discipline or terminate employees was constrained by policies that were implemented by the Town Council, thus confirming that he does not qualify as a final policymaker. *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) ("When an official's discretionary decisions are constrained by policies not of that official's making," such official is not a final policymaker for purpose of municipal liability).

As further evidence that Johnson did not have policymaking authority, his decision to discharge Plaintiffs was subject to appeal to the Town's Personnel Advisory Board (and subsequently the Town Manager) for a determination of whether good cause existed for the terminations under the Town's policies. [SOF 208] As the Supreme Court has held, an employee is not a final policymaker if his decisions are subject to a higher level review "to measure the official's conduct for conformance with [personnel] policies." *Praprotnik*, 485 U.S. at 127; *see also Scala v. City of Winter Park*, 116 F.3d 1396, 1401 (11th Cir. 1997) (holding that a city manager and his subordinate were not final policymakers because a civil service board had the authority to review the plaintiff's termination); *Moore v. County of L.A.*, 2012 U.S. Dist. LEXIS 115193, at *11 (C.D. Cal.

2

Aug. 15, 2012) ("Plainly, whatever discretion Cooley and other DA's Office officials wield is constrained by policies not of their making, and is subject to review by the Board. Thus, Cooley and other officials at the DA's Office are not final policymakers for the County under *Monell* as a matter of law.") (internal citation omitted). These precise circumstances exist here. For this additional reason, Plaintiffs cannot establish municipal liability.

In sum, because Johnson was not a final policymaker, Plaintiffs cannot prevail on their Section 1983 claims against the Town. Instead, the Town is entitled to summary judgment based on this fatal infirmity. *See, e.g., Gillette*, 979 F.2d at 1349 (granting judgment in favor of city on due process claim because fire chief who made termination decision did not have authority to establish personnel policies); *Cooke v. Lake Havasu City*, 2010 U.S. Dist. LEXIS 66144 (D. Ariz. July 1, 2010).[3]

## II. PLAINTIFFS DID NOT ENGAGE IN PROTECTED SPEECH.

To establish a *prima facie* case of First Amendment retaliation, Plaintiffs must prove that (1) they engaged in constitutionally protected speech; and (2) their protected speech was a substantial or motivating factor in the City's decision to terminate their employment. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). Defendants are entitled to summary judgment on the First Amendment claims because Plaintiffs cannot meet their initial burden of demonstrating that they engaged in protected speech.

Government employers are empowered to regulate speech that is disruptive to the management of personnel and internal affairs. *See, e.g., Connick v. Myers*, 461 U.S. 138, 146-148 (1983). The broad discretion given a government employer to effectively manage its operations was recently emphasized by the U.S. Supreme Court:

> [An employee's speech] may seek to achieve results that 'contravene governmental policies or impair the proper performance of governmental

---

[3] Plaintiffs' "official capacity" claims against the individuals should be dismissed for the same reasons. A suit against a governmental officer in his or her official capacity is equivalent to a suit against the governmental entity itself. *Monell*, 436 U.S. at 691.

functions.' *Garcetti*, 547 U.S., at 419, 126 S. Ct. 1951, 164 L. Ed. 2d 689. Government must have authority, in appropriate circumstances, to restrain employees who use petitions to frustrate progress towards the ends they have been hired to achieve.   A petition, like other forms of speech, can bring the 'mission of the employer and the professionalism of its officers into serious disrepute.' *Roe*, 543 U.S., at 81, 125 S. Ct. 521, 160 L. Ed. 2d 410.   A public employee might, for instance, use the courts to pursue personal vendettas or to harass members of the general public.   That behavior could cause a serious breakdown in public confidence in the government and its employees.   And if speech or petition were directed at or concerned other public employees, it could have a serious and detrimental effect on morale."

*Borough of Duryea v. Guarnieri*, 131 S. Ct. 2488, 2495-2496 (2011).

Thus, to resolve a First Amendment claim by a municipal employee, this Court must perform a balancing test to determine whether the interest of the government employer "in promoting the efficiency of the public services it performs through its employees" outweighs the employee's interests, as a citizen, "in commenting upon matters of public concern."   *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). Pertinent considerations in this balancing test are "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise."   *Rankin v. McPherson*, 483 U.S. 378, 388 (1987); *see also Brewster v. Board of Educ.*, 149 F.3d 971, 979 (9th Cir. 1998) ("[C]ourts must give government employers wide discretion and control over the management of [their] personnel and internal affairs.   This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch.")   Significantly, the *Pickering* "balancing test is a question of law, not fact," and therefore is an appropriate matter to be resolved on summary judgment.   *Carboun v. Chandler*, CV-03-2146-PHX-DGC, 2005 U.S. Dist. LEXIS 21950, at *14 (D. Ariz. Sept. 27, 2005).

When applying the *Pickering* test, courts give substantial deference to a governmental entity's judgment in making personnel decisions concerning a police

department.  *See, e.g., Aguilera v. Baca*, 510 F.3d 1161, 1171 (9th Cir. 2007) ("Law enforcement agencies are entitled to deference, within reason, in the execution of policies and administrative practices that are designed to preserve and maintain security, confidentiality, internal order, and esprit de corps among their employees."); *Cochran v. City of Los Angeles*, 222 F.3d 1195, 1201 (9th Cir. 2000) ("[T]he unit of government in which appellees worked was a police department, a quasi-military organization. Discipline and esprit de corps are vital to its functioning.  Given that 'a wide degree of deference to the employer's judgment is appropriate' when 'close working relationships are essential to fulfilling public responsibilities,' the balance of interests tips in favor of the City."); *Kannisto v. City and County of San Francisco*, 541 F.2d 841, 843 (9th Cir. 1976) (police department "has a substantial interest in developing discipline, *esprit de corps*, and uniformity…to insure adequate promotion of safety of persons and property"). When this standard is applied, the inescapable conclusion is that Plaintiffs' speech was unprotected as a matter of law.

### A.    Plaintiffs Are Not Entitled To First Amendment Protection For Their Recklessly False Allegations Of Misconduct By Chief Gilbert.

Quite frankly, it is difficult to imagine a case where the balance weighs more heavily in favor of the government employer.  On the Plaintiffs' side, any purported First Amendment protection is significantly diminished based on, among other things, the fact that Plaintiffs made recklessly false allegations of unethical (and possibly criminal) conduct by Chief Gilbert in connection with his use of sick and vacation time.  *Ceballos v. Garcetti*, 361 F.3d 1168, 1179 (9th Cir. 2004) *reversed on other grounds by Garcetti v. Ceballos*, 547 U.S. 410 (2006) ("[T]he recklessness of the employee and the falseness of the statements should be considered in light of the public employer's showing of actual injury to its legitimate interests, as part of the *Pickering* balancing test.").  Here, the Plaintiffs claimed responsibility for an anonymous letter to Arizona Peace Officer Standards and Training Board ("AZ POST") – the entity responsible for regulating the peace officer profession – which alleged that:

1
2

> Chief Jeff Gilbert accrues "sick" and "vacation" time but when he chooses to take time off which is a substantial amount of time, he doesn't report the time.  He never uses any of his "sick" or "vacation" time.  He doesn't even complete a time sheet, if he does complete one, it has only been recently.

3
4
5
6
7
8
9
10
11
12
13
14
15
16

[SOF 38, 44, 47, 49, 62]  In reality, the overwhelming and undisputed evidence shows that these allegations – which provided the basis for Plaintiffs' terminations – were utterly false.  [SOF 191-92, 194]  As an initial matter, it is uncontroverted that Chief Gilbert used 128 hours of vacation time and 12 hours of sick leave from June 17, 2009 to April 5, 2011 – the period leading up the AZ POST letter.  [SOF 137]  Thus, there is no merit to the contention that he *never* used his accrued time off.  It is also undisputed that Chief Gilbert obtained verbal and written approval from the Town Manager to use his sick and vacation time.  [SOF 132, 137]  Furthermore, as an exempt employee, Chief Gilbert was *not* required to complete a time sheet.  [SOF 128-29]  As such, the insinuation that the Chief engaged in misconduct by failing to record his hours is patently misleading.  Moreover, both Chief Gilbert's employment contract and the Town's Personnel Policy gave him latitude to take time off under certain circumstances without using accrued leave, and the Town Manager expressly approved 40 hours of such time off in September 2009.  [SOF 130, 133-35]

17
18
19
20
21
22
23
24
25
26
27
28

Not only did Plaintiffs falsely accuse Chief Gilbert – the highest ranking law enforcement official in the Town – of essentially stealing from the Town, but they were reckless in doing so.  Plaintiffs were virtually uniform in conceding that they lacked personal knowledge as to whether Chief Gilbert had misused his sick or vacation time.  [SOF 35, 50, 142, 145, 147-48, 150, 161, 173-74]  To make matters worse, Plaintiffs were aware that the very same issue was investigated by the Arizona Department of Public Safety ("DPS") in 2010, and that there was no finding of wrongdoing.  [SOF 26-36, 48]  In fact, Chief Gilbert held a department meeting in which he informed Plaintiffs that he had been exonerated by DPS, and Plaintiffs had no reason to disbelieve him.  [SOF 33-36]  After the meeting, Plaintiffs did not acquire any new information suggesting that the Chief was misusing his sick or vacation time, yet Plaintiffs were

undeterred from resurrecting the same stale allegation in the AZ POST letter.  [SOF 51]

Not only did Plaintiffs disregard the results of the DPS investigation, but they made no effort whatsoever to independently determine whether the Chief had engaged in misconduct.  For instance, they did not research whether the Chief was an exempt employee who was not required to record his time.  [SOF 143-44, 153, 157, 162, 164, 167]  Plaintiffs also did not bother to review the Chief's contract (which was a public record), despite the fact that many of them attended Town Council meetings where the contract was up for renewal, and therefore were keenly aware that the Chief's employment was governed by the terms of a written agreement.  [SOF 136, 138-41, 151-52, 155, 165, 168]  Had they done so, they would have immediately recognized that the Chief had a contractual right to take paid leave without using sick or vacation time.  [SOF 133-34]

The Plaintiffs' failings did not stop there.  They also neglected to track the Chief's working hours or days, or to make any effort to ascertain how much time he took off.  [SOF 146-47, 149, 154, 156, 158, 160, 163, 170-72, 190]  Moreover, in another inexcusable oversight, they never spoke to the Town Manager about whether the Chief was misusing his sick or vacation time.  [SOF 159, 166, 169]  Had they done so, the Town Manager could have easily clarified that the Chief submitted numerous requests to use sick and vacation time, which she personally approved.  [SOF 27, 138, 190]  Thus, it comes as no surprise that Plaintiffs were admittedly ignorant of whether there was any merit to the allegation that Chief misused sick or vacation leave.  [SOF 35, 50, 142, 145, 147-50, 153, 161, 173-74]

In sum, Plaintiffs' allegations regarding the Chief's use of sick and vacation time were based on nothing more than unsupported speculation and conjecture.  Because Plaintiffs were, at a minimum, disturbingly reckless in making the false accusations in the AZ POST letter, their speech is entitled to little (if any) protection.  *Moran v. Washington*, 147 F.3d 839, 849 (9th Cir. 1998) (recognizing that the falsity of speech "undermines [a plaintiff's] First Amendment interest for balancing purposes").

**B.      Plaintiff's Speech Should Not Be Protected Because They Acted For Selfish Reasons.**

Plaintiffs' speech is also unworthy of protection because they acted for selfish reasons, and *not* for the purpose of fostering public discourse.  It is well-settled that speech that deals with individual personnel disputes and grievances is not protected.  *See Connick*, 461 U.S. at 146-148; *Cochran*, 222 F.3d at 1201.  As the Ninth Circuit has noted, courts must ask the following question when determining if speech rises to the level of a public concern:  "Does the speech 'seek to bring to light actual or potential wrongdoing or a break of public trust,' or is it animated instead by 'dissatisfaction' with one's employment situation?"  *See, e.g., Desrochers v. City of San Bernardino*, 572 F.3d 703, 715 (9th Cir. 2009).  Here, the undisputed evidence shows that the Plaintiffs' speech was animated by a dislike for the Chief and a desire to protect themselves and improve their personal work environment – matters that do not relate to a public concern.

For instance, Kemp, Frakes, Ponce, and Norris testified that they complained to AZ POST because they were required to do so to avoid losing their certification as police officers.  [SOF 37-43, 52-57]  Kemp was, perhaps, the most blunt about it, admitting that he participated in the complaint, "to cover [his own] ass."  [SOF 52]  Thus, the undisputed evidence shows that Plaintiffs were acting within the scope of their duties as police officers, and for the purpose of preserving their own jobs – and not as "citizens." For these reasons alone, the Court should conclude that their speech was unprotected. *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006) ("We hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.").  Moreover, in a particularly candid admission, one Plaintiff testified that he did not care about what AZ POST did with his complaint – hardly the sentiment of someone who was attempting to raise issues of public concern.  [SOF 53]

The record is replete with additional evidence that Plaintiffs acted based on purely

8

personal motives.  For instance, Yeomans admitted that he joined in the complaint because he was dissatisfied with the way his own employment issues were handled by Chief Gilbert.  [SOF 58]  By the same token, Norris acknowledged that she was motivated by a desire to protect herself from becoming embroiled in a lawsuit relating to Chief Gilbert's alleged misconduct, and that she was hopeful that the complaints "would bring a better employment situation for [her] by making [her] work environment better." [SOF 59-60]  Likewise, Ponce testified that the Chief's behavior made the work environment unpleasant for him, and that he believed things would improve under a new Chief of Police.  [SOF 56]  Indeed, Plaintiffs were hopeful that Chief Gilbert would resign or be fired because they were unhappy with his leadership, making their actions tantamount to a self-serving coup.  [SOF 61, 203]  In sum, the undisputed evidence confirms that Plaintiffs' complaint was the type of self-interested grievance that falls outside the purview of the First Amendment.  *See, e.g., Desrochers*, 572 F.3d at 715 (holding that speech was unprotected based on undisputed evidence that plaintiffs "were motivated by their dissatisfaction with their employment situation brought on by 'a difference of personalities between the [plaintiffs] and Kimball.  For example, [one plaintiff] forthrightly described his job as 'unrewarding' so long as Kimball was his supervisor.'").

### C. Plaintiffs' First Amendment Rights Are Further Diminished Because They Raised Complaints In A Manner That Was Unnecessarily Disruptive.

Any purported First Amendment protection is also diminished because Plaintiffs ignored the chain of command.  Instead, they chose to raise their complaints in a highly disruptive manner that involved AZ POST, the Town Council, and the citizens of Quartzsite, thus reducing any protectable interest.  *See, e.g., Lytle v. City of Haysville*, 138 F.3d 857, 865 (10th Cir. 1998) ("In considering the time, place, and manner of the disputed speech, this circuit has considered whether the employee used less disruptive internal channels, rather than going outside the city administration.").  [SOF 47, 63-64, 89-92, 96-99, 103-04, 109]

9

Plaintiffs admitted that they understood the critical importance of following the chain of command in the police department.  [SOF 10, 20]  In addition, Plaintiffs acknowledged receiving the Town's Personnel Policy, which sets forth the following framework for raising concerns:

> A grievance is a complaint filed by a confirmed employee concerning circumstances thought by the employee to be unjust or incorrect. . . .  If an employee feels he or she has a complaint, the complaint must first be discussed with the immediate supervisor.  Every attempt should be made to resolve the complaint at the lowest level of supervision possible.

[SOF 45-46]  Nevertheless, Plaintiffs brazenly disregarded the chain of command and Town policy by going directly to a third party agency, AZ POST, rather than using less disruptive internal channels.  [SOF 47, 126]  In fact, as confirmation that Plaintiffs' complaints were misdirected, AZ POST referred the matter back to the Town for investigation.  [SOF 88]

To make matters worse, Plaintiffs then added fuel to the fire by using the threat of publicity as a weapon to achieve their goal of removing Chief Gilbert.  Plaintiffs agreed to be listed as signatories on a letter to the "Mayor, Members of Town Council, [and] Town Manager," stating in part:

> [M]embers of the Quartzsite Police Department, representing approximately 80% of the department, have made it known to members of the Town Council and other agencies our concerns involving conduct of [Chief Gilbert]. . . .  We have notified you that we have a vote of "No Confidence" in his leadership.  Left with little other choice, we have prepared the following press release to be submitted to the media within 24 hours after delivery of this letter, along with a copy of the press release, to those who are listed above.  We feel it is our duty to inform the citizens of this community and the rest of the public, that we do not stand behind Chief Gilbert. . . .  As it is apparent to us that a vote of No Confidence in Chief Gilbert is not enough to ask for his resignation with cause, we feel that notifying our constituents of the kind of man and Officer that is being allowed to run the Quartzsite Police Department is the only avenue left to convince you to start an honest investigation into a serious matter.

[SOF 96-97]  The letter included an attached press release, which stated in part:

> We have notified the Mayor, members of the Quartzsite Town Council and AZ POST of town policy and criminal violations by [Chief] Gilbert.  We have expressed a vote of "No Confidence" in his leadership, and have requested his resignation. . . .  Members of the Quartzsite Police Department, in a show of unity and represented by AZCOPS, at the Town

10

Meeting on June 14th, 2011, will give a public statement of "No Confidence" in Police Chief Jeff Gilbert and our reasons for the vote.

[SOF 98] After attempting to coerce the Town into removing Chief Gilbert, Plaintiffs then made good on their threat by delivering the press release to several media outlets.

[SOF 99-100] In addition, Plaintiffs and their representatives made further efforts to publicize their complaints at a June 14, 2011 Town Council meeting, notwithstanding the fact that an independent investigation of Chief Gilbert was ongoing. [SOF 104, 109, 175-77] At the meeting, Plaintiffs wore red to show their opposition to Chief Gilbert, and distributed letters to the public that repeated many of their allegations of misconduct, thus further enflaming the situation. [SOF 104-05, 110]

In discussing the impact of Plaintiffs' actions, the Assistant Town Manager stated:

> I think the concerns could have been handled very simply as personnel matters rather than becoming, you know, dirty laundry in public. I think they very specifically could have been handled completely differently. Quite frankly, I really wish they would have been. The fact that they tried to do this in public took this out of our hands, and it cost the Town enormous amounts of money. . . . Most of the concerns of that letter were personnel matters that were just, we felt, very easily taken care of at a, you know, mid-management level, a supervisory – first-level supervisory level. Instead they got blown out of proportion. They got aired in the public, and it divided the department.

[SOF 127] Because Plaintiffs chose to raise their concerns in a disruptive and inappropriate manner, they are entitled to little or no First Amendment protection. The decision in *Belcher v. City of McAlester* is instructive on this issue:

> Belcher could have used 'less disruptive internal channels,' *id.*, by explaining his concerns to his superior officers at the Fire Department and following the chain of command. Instead, Belcher chose to go outside the Department, speaking directly to Council members in violation of Department and City policy, diminishing the level of protection his speech might otherwise enjoy. . . . In sum, Belcher's narrow interest in expressing his concerns through external channels, in violation of City and Department policy, when weighed against the heightened interest of the City and the Department in maintaining harmony among firefighters and their officers, tips the scales on the City's side.

324 F.3d 1203, 1208-1209 (10th Cir. 2003). The same reasoning applies here with even greater force. As in *Belcher*, Plaintiffs disregarded the City's Personnel Policy, which required them to raise their concerns through internal channels. However, they went well

11

beyond the scope of the disruptive conduct in *Belcher* – which involved a complaint to the City Council – by complaining to AZ POST, threatening to issue a press release as leverage to force the Town to remove Chief Gilbert, and then publicizing their allegations to the Town Council, the media, and the general public.  [SOF 47, 89-92, 96-100, 104, 109]

In sum, Plaintiffs' speech is unprotected because (1) they made recklessly false allegations against the Chief of Police; (2) they acted for self-interested reasons, and not for the purpose of fostering public discourse; and (3) they raised their allegations in an unnecessarily disruptive manner.

### D. The Undisputed Evidence Shows That Plaintiffs' Rights (If Any) Were Substantially Outweighed By The Disruptive Impact Of Their Speech.

In contrast to the limited (and possibly non-existent) value of Plaintiffs' speech, the City had an overwhelming interest in preserving order, harmony, and discipline within the Police Department.  Numerous courts, including the Ninth Circuit, have repeatedly recognized that police departments, as paramilitary organizations, are given the highest deference when applying the *Pickering* balance.  *Cochran*, 222 F.3d at 1201. Here, Plaintiffs' purported right to make disruptive and false allegations of misconduct by Chief Gilbert is dwarfed by the Town's compelling interest in maintaining the orderly and efficient operation of the department responsible for public safety.

Significantly, the Ninth Circuit has held that, "in executing the *Pickering* balance, courts should not require government employers to demonstrate that the employee's speech actually disrupted efficient office operation; rather 'reasonable predictions of disruption' are sufficient."  *Moran*, 147 F.3d at 846.  Here, the Town had discretion to terminate Plaintiffs based on the likely ramifications of their actions, which involved false allegations of misconduct by the Chief of Police.  The consequences of this type of speech are easy to recognize.

As Plaintiffs concede, police officers are held to a higher level of integrity, and it is important for the police department to have a good relationship with the public in order

to provide effective law enforcement services.  [SOF 7-19, 23-25]  Furthermore, Plaintiffs understand that it is important for police officers to trust their colleagues, since they may be required to rely upon them for back-up in potentially life-threatening situations.  [SOF 22]  This concern is even more pronounced in this case because the Town has a small police force of 14 sworn officers, all of whom (including the Chief) are required to perform patrol duties.  [SOF 6, 21]

Against this backdrop, Plaintiffs' allegations could be reasonably expected to:   1) create discord between members of a small department who must work together closely to perform important public safety functions; (2) undermine the authority of the Chief of Police, who is the leader of a paramilitary organization that relies on chain of command; (3) divert important Town resources into a large scale investigation; (4) potentially endanger the lives of police officers and the public by breeding animosity between co-workers who might be called upon to back each other up in dangerous situations; and (5) cause members of the public to lose trust in the police, thereby impairing the department's ability to provide effective law enforcement services.  Based on these concerns alone, the Court should conclude that the *Pickering* balance weighs strongly in favor of the Town, and therefore grant summary judgment for Defendants.

However, and even though these reasonable predictions would be sufficient to support summary judgment in favor of Defendants, the Court need not rely solely on the mere possibility that Plaintiffs' complaint could be disruptive.  Here, the record is replete with undisputed evidence that each of foregoing concerns became a reality.

Once the complaint became common knowledge, an atmosphere of distrust, divisiveness, and discord became prevalent in the department.  According to Plaintiffs, Sgts. Garcia and Schultz took the Chief's side, while ten employees (including all of the Plaintiffs) were opposed to the Chief.  [SOF 65-68]  Indeed, Plaintiffs themselves testified regarding the following detrimental impact on the department after the complaint:

- Frakes acknowledged that the department was divided and suffered from low morale in the aftermath of the complaints, and testified that he personally observed a deterioration in the relationship between Chief Gilbert and Plaintiffs. Frakes also witnessed friction between Plaintiffs and the Chief's supporters, which made it more challenging to provide effective law enforcement services. In addition, Frakes cited two occasions on which he felt that the Chief or his supporters failed to provide appropriate or timely backup in potentially dangerous situations. [SOF 69-75]

- Ponce agreed that there was a lack of trust between Plaintiffs, on one hand, and the Chief and his supporters, on the other hand. Ponce also confirmed that his relationship with Chief Gilbert worsened after the allegations became public. In addition, Ponce was concerned about whether he could rely on the Chief and the Chief's supporters for backup, and became fearful for his own safety. [SOF 78-82]

- Yeomans testified that the atmosphere of divisiveness caused him anxiety about his ability to perform his job as a police officer. Yeomans also confirmed that the effectiveness of the department suffered, stating, "Nobody was doing traffic stops. Nobody was being proactive. They were just responding to emergency calls. . . . The morale of the department was on the floor." [SOF 77, 83]

- Norris testified that Chief Gilbert became more difficult to contact after the complaint. Moreover, she heard that he ignored a call for backup from a complaining officer. [SOF 84-85]

- Conley noticed that there was tension between the Chief and the other officers, and that the Chief no longer spoke to the complainants. As a result, she found it very stressful to work in the police department. In addition, Conley did not have confidence that the Chief and the Chief's supporters could work effectively with the other officers, since there was a lack of trust between the two groups. [SOF 86-87]

Not only did Plaintiffs' complaints disrupt the police department, but it forced the Town to invest significant resources in retaining a third party to conduct a comprehensive investigation into the allegations against Chief Gilbert, which involved interviews of

every police officer and took more than a month to complete.  [SOF 175-77]  As this Court has recognized, the disruptive impact of an investigation weighs in favor of the employer in the *Pickering* balance.  *See Carboun*, 2005 U.S. Dist. LEXIS 21950, at *16 ("[T]he Letter caused the City Manager to institute a substantial internal investigation. . . . Such an investigation consumes resources and distracts attention from the daily business of police work, carrying the potential for hindering the effective operation of the department.") (internal citations omitted).  In addition, the Town conducted a second investigation on the issue of whether Plaintiffs had made false allegations of misconduct by the Chief.  [SOF 178-79, 182]  During that time, the Town placed Plaintiffs on administrative leave pending the outcome, which resulted in an increase in crime in the Quartzsite community.  [SOF 182, 185]

As another relevant factor, Plaintiffs also fanned the flames by publicizing their allegations, which resulted in a combustible, toxic, and divisive atmosphere within the Town.  [SOF 96-102]  As the Ninth Circuit has expressly recognized, police officers are charged with preserving the integrity and image of the department, and therefore, speech that results in public denigration of the agency loses its protection.  *See Dible v. City of Chandler*, 515 F.3d 918, 928-29 (9th Cir. 2008).  These precise circumstances exist here.

Plaintiffs made efforts to publicize their complaints at two Town Council meetings, both of which degenerated into raucous affairs.  On June 1, 2011, a crowd of approximately 200 people showed up for a special meeting regarding the Plaintiffs' complaints, but there was no quorum.  [SOF 90-93]  The crowd became loud and disruptive, and people began shouting, "get rid of him," in reference to the Chief.  [SOF 93-95]  Unfortunately, the situation escalated further at a June 14 meeting, at which Plaintiffs distributed written materials regarding their complaint and authorized a spokesperson to make a public statement regarding their complaints.  [SOF 104, 109]  Plaintiffs and their supporters wore red at the meeting to signify their opposition to the Chief, and the Chief's supporters wore blue, further emphasizing the deep division within the department.  [SOF 105-108]  The undisputed evidence (including Plaintiffs'

testimony) shows that there was heightened tension, yelling, and animosity between the factions. In fact, the meeting escalated to a near riot, and the Chief was concerned for public safety. [SOF 108, 110-14]

At the close of the meeting, two police officers struggled to arrest an opponent of the Chief who was behaving in a disorderly manner. [SOF 115] Significantly, none of the Plaintiffs intervened to help their colleagues with the arrest; instead, Plaintiffs stood with their backs to the wall. [SOF 116] In the Chief's view, this incident confirmed the critical fracture within the department, and likely caused the community to lose trust in the department. [SOF 117-18]

The public disruption also spilled over into the community. Plaintiffs noticed that citizens were choosing sides between the Chief and the complainants, and showing their support by wearing red or blue – conditions that were detrimental to effective law enforcement. [SOF 8-9, 16-17, 101-02, 124-25] In addition, Ponce experienced backlash in the community, and Frakes observed the Chief's supporters following him and photographing the Plaintiffs' homes. [SOF 76, 119] The public disruption also manifested itself in media reports that portrayed the police department and community in an unflattering light. [SOF 120-22] As the Ninth Circuit has recognized, "police officers are quintessentially public servants and part of their job is to safeguard the public's opinion of them." *Dible*, 515 F.3d at 929. Here, Plaintiffs utterly failed at this important responsibility.

In sum, Plaintiffs' false allegations are worthy of little or no protection. In contrast, the Town's interests are so strong as to not just tip the balance in its favor, but to break the scale. The undisputed evidence shows that Plaintiffs' speech divided the department, impaired the efficiency of law enforcement, consumed the Town's resources, potentially endangered public safety, divided the community, and publicly discredited the Town. If Plaintiffs' speech does not lose its protection under these circumstances, then the *Pickering* balance will be eviscerated.

16

**III.    THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO IMMUNITY.**

Even setting aside the fact Plaintiffs' speech was unprotected, the individual defendants are entitled to summary judgment for multiple reasons.  As an initial matter, the record is devoid of any evidence that Town Manager Alex Taft or Chief Gilbert were involved in the termination Plaintiffs' employment.  Instead, the undisputed evidence shows that Assistant Town Manager Al Johnson was the sole decisionmaker, and that Johnson never consulted Taft or Gilbert on the subject.  [SOF 1, 179-84, 195-98]  While Plaintiffs may contend that Taft and Gilbert must have been involved in a purported conspiracy to retaliate against them, it is well-settled that a party cannot rely on unsupported and self-serving speculation to defeat summary judgment.  *See, e.g.,* *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (stating that "this court has refused to find a genuine issue where the only evidence presented is uncorroborated and self-serving testimony") (internal citation omitted); *Villodas v. Healthsouth Corp.*, 338 F. Supp. 2d 1096, 1104-05 (D. Ariz. 2004) (same).

Even if Taft and Gilbert were involved in the termination decisions (which they were not) all three individual defendants are immune from liability as a matter of law.  As public officials, the individual defendants are entitled to qualified immunity unless Plaintiffs prove that they violated "clearly established statutory or constitutional rights of which a reasonable person should have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Plaintiffs cannot meet this lofty burden.

As discussed above, Plaintiffs' speech was unprotected based on, among other things, the falsity of the sick/vacation allegations; the reckless manner in which they failed to investigate the allegations before accusing the Chief of serious misconduct; Plaintiffs' self-serving motives for making the accusations; Plaintiffs' callous disregard for the chain of command – a critical element of a paramilitary organization; the deleterious impact of the allegations on the efficient operation of the police department; and the resulting fracture among citizens, which manifested itself in raucous and rowdy disputes at Council meetings and threatened to tear at the very fabric of the community.

1    For these same reasons, the Court must conclude that Plaintiff's rights (if any) were not

2    clearly established.

3         As the Ninth Circuit has observed:  "Because the underlying determination

4    pursuant to *Pickering* whether a public employee's speech is constitutionally protected

5    turns on a context-intensive, case-by-case balancing analysis, the law regarding such

6    claims will rarely, if ever, be sufficiently 'clearly established' to preclude qualified

7    immunity under *Harlow* and its progeny."  *Moran*, 147 F.3d at 847.  Given the

8    overwhelming and undisputed evidence of the actual disruption caused by Plaintiffs'

9    false allegations against the Chief, Plaintiffs cannot seriously contend that this is the rare

10   case in which qualified immunity does not apply.  For this additional reason, the

11   individual defendants are entitled to summary judgment on the First Amendment claims.

12        Finally, for the same reasons that the individual defendants are entitled to qualified

13   immunity, there is insufficient evidence to support an award of punitive damages, which

14   requires proof of an evil motive or intent, or a reckless disregard of federally protected

15   rights.  *Broulette v. Starns*, 161 F. Supp. 2d 1021, 1028 (D. Ariz. 2001).

16   **IV.   PLAINTIFFS' CLAIMS UNDER A.R.S. § 38-532 ARE BARRED AS A**
         **MATTER OF LAW BECAUSE THEY HAVE ALREADY HAD THEIR**
17       **DAY IN COURT.**

18        Arizona Revised Statute § 38-532(H) provides that certain employees who believe

19   they have been terminated for whistleblowing may file a complaint with the State

20   Personnel Board.  Plaintiffs here chose that remedy.[4]  [SOF 209]  After briefing on the

21   merits, four different hearing officers all concluded that Plaintiffs failed to make out a

22   case as a matter of law.  [SOF 210]  The hearing officers' recommendations went to the

23   State Personnel Board, which adopted the hearing officers' recommendations on a

24   unanimous vote.  [SOF 211]  Pursuant to A.R.S. § 38-522(I), losing parties who avail

25   themselves of this procedure may appeal the State Personnel Board's decision to the

26

27   ─────────────────
     [4] Plaintiff Conley did not choose the administrative remedy, but that is because she had
28   no administrative claim and has no claim here because she was not a law enforcement
     officer.  Consequently, she is not a covered employee who can bring a claim pursuant to
     A.R.S. § 38-532.  *See* A.R.S. § 38-531(1) and (3).

Superior Court under Arizona's Administrative Review Act, which requires that any appeal be filed within 35 days of service of the Personnel Board's decision. A.R.S. § 12-904(A). This deadline has long since run, without Plaintiffs ever filing an appeal to the Superior Court. Thus, the dismissals of Plaintiffs' 38-532 claims are final and binding.

Whether the issue is framed in terms of issue preclusion, res judicata, or even election of remedies, Plaintiffs cannot get a second bite at the apple by seeking redress from this Court on a claim that they chose to litigate through the administrative process set forth in A.R.S. § 38-532. *See, e.g.*, Restatement (Second) of Judgments § 83(1) (1982) (If an administrative adjudication has the essential elements of an adjudication, and preclusion is consistent with the scheme of remedies, then "a valid and final adjudicative determination by an administrative tribunal has the same effects under the rules of res judicata, subject to the same exceptions and qualifications, as a judgment of a court"); *see also* 25 Am. Jur. 2d Election of Remedies § 1 ("[A]n election of remedies is the act of choosing between two or more different and coexisting methods of procedure and relief allowed by law on the same set of facts, where a party has but one cause of action, one right infringed, and one wrong to be redressed."). Even if the Court allowed Plaintiffs to re-litigate the claims here, the claims would still suffer from the fatal flaws identified in the briefing before the State Personnel Board. [SOF 210-11] As such, the Court should award summary judgment as a procedural and substantive matter.

## V.     PLAINTIFFS' DEFAMATION CLAIMS HAVE NO MERIT.

Frankly, it is difficult to identify what specific comments were made by Defendants that Plaintiffs view as defamatory. They identified none in the original or amended complaints. And in their depositions, some plaintiffs appeared not even to know that they were asserting such a claim. For example, when Plaintiff Norris was asked if she was asserting a defamation claim against the Town or any of the defendants in this case, she responded, "I don't know what you mean." [SOF 212] To clarify, she was asked, "are you suing for defamation?" to which she again responded, "I don't know

what that is.  I'm sorry."  [SOF 213]

It gets worse.  Plaintiff Yeomans testified in his deposition that he has never even reviewed either the original or amended complaints filed on his behalf (which is problematic in and of itself).  [SOF 214]  But in light of the fact that he has never reviewed the complaints, it's not surprising that when asked what it was that Defendant Gilbert allegedly did to defame him, he had no concept of what such a claim is and responded only that Gilbert defamed him "by not recalling all the incidents that he had with me."  [SOF 215]  This statement is just one example among many demonstrating the utter lack of evidence that any of the Plaintiffs have put forth in this litigation to establish the elements of a defamation claim, which is grounds for summary judgment in favor of Defendants.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986) (holding that summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").  That is particularly true in light of the fact that as law enforcement personnel, Plaintiffs are public figures and must prove the higher "actual malice" standard by clear and convincing evidence in order to establish liability.  *Turner v. Devlin*, 174 Ariz. 201, 205, 848 P.2d 286, 290 (1993); *Godbehere v. Phoenix Newspapers, Inc.*, 162 Ariz. 335, 343-44, 783 P.2d 781, 790-91 (1989); *see also Heuisler v. Phoenix Newspapers, Inc.*, 168 Ariz. 278, 282, 812 P.2d 1096, 1100 (Ct. App. 1991); *see also Carboun*, 2005 U.S. Dist. LEXIS 21950, at *25 (clear and convincing standard must be taken into consideration in ruling on summary judgment).  Because Plaintiffs cannot do that, summary judgment is appropriate.

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court enter summary judgment in their favor on all claims.

RESPECTFULLY SUBMITTED this 28th day of September 2012.

JACKSON LEWIS LLP


By:  /s/ Stephen B. Coleman
       Justin S. Pierce
       Stephen B. Coleman
       2398 E. Camelback Rd., Suite 1060
       Phoenix, AZ 85016
       Attorneys for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on September 28, 2012, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System, and an electronic copy was forwarded by the Court to the following CM/ECF registrant.

Jon D. Schneider
Charles D. Onofry
Dee Giles
Schneider & Onofry, P.C.
3101 N. Central Ave., Suite 600
Phoenix, AZ 85012-8985
Attorneys for Plaintiffs

By:   /s/Valerie Armstrong
4812-8399-4896, v. 1

21