Charles D. Onofry – 012837
Luane A. Rosen - 013391
Dee R. Giles – 025010
**SCHNEIDER & ONOFRY, P.C.**
3101 North Central Avenue, Suite 600
Phoenix, Arizona 85012-2658
Phone: (602) 200-1280; Fax: (602) 230-8985
E-mail: conofry@soarizonalaw.com

Attorneys for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA**

| | |
|---|---|
| Linda Conley; Heriberto Dominguez and Yoami Dominguez, husband and wife; Stephen Frakes; James C. Kemp and Reyna Kemp, husband and wife; Michelle Norris; William Ponce; and Herlan Yeomans and Eloina Yeomans, husband and wife, | No. 2:11-cv-01637-MEA |
| Plaintiffs, | **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON §1983 CLAIM FOR FIRST AMENDMENT RETALIATION** |
| vs. | **(Oral Argument Requested)** |
| Town of Quartzsite, a political subdivision; Alex and John Doe Taft; Jeffrey and Jane Doe Gilbert; and Albert and Jane Doe Johnson, | (Assigned the The Honorable Mark E. Aspey) |
| Defendants. | |

Pursuant to Rule 56, Fed.R.Civ.P., Plaintiffs ask this Court to grant summary judgment on their First Amendment Retaliation claim under 42 U.S.C. §1983. This Motion is supported by the following Memorandum of Points and Authorities and the accompanying statement of facts.

## I.     SUMMARY OF ARGUMENT

Plaintiffs are five[1] former officers and an administrative assistant with the Town of Quartzsite police department, who were terminated for reporting to the Town Council, Mayor, and AZPOST[2] (a state agency that certifies and investigates ethical violations by officers) their suspicion the Town's Chief of Police Jeff Gilbert was not properly reporting his use of sick and vacation time. Plaintiffs' suspicions were based on their own observations and information from

---

[1] The claims of former Plaintiff, Heriberto Dominguez, were dismissed with prejudice on 9/25/2012. [Doc. 87-1.]
[2] AZPOST stands for Arizona Peace Officer Standards and Training Board.

1    finance department employees.

2        Based solely on reporting this suspected impropriety, the Town suspended Plaintiffs.  It

3    later added other, pretextual reasons for some suspensions, but never waivered from its position

4    that reporting the chief's misuse of sick and vacation time was a substantial or motivating reason

5    for termination.

6        The Town justifies the terminations by claiming Plaintiffs knew the allegation was false

7    because a similar allegation had been investigated by DPS the year before.  In Defendants' view,

8    the DPS investigation "exonerated" Gilbert.  In truth, the Town knew the DPS investigation was

9    woefully deficient and in no way exonerated Gilbert.  This can be seen from the report itself.

10   The only way to determine whether the chief properly reported his sick and vacation time was to

11   conduct interviews (of the chief, town manager, and various officers) and obtain whatever leave

12   request forms the Gilbert filed with the finance department.   DPS did none of this, and

13   Defendants knew this.  Notably, even the DPS officers who did the investigation admit their

14   "investigation" in no way exonerated the chief.

15       Discharging Plaintiffs because of their statement about the chief misusing sick and

16   vacation time constitutes First Amendment retaliation in violate of 42 U.S.C. §1983 because the

17   statement was (1) on a matter of "public concern" (the perceived misuse of public money and

18   abuse of authority), (2) made in Plaintiffs' capacity as private citizens, (3) a substantial or

19   motivating factor in terminating Plaintiffs' employment, (4) an action on which the Town lacked

20   adequate justification, and (5) the Town would not have otherwise fired Plaintiffs.

21       Further, Defendants are not protected by qualified immunity because Plaintiffs' protected

22   free speech rights were already clearly established.  The assistant town manager, who made the

23   termination decisions, admits he knew these rights were well established.   However, he

24   mistakenly believed Plaintiffs' First Amendment rights were subordinate to a perceived violation

25   of the Town Code, which made it a basis for discipline to engage in conduct "that might bring

26   discredit to the town."

Accordingly, this Court should grant summary judgment on Plaintiffs' First Amendment claim.

**II.     SUMMARY OF RELEVANT FACTS**

    **A. The DPS Investigation into Chief Gilbert.**

Chief Gilbert is obligated, like every other officer, to report sick and vacation time taken off.  SOF ¶ 1.  In May 2010 and at the request of former Mayor Ed Foster and a former council member, DPS opened a criminal "inquiry" into, *inter alia*, allegations that Chief Gilbert committed a <u>criminal violation</u> by not reporting sick and vacation time.  SOF ¶ 2.  During its investigation, DPS never interviewed Chief Gilbert, Town Manager Alexandra Taft, or any officers (other than Ponce and Kemp) or finance department employees.  SOF ¶ 3.  DPS never obtained any finance department records regarding sick and vacation time reported by the chief.  SOF ¶ 4.  DPS never even received or reviewed the Town's personnel policy or the chief's employment contract, the only two documents that define Gilbert's reporting obligations. SOF ¶ 5.  In fact, DPS stopped its investigation when the complainants could not identify a specific date a violation may have occurred and because it received second-hand (and erroneous) information the chief could take any amount of time off without reporting as long as the town manager approved it.  SOF ¶ 6.  DPS "concluded" its so-called investigation by stating it "did not discover any criminal violations."  SOF ¶ 7.

The limited scope of the DPS investigation was confirmed by Detective Henderson, who testified at his deposition there was nothing to investigate because he was not provided with specific dates or time periods when Chief Gilbert was alleged to be absent on vacation or sick time.  SOF ¶ 8.  According to Henderson, the majority of the DPS report was focused on an alleged misuse of grant funds – not on the sick and vacation time – because there was never really a true complaint filed regarding the sick and vacation time.  SOF ¶ 9.

    **B. Chief Gilbert's Threatened Retaliation.**

After this investigation, Chief Gilbert obtained a copy of the DPS report and called a department meeting.  SOF ¶ 10.  Even though Chief Gilbert knew (or at least should have

known) the inadequacy of the investigation, he claimed DPS had exonerated him.  SOF ¶ 11. He then threatened retaliation, stating he knew which officers participated in the DPS investigation and there would be "repercussions."  SOF ¶ 12.  Chief Gilbert did not provide a copy of the DPS report that allegedly exonerated him to any of the officers. SOF ¶ 13.

Gilbert's statement that DPS "exonerated" him was categorically false.  In fact, the DPS report did not exonerate Gilbert.  As Detective Henderson testified, "The investigation shows that there was never enough brought forth to even investigate [the sick and vacation time] matter fully."  SOF ¶ 14.  Henderson's testimony is corroborated by Sergeant Pinnow, who testified that DPS was not able to say one way or the other whether Chief Gilbert failed to report sick and vacation time he took because, "We just did not have enough facts to continue our investigation."  SOF ¶ 15.  Certainly, this is a far cry from being exonerated.

## C.  The Officers Report the Suspected Ethical Violations to AZPOST.

AZPOST certifies peace officers throughout Arizona, investigates alleged ethical improprieties, and imposes discipline on officers.  Its role over officers is similar to the State Bar's role over lawyers.

In early May 2011, several officers gathered while off duty to draft a letter to AZPOST complaining about Chief Gilbert's conduct.  SOF ¶ 16.  The letter was a compilation of information and complaints from Conley and nine police officers, including two who were never terminated.  SOF ¶ 17.  On May 11, 2011, several Plaintiffs (and Officer Rodriguez, who was not terminated) – while off duty – delivered the letter to AZPOST.  SOF ¶ 18.

The officers prefaced their statements with words that proved to be prophetic in anticipating the retaliation that later ensued.  They wrote:

> We …write this letter with great hesitation, and only after much discussion and contemplation.  We hesitate because we consider ourselves a team of professional, dedicated, and educated individuals and it goes against our nature to go against the Chief of Police.  *We also hesitate because we fully believe that if this letter does not have the desired result, and we continue to work under administration, **there will most certainly be retaliation.***

SOF ¶ 19.  (Emphasis added.)

The AZPOST letter outlined more than a dozen improprieties that Plaintiffs' believed had been committed by Chief Gilbert in his capacity as police chief, including claims that he engaged in selective enforcement and ran license plates and/or criminal histories on political adversaries, their associates, or those he simply did not like.  SOF ¶ 20.  However, relevant to Plaintiffs' terminations was the claim that Chief Gilbert did not properly report his use of sick and vacation time:

> Chief Gilbert accrues "sick" and "vacation" time but when he chooses to take time off, which is a substantial amount of time, he doesn't report the time.  He never uses any of his "sick" or "vacation" time.  He doesn't even complete a time sheet, if he does complete one, it has only been recently.

SOF ¶ 21.

Plaintiffs also sent a separate letter to the Mayor and Town Council advising they "met with AZPOST to make a formal complaint against Police Chief Jeff Gilbert."  SOF ¶ 22.  Eventually, the Town received the AZPOST letter.  In response, the Town hired the Jackson Lewis law firm to conduct an internal investigation into the allegations <u>made against the chief</u>.  SOF ¶ 23.  Jackson Lewis issued a reported to the Town on July 7, 2011, concluding that some of the allegations were accurate while others were unsupported by the evidence.  SOF ¶ 24.

**D.  <u>The Town Investigates the Plaintiffs Who Reported the Chief's Conduct.</u>**

On July 19, 2011, town manager Defendant Taft appointed assistant town manager Defendant Johnson to act as personnel officer in the internal investigation <u>of the chief</u>.  SOF ¶ 25.  <u>There was no similar written appointment made to investigate the officers</u>.  Nonetheless, rather than investigate the chief, Johnson investigated the officers.  SOF ¶ 73.  *Johnson admits that, before firing Plaintiffs, he never independently verified how many hours Gilbert worked, how many hours Gilbert had reported taking off to the finance department, or how many hours of "informal time off" he was given and was not reported to finance.*  SOF ¶¶ 74-75, 77.  Rather, he either took the positions that Chief Gilbert either did not have to report his time because he was "exempt" or that, based on information he got from Defendant Taft, the chief had not violated his contract in terms of sick and vacation time.  SOF ¶¶ 76, 114.  Simply put, Johnson

conducted no actual, internal investigation of Gilbert.

Rather, on July 20, 2011, the very day after he was appointed, Johnson served Notices of Investigation on the six Plaintiff officers and three officers who have been reinstated, and served Conley with a Notice of Intent to Dismiss on July 19, 2011.  SOF ¶ 26.  The Notices alleged a violation of Town policy by "[e]ngaging in any conduct, on or off the job, that might bring discredit to the Town."  SOF ¶ 27.

The sole factual basis identified in the Notices to support the suspensions was the statement in the AZPOST letter that Chief Gilbert failed to properly report sick and vacation time, with Johnson claiming:

> "… you made an allegation against Chief Gilbert which you knew or had reason to know was baseless given your knowledge of the existence of the prior DPS investigation ….

SOF ¶ 28.

Plaintiffs were suspended, and shortly thereafter, Defendant Johnson issued a "Notice of Intent to Terminate Employment," repeating the allegation that Plaintiffs made a knowingly false allegation against the chief.  SOF ¶¶ 29-30.  As to Conley, the termination notice also referenced an allegation regarding telling the public the Town was under "Marshall Law."  SOF ¶ 31.  The Town also served Amended Notices on some officers, alleging one or two other very minor allegations, each of which were merely a pretext for firing Plaintiffs.  SOF ¶ 32.  Plaintiffs were given pre-termination hearings conducted by Defendant Johnson.  Following the notices and pre-termination hearings, Defendant Johnson terminated each of the Plaintiffs.[3]  SOF ¶ 33.

## III.   LEGAL ARGUMENT

### A.   Plaintiffs were Terminated in Retaliation for Exercising Their First Amendment Free Speech Rights.

"[A] state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression."  *Connick v. Myers*, 461 U.S. 138, 142 (1983).  Stated differently, a "state may not abuse its position as employer to stifle 'the First

Amendment rights [its employees] would otherwise enjoy as citizens to comment on matters of public interest.'"  *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009), *cert. denied*, 130 S.Ct. 1047 (2010), *quoting Pickering v. Board of Education*, 391 U.S. 563, 568 (1968).  This is because "some rights and freedoms [are] so fundamental to liberty that they cannot be bargained away in a contract for public employment."  *Borough of Duryea v. Guarnieri*, __ U.S. __, 131 S.Ct. 2488, 2493 (2011).  Citizens must not be "deprived of [these] fundamental rights by virtue of working for the government."  *Id.*

Under the landmark *Pickering* case, the Supreme Court defined the court's task in analyzing a First Amendment retaliation claim as seeking "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." 391 U.S. at 568. In fact, the "First Amendment interests at stake extend beyond the individual speaker" to the public, which has an important interest "in receiving the well-informed views of government employees engaging in civic discussion," *Garcetti v. Ceballos*, 547 U.S. 410, 419 (2006).  Such speech is a "necessity for informed, vibrant dialogue in a democratic society."  *Id.; see also City of San Diego v. Roe*, 543 U.S. 77, 82 (2004)("Were [public employees] not able to speak on [their employer's operations], the community would be deprived of informed opinions on important public issues.  The interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it.").

Since *Pickering,* the Ninth Circuit has settled on the following five-step sequential inquiry "to determine whether a public employee has alleged a violation of his First Amendment rights as a result of government retaliation for his speech:"

> (1)  whether the plaintiff spoke on a matter of public concern;
>
> (2)  whether the plaintiff spoke as a private citizen or public employee;

---

[3] Additional facts and testimony regarding Johnson's "investigation" of the issues and his decisions to fire some officer and not others are set forth in Plaintiffs' separate statement of facts.  See SOF ¶¶ 54-60.

(3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; and

(4) whether the state had an adequate justification for treating the employee differently from other members of the general public; or

(5) whether the state would have taken the adverse employment action even absent the protected speech.

*Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1102-03 (9th Cir. 2011); *Eng,* 552 F.3d at 1070.  The plaintiff has the burden of proof on the first three elements, at which point the burden shifts to the public employer to prove the last two.  *Clairmont*, 632 F.3d at 1103.

   1. <u>Plaintiffs Spoke on a Matter of Public Concern because Their Speech Involved Potential Police Misconduct and Misappropriation of Public Funds.</u>

Whether a plaintiff has spoken on a matter of "public concern" is a pure question of law.  *Connick*, 461 U.S. at 147-48, n. 7.  The 9th Circuit has "defined the scope of the public concern element broadly and adopted a liberal construction of what an issue of public concern is under the First Amendment."  *Clairmont,* 632 F.3d at 1103.  Whether speech addresses a public concern is determined by the "content, form, and context of a given statement, as revealed by the whole record."[4]  *Connick*, 461 U.S. at 147-48.  "[C]ontent is the greatest single factor in the *Connick* inquiry."  *Johnson v. Multnomah County*, 48 F.3d 420, 424 (9th Cir. 1995).

Plaintiffs' speech was on a matter of public concern, because it falls under one or more of the following:

- Speech that "relat[es] to any matter of political, social, or other concern to the community." *Connick*, 461 U.S. at 146; Speech where an employee seeks "to bring to light actual or potential wrongdoing or breach of public trust." *Id.* at 148; Speech addressing the "misuse of public funds, wastefulness, and inefficiency in managing and operating government entities." *Johnson*, 48 F.3d at 425; "Speech that is 'relevan[t] to the public's evaluation of the performance of governmental agencies.'" *Eng*, 552 F.3d at 1073 (citation omitted);Communications "on matters relating to the functioning of government." *Id.* at 1072 (citation omitted); speech "that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication." *City of San Diego*, 543 U.S. at 84; Speech addressing "[u]nlawful conduct by a government employee or illegal

---

[4] The "form" of speech refers to how the speech was made and to whom, while "context" refers to whether, for example, the speech occurred in the context of an internal power struggle or personal employment grievance." *Clairmont*, 632 F.3d at 1104.  Form and context become relevant only in a close cases where "the subject matter of a statement is only marginally related to issues of public concern." *Johnson*, 48 F.3d at 425.

activity within a government agency." *Thomas v. City of Beaverton*, 379 F.3d 802, 809 (9th Cir. 2004).

See also, *McKinley v. City of Eloy*, 705 F.2d 1110 (9th Cir. 1983).

Further, numerous courts have held that exposing official misconduct within a police department is of great public importance.[5]

Plaintiffs reported their suspicion to AZPOST, the Town Mayor, and Town Council that Gilbert was abusing the public trust by taking sick and vacation time without properly reporting it.  As a matter of law, Plaintiffs' speech involves a "matter of public concern."

    2.    <u>Plaintiffs Spoke as Private Citizens because They were Reporting what Any Other Citizen would have Reported Given the Public Importance of the Speech.</u>

Speech is made in the "capacity as citizen if the speaker 'had no official duty' to make the questioned statements, or if the speech was not the product of 'performing the tasks the employee was paid to perform.'"  *Eng*, 552 F.3d at 1071.  Nor does speech about abuse discovered at work mean the speech is made as a public employee rather than a private citizen.  *See Pickering*, *supra* at 572 (employees, like teachers "are, as a class, the members of a community most likely to have informed and definite opinions . . . it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal.")

As an illustration, in *Freitag v. Ayers*, 468 F.3d 528 (9th Cir. 2006), the Ninth Circuit held a prison guard's comments to a state senator were protected speech made "as a citizen" because she was doing what any citizen could do.  The court reasoned:

> Freitag acted ***as a citizen*** when she wrote letters to Senator Polanco and communicated with the Inspector General regarding her complaints of sexual harassment.  ***Her right to complain both to an elected public official and to an independent state agency is guaranteed to any citizen in a democratic society***

---

[5] In *Myers v. City of Highland Village*, 269 F.Supp.2d. 850 (E.D. Tex. 2003), the court held:

> Speech "complain[ing] of ***misconduct within the police department ... [is] speech addressing a matter of public concern***.

*Id.* at 857; *see also Branton v. City of Dallas*, 272 F.3d 730, 740 (5th Cir. 2001) ("Exposure of official misconduct, especially within the police department, is generally of great consequence to the public."); *Jackler v. Byrne*, 658 F.3d 225, 237 (2nd Cir. 2011)("police malfeasance consisting of the use of excessive force is plainly a matter of public concern."); *Thompson v. City of Starkville*, 901 F.2d 456, 463 (5th Cir. 1990)(officer's affidavit exposing possible corruption in the police force constituted a complaint of misconduct within the department that addressed a matter of public concern."

*regardless of his status as a public employee.* …  Under *Ceballos*, Freitag does not lose her right to speak as a citizen simply because she initiated the communications while at work or because they concern the subject matter of her employment.

*Id.* at 545 (emphasis added); *see also*, *Fulk v. Sandoval*, 2010 WL 1132560 (S.D. Ill. 2010), (part-time police officer who witnessed the mayor access juvenile records for no official purpose was acting as citizen in reporting conduct to the state attorney and village board). *Id.; See also Myers,* 269 F.Supp.2d. at 857 ("If releasing the speech to the public would inform the populace of more than the fact of an employee's employment grievance, the content of the speech may be public in nature.")

In the instant case, all the relevant factors demonstrate that Plaintiffs' statement was made in their capacity as private citizens.  As a threshold matter, Plaintiffs plainly stated in the AZPOST letter they were doing "the right thing for the Town of Quartzsite, *its citizens*, and its employees."  SOF ¶ 34.  Indeed, reporting concerns about a police chief's suspected abuse of public funds is something any citizen should and would do.  In this regard, the complaint was not about their workplace or work conditions.  Further, just as in *Fulk*, the speech was made while off duty and outside the police department chain of command to AZPOST, the Mayor, and Town Council, channels that are available to any citizen.  As noted by the court in *Frietag*, it is every citizen's right to complain to public entities and elected public officials regardless of whether they are also public employees.

Finally, it was not part of Plaintiffs' job duties to report this suspected abuse.  SOF ¶ 36. The officers' job duties are described in the Town Code as obligating them to enforce the Town Code and state statutes within the jurisdictional limits of the Town of Quartzsite.  SOF ¶ 35.  The officers did not present this complaint as part of a requested criminal investigation, there is no statute obligating the officers to report this conduct, nor did any part of the ethical duties imposed by their membership in AZPOST create any such duty.  SOF ¶¶ 37-38.

3.    Plaintiffs' Protected Speech was a Substantial or Motivating Factor in the Town's Adverse Employment Actions Against Them.

The final element Plaintiffs must establish is that their protected speech was a

"substantial or motivating factor" for firing Plaintiffs.  On this element, a "plaintiff need only prove that the protected activity was a 'substantial' factor in the decision to terminate; it is <u>not</u> <u>necessary</u> to demonstrate that the dismissal was based <u>solely</u> on these activities." *McKinley,* 705 F.2d at 1115 (citations omitted; emphasis added).

As to Plaintiff Ponce – this was the <u>only</u> basis for the Town's termination.  SOF ¶ 41. Even though the Town later added other stated reasons for the adverse action against some of the officers, it never waivered from its position that the report on sick and vacation time was a reason for terminations.  SOF ¶ 44.  Further, if the sick and vacation time statement was the <u>only</u> reason for discharging Ponce, it certainly must have been a substantial factor for the others.

4. <u>Defendants Cannot Meet Their Burden in Proving the Town had Adequate</u> <u>Justification to Defeat Plaintiffs' Protected Speech Rights.</u>

Because Plaintiffs have established the first three elements of First Amendment Retaliation, the burden shifts to Defendants to establish elements four and five. *Clairmont,* 632 F.3d at 1103.  The fourth element, whether the Town had adequate justification to terminate Plaintiffs' employment notwithstanding their protected speech, is more commonly known as the *Pickering* balancing inquiry.  *Eng,* 552 F.3d at 1071.  Under *Pickering*, Defendants must establish that the Town had a legitimate administrative interest in firing Plaintiffs that outweighed Plaintiff's First Amendment rights.  *Clairmont*, 632 F.3d at 1106-07.  That is, Defendants must show that discharging Plaintiffs for their protected speech was necessary for the police department to operate efficiently and effectively.  *Eng*, 552 F.3d at 1074; "Even where the speech criticizes the operations of a public safety official or entity, the *Pickering* analysis requires a balancing of the 'public and social importance' of the speech against the dissention it would cause *in the work place*."  *Mosholder v. Barnhardt*, 697 F.3d 443, 451 (6th Cir. 2012); *Sexton*, 210 F.3d at 912.

Cases analyzing this element focus on whether disruption resulted from the act or the content of the protected speech.  *Clairmont,* 632 F.3d at 1107.  In looking at the act of speaking, the court considers the manner, time, and place in which the speech took place.  *Id*.  Speech that

occurs at the office would be more likely to support disruption of the workplace, while speech that occurs away from the office and during the employee's free time cuts in favor of the employee's First Amendment rights. *Id.*

However, before the court undertakes the *Pickering* balancing test, "it is critical to determine whether the defendant has produced sufficient evidence that the speech had an adverse effect on the efficiency of the employer's operations." *Sexton*, 210 F.3d at 912. An employer's simple assertion the speech affected moral, without supporting evidence, is not sufficient. *Id*. Rather, defendants must prove "***actual, material and substantial disruption, or reasonable predictions of disruption in the workplace***." *Clairemont*, 632 F.3d at 1107; *Johnson*, 48 F.3d at 426 (requires proof that speech "severely damaged office harmony and working relationship.")

Disruption requires more than violating a "concept of loyalty." *Clairemont,* 632 F.3d at 1108. It requires proof that the speech "severely damaged office harmony and working relationships." *Johnson*, 48 F.3d at 426. *See also McKinley,* 705 F.2d at 1115 (the disruption must be "real, not imagined"); *Sexton*, 210 F.3d at 912 ("Mere allegations of disruption are insufficient.") Speech that alleges "potentially illegal misconduct of public officials occupies the 'highest rung of First Amendment hierarchy'" and requires the defendant to make a greater showing of disruption that was actually caused by the protected speech. *Sexton*, 210 F.3d at 913 (citation omitted).

In this case, Plaintiffs' speech regarding this matter of great public concern must be weighed against the disruption to the workplace caused by the officers reporting this suspected abuse.

As a preliminary matter, for Gilbert and Defendants to claim the allegations in the AZPOST letter "disrupted" the workplace is like the child accused of murdering his parents who seeks mercy from the court because he is an orphan. If there was any disruption, it was caused by Chief Gilbert's conduct, not by the speech bringing it to light. Indeed, it has been held that "if

the allegations of internal misconduct are indeed true, [the employee's] statements could not have adversely affected the proper functioning of the government since the statements were made for the very reason that the department was not functioning properly." *Brawner v. City of Richardson*, 855 F.2d 187, 192 (5th Cir. 1988).

Beyond this, Defendants' claim that the officers' letter caused disruption is, at a minimum, wildly speculative.  At worst, it is a complete fabrication.

There is no evidence whatsoever that police operations were affected.  SOF ¶ 84.  When first asked how the letter "disrupted police operations," Gilbert testified, "well number one … I had to be very careful as far as what my conversations were with them."  SOF ¶ 86.  When asked to describe what effect this speech had on the public health, safety, and welfare, Gilbert said, "I think in general there was a preoccupation on everybody's part, but I think the department was operating you know."  SOF ¶ 87.  Further, Gilbert never reported any problem with police operations to either Johnson or Taft.  SOF ¶ 85.

There is no evidence that morale was adversely affected in any material way.  Gilbert claims the letter created "tension between the officers" which he later agreed was really a "collegiality" issue.  SOF ¶ 88.  Not only does this not amount to "disruption," a "collegiality" issue existed long before the AZPOST letter was sent as evidenced by the fact that nine of the fourteen-person police force (almost 70%) gathered off duty to discuss its multiple complaints about Gilbert.  Indeed, Gilbert himself admitted there was already "fractures" within the department as a result of the 2010 DPS investigation.  SOF ¶ 89.

There is no evidence the individual officers' job performance was affected.  SOF ¶ 90.  Gilbert said, "I didn't see them on a regular basis …. So I really couldn't say on day to day."  SOF ¶ 91.  In fact, he could not list a single specific instance for any of the plaintiffs that showed their job performance was affected.  SOF ¶ 92.  Gilbert could only offer speculation some officers were only "doing their minimum job."  This was based on third-hand information he received from another supervisor "who believed" several officers were less productive because

they were "busy talking about the problems."  SOF ¶ 93.

No police procedures were changed because of the officers' complaint.  The only police procedure that changed during this time was that Gilbert requested that Sergeant Ponce record start times for officers who worked on a county task force.  SOF ¶ 94.

Defendants next claim the officers' complaint was responsible for citizens becoming disruptive at two town hall meetings that occurred in June 2011.  According to Gilbert, citizens were being disruptive by talking loud, voicing their opinions, and speaking out of turn.  SOF ¶ 95.  In each meeting, a person was arrested.  For starters, this claim is not even relevant to the inquiry because it does not involve disruption to the workplace or police operations.  This allegation involves the public's reaction to Chief Gilbert's conduct – not a problem within the police department.

Beyond this, Defendants' reasoning for blaming the officers for these disruptions is far fetched.  Acrimony at Quartzsite Town meetings is nothing new.  There are a number of known "troublemakers" (as Johnson and Taft refer to them) who have been disruptive at these meetings before to the point of being arrested.  SOF ¶ 96.  Taft admits there were problems within the town council dating back to 2008, pointing to the fact there have been six (6) mayors since then.  SOF ¶ 97.  In any event, Defendants first blame the officers by claiming these meetings would not have been so disruptive if Plaintiffs had filed an internal "grievance" as opposed to notifying AZPOST or the Mayor.  SOF ¶ 98.  But, this allegation does not fit into the "grievance" category.  A "grievance" is typically a complaint involving one's own circumstances.  Further, the Town grievance procedure would have had the officers taking their complaint to Gilbert first and then Taft, someone closely allied with Gilbert.  SOF ¶ 99.  As it is, Taft did get notice of the complaint.  Nor is a grievance even appropriate as it presupposes the public has no right to hear their police chief may be misusing public funds.  This argument also assumes the citizens were disruptive because of the officers' issues.  Finally, Johnson himself said that he did not fire any of the officers because they or the issue had gone public.  SOF ¶ 42.

Nor is there proof the officers instigated the citizens at either meeting. This too is complete speculation. Plaintiffs themselves never even spoke at the meetings. SOF ¶ 100. Taft doesn't even recall anyone talking about the officers or their complaints. SOF ¶ 101. The only "fact" Defendants can cite to is that some citizens were wearing t-shirts and hats showing support for the officers. SOF ¶ 102. But, this does not prove: (1) that this particular person was disruptive or (2) even if disruptive, it was for the officers' cause as opposed to some other complaint. Again, Taft admits there were several known troublemakers who "usually" caused trouble and complained." SOF ¶ 103.

Even Gilbert himself agreed the "chaos at one meeting was created predominately" by a Town citizen, Mick Roth, not the Plaintiffs. SOF ¶ 104. And Johnson doesn't even think Roth and Jones were arrested because of anything related to the officers' complaints. SOF ¶ 105.

Finally, Defendants claim that after the June 28, 2011, meeting where Jennifer Jones was arrested, it received dozens of letters and e-mails threatening both Taft and Gilbert which in their mind created a safety issue. Again, even if true, this is not relevant because it does not involve a disruption to the workplace or affect police operations. Further, not a single document has been produced to establish that any of the anger expressed by the town's people in these letters was the result of the AZPOST letter. To the contrary, the letters overwhelming complained bitterly about the fact that Jennifer Jones was deprived of her right to speak freely at the meeting and arrested.

Further, while Defendants may contend that Plaintiffs' speech is not protected because the statements were false, that argument also fails for either of two separate reasons.

First, defendants cannot possibly prove the statements were false. For starters, Plaintiffs had every reason to suspect an abuse. Plaintiff Ponce was responsible for keeping track of leave request forms which Gilbert was obligated to submit. He saw that Gilbert was taking off large amounts of time but not submitting a corresponding number of leave request forms. Comments made to him from finance department employees also led him to believe Gilbert was not

1    properly reporting. SOF ¶¶ 94, 135, 137-140.  Even before Ponce, former Town Manager Dan

2    Field saw that Gilbert would be gone for large unexplained amounts of time.  Notably, Field was

3    town manager for several years (including 2006-07) during which no leave request forms have

4    ever been filed. SOF ¶¶ 129-134.

5         Defendants have raised several bogus reasons why they claim the statements were false.

6    All the defendants have joined in the most incredible assertion: the statements were "knowingly

7    false" because the 2010 DPS investigation "exonerated" Gilbert.  As set forth above, that is

8    patently wrong and defendants know that.  *See infra at 2-3.*

9         Johnson – the person who terminated plaintiffs – also justified the terminations claiming

10   the statements were "knowing false" because Gilbert had no obligation to report to finance any

11   time whatsoever taken off.  SOF ¶ 50.  This is directly contrary to Chief Gilbert's contract,

12   which provides:

13        … there may be times that [he] as an unclassified employee takes informal time off
          without the necessity of reporting such time to payroll …. [a]ll other provisions
          relating to vacation, sick leave, … also shall apply to the [chief] as they do to other
14        employees of the town, including the accrual of vacation and sick leave and
          payment thereof upon termination of employment."

15   SOF ¶ 106.

16        In fact, as with other Town employees, Gilbert is obligated to accurately report to the

17   finance department sick and vacation time taken because, among other things, some

18   accumulated time can be cashed in.[6]  SOF ¶¶ 107-108.

19        Defendants next claim the statements were false based on how both Gilbert and Taft

20   interpret the contract.   They claim that if Gilbert works any amount of time beyond 40 hours in

21   a given week, then – with the permission of Taft – Gilbert can take off a similar amount of time

22   without reporting it.[7]  SOF ¶ 115.  But defendants have absolutely no way to prove that Gilbert

23   did not take off time that should have been reported.  To know whether Gilbert underreported,

24

---

25   [6] Sick time, which is not vested, is cashed out annually; while vacation time is a vested right that accrues up to a
     certain limit.  SOF ¶¶ 108-110.  The chief will be paid for unused vacation time when his employment ends.  *Id.*

26   [7] Former Town Manager Dan Field disagrees with both of these interpretations.  He says that Gilbert was obligated to
     report any time taken off, and only in an exceptional circumstance, would he as town manager think of telling Gilbert
     to take time off and not report it.  He expressly rejected Taft and Gilbert's interpretation.  SOF ¶ 119.

1   one needs to know how many hours Gilbert worked over 40 hours in a week, how much time he

2   actually took off, how many hours of time off were reported to finance, and how hours of

3   "informal time off" were approved by Taft and not reported.

4      Defendants have none of this evidence.  Gilbert does not document how many hours he

5   works and Taft has no way to know since she works in a different building.  SOF ¶¶ 123.  Taft

6   could not even estimate how many hours of "informal time off" she approved.  SOF ¶¶ 127-128.

7   Against this background, defendants cannot even possibly come close to proving the officers'

8   statement was false, let alone knowingly false.[8]

9      But, even if Defendants could prove the statement was false, this does not strip Plaintiffs'

10  speech of constitutional protection.  In *Johnson, supra*, the Ninth Circuit expressly held that even

11  recklessly false statements may be entitled to First Amendment protection:

12      … erroneous statement is inevitable in free debate, and … must be protected if the
        freedoms of expression are to have the "breathing space" that they "need … to
13      survive."   For this reason, constitutional protection is afforded some false
        statements.  In determining the level of protection to such statements, the Supreme
14      Court has traditionally balanced the interest in creating a "breathing space" for
        speech against the competing governmental interests associated with preventing
        injurious falsehood statements.
15                              *   *   *
        There is a significant First Amendment interest in encouraging public employees,
16      who have special access to facts relevant to debates on issues of public concern, to
        speak freely and make that information available.  There is a real danger that
17      stripping all First Amendment protection from recklessly false statements may
        inhibit the flow of accurate information from public employees who are uncertain
18      about whether they have accumulated a legally sufficient factual basis for their
        statements.
19                              *   *   *
        We conclude, therefore, that recklessly false statements are not per se unprotected
20      by the First Amendment when they substantially relate to matters of public
        concern.  *Instead, the recklessness of the employee and the falseness of the
        statements should be considered in light of the public employer's showing of actual
        injury to its legitimate interests, as part of the Pickering balancing test.*

21  *Johnson,* 48 F.3d at 424.

22      Thus, given the high public importance of the information, the basis for plaintiffs' belief,

23  the inherent difficulties in proving falsity, and the absence of any actual injury to police

24  operations, these statements – even if ultimately proven false – are protected.

25

26

---

[8] Additional facts supporting that the chief was required to report his sick and vacation time, except under exceptional
circumstances, are set forth in Plaintiffs' separate statement of facts.  SOF ¶ 120.

5. Defendants Cannot Meet Their Burden of Proving the Town would have Terminated Plaintiffs' Employment Absent the Protected Speech.

Defendants must also prove the Town would have terminated Plaintiffs even without the protected speech. *Clairmont,* 632 F.3d at 1108. This element addresses the situation where there are other stated reasons for the adverse employment action and asks whether the public employer "would have taken the adverse action "if the proper reason alone had existed." *Id.*

As to Ponce, ***there was no reason other than the protected speech given by Defendants for his termination.*** SOF ¶ 41. And as to plaintiffs Frakes and Norris who had charges added after the initial suspension, Johnson could not say he would have discharged them for those additional reasons. SOF ¶¶ 65, 70. Thus, defendants cannot possibly meet their burden as to these plaintiffs. For the remaining plaintiffs, the additional charges are clearly a pretext having been raised only after the initial suspension in order to justify their improper actions. SOF ¶¶ 61-72. These included allegations that one or more of the Plaintiffs improperly took time off to deliver the letter to AZPOST. SOF ¶¶ 62, 66.

Further, the Town has never said it relied on the Plaintiffs' performance evaluations to fire them, which would be the true indicator of whether or not the Town would have fired Plaintiffs absent the protected speech. *See, e.g., Mt. Healthy City School Dist. v. Doyle*, 429 U.S. 274, 286-87 (1977); *Clairmont*, 632 F.3d at 1108. None of the Plaintiffs were on probation or under any type of disciplinary action. In fact, at the time Plaintiffs wrote and delivered the AZPOST letter, none of them had poor performance records.

Simply put, Defendants cannot establish that, but for the protected speech, Defendants would have terminated Plaintiffs anyway.

**B. Defendants are Not Protected by Qualified Immunity because Plaintiffs' Protected Free Speech Rights were Clearly Established at the Time Plaintiffs were Terminated.**

Once a plaintiff establishes a violation of his constitutional rights, a government official is only entitled to qualified immunity "[i]f the right was ***not*** clearly established at the time of the violation." *Clairmont*, 632 F.3d at 1109 (emphasis added). "Whether the law was clearly

1  established is an objective standard; the defendant's 'subjective understanding of the

2  constitutionality of his or her conduct is irrelevant.'" *Id.* at 1109. "Closely analogous case law is

3  *not* required to show that a right was clearly established" and "[t]he facts of already decided

4  cases do not have to match precisely the facts with which [the government employer] is

5  confronted." *Id.* Rather, there must simply be "some parallel or comparable factual pattern." *Id.*

6      Without question, it was well established at the time the Town discharged Plaintiffs that a

7  public employer cannot discharge a public employee in retaliation for speaking on a matter of

8  public concern and that police misconduct and/or misuse of public funds are matters of public

9  concern. As was true in *Robinson, supra*, relevant decisions defining the scope of Plaintiffs'

10  constitutional rights were decided well before their jobs were terminated in 2011, "giving

11  Defendants adequate notice that their actions would violate Plaintiffs' First Amendment rights."

12  566 F.3d at 826. In 1968, the Supreme Court ruled in *Pickering* that "the First Amendment

13  protects employee speech on matters of 'legitimate public concern." *Robinson, id., quoting*

14  *Pickering*, 391 U.S. at 571-72. By 1983, it was "clear that only a 'real, not imagined, disruption'

15  might outweigh the expressive interests of the employee, that this exception cannot serve as a

16  'pretext,' and that 'employers would be required to make an even' stronger showing of

17  disruption when the speech dealt … directly with issues of public concern." *Id., quoting*

18  *McKinley, supra*, 705 F.2d at 1114. By 1988, the "'misuse of public funds, wastefulness, and

19  inefficiency in managing and operating government entities' had been held 'matters of inherent

20  public concern.'" *Id., quoting Roth, supra*, 856 F.2d at 1405.

21      Notably, Defendant Johnson concedes he was aware that he could not discharge

22  Plaintiffs for exercising their First Amendment rights. Johnson expressly testified that, at the

23  time he terminated Plaintiffs, he was aware that the Town could not terminate or retaliate against

24  an employee for engaging in protected speech. SOF ¶ 45. Johnson further acknowledged his

25  belief that officers retain the same rights as ordinary citizens to complain about things. SOF ¶¶

26  46-47.

Thus, at the time Defendants acted in 2011, it is undisputed "both the constitutional protection of employee speech and a First Amendment cause of action for retaliation against protected speech were clearly established and potentially applicable to Defendants' conduct." *Robinson*, 566 F.3d at 826.

## CONCLUSION

Defendants retaliated against Plaintiffs because they told the Mayor, Town Council, and AZPOST that Chief Gilbert did not properly report vacation and sick time.  If true, the chief committed an abuse of public trust and misused public funds.  The public has an inherent right and need to know whether it can trust its Chief of Police.  Defendants cannot substantiate that Plaintiffs' complaints to AZPOST, the Mayor, and the Town Council caused any greater level of disruption than already existed without the letters since the letters only memorialized what all the officers had already discussed with each other.  Notably, the letter was signed by 80% of the police force.  For all the foregoing reasons, Plaintiffs respectfully request that this Court enter an order granting summary judgment in their favor and against Defendants on Plaintiffs' First Amendment retaliation claim, entitling them to an award of damages for back pay, mental and emotional distress, and attorneys' fees and costs.[9]

Dated this 28th day of September, 2012.

SCHNEIDER & ONOFRY, P.C.


By s/Charles D. Onofry
            Charles D. Onofry
            Luane A. Rosen
            Dee R. Giles
            3101 N. Central Avenue, Suite 600
            Phoenix, Arizona  85012-2658
            Attorneys for Plaintiffs

---

[9] Should the court grant summary judgment in favor of Ponce only based on the sole reason given to terminate his employment, the remaining Plaintiffs ask the court to grant them summary judgment on both the defense of qualified immunity and on the first four elements of their First Amendment claim, leaving only the issue of whether Defendants can prove that Plaintiffs would have been fired absent the protected speech as the only issue for trial on this claim.

☒    I hereby certify that on September 28, 2012, I electronically transmitted the attached document to the Clerk's office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Justin Scott Pierce
Jackson Lewis LLP
2398 E. Camelback Road, Suite 1060
Phoenix, AZ  85016-3451
Attorneys for Defendants

s/Danijela Bakovic