Charles D. Onofry – 012837
Luane A. Rosen - 013391
Dee R. Giles – 025010
**SCHNEIDER & ONOFRY, P.C.**
3101 North Central Avenue, Suite 600
Phoenix, Arizona 85012-2658
Telephone: (602) 200-1280
Fax: (602) 230-8985
E-mail: conofry@soarizonalaw.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Linda Conley; Heriberto Dominguez and Yoami Dominguez, husband and wife; Stephen Frakes; James C. Kemp and Reyna Kemp, husband and wife; Michelle Norris; William Ponce; and Herlan Yeomans and Eloina Yeomans, husband and wife,<br><br>                    Plaintiffs,<br><br>vs.<br><br>Town of Quartzsite, a political subdivision; Alex and John Doe Taft; Jeffrey and Jane Doe Gilbert; and Albert and Jane Doe Johnson,<br><br>                    Defendants. | No. 2:11-cv-01637-MEA<br><br>**PLAINTIFFS' SEPARATE STATEMENT OF FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON §1983 CLAIM FOR FIRST AMENDMENT RETALIATION**<br><br>**(Oral Argument Requested)**<br><br><br>(Assigned to The Honorable Mark E. Aspey) |

Pursuant to Rule 56, Fed.R.Civ.P., and Rule 56.1(a), L.R.Civ.P., Plaintiffs, through their undersigned counsel, hereby submit their separate statement of facts in support of their Motion for Summary Judgment on their §1983 Claim for First Amendment Retaliation.

**The DPS Investigation into Chief Gilbert**

1.                    Chief Gilbert is obligated, like every other officer, to report sick and vacation time taken off.  *See* Section 5 of "Employment Renewal of Town Officer" dated 2/8/2011 (Chief Gilbert's contract), attached as Exhibit "A"; and pp. 25-37 of The Town of Quartzsite's Personnel Policy, attached as Exhibit "B."

2.      In May 2010 and at the request of former Mayor Ed Foster and a Council member, DPS opened a criminal "inquiry" into allegations that Chief Gilbert committed a underline criminal violation by not reporting sick and vacation time to the Town finance director and by improperly spending grant money.  *See* DPS Criminal Investigation Report, DR #2010-026192, attached as Exhibit "C" (first 15 pages).

3.      During its investigation, DPS never interviewed Chief Gilbert, Town Manager Alexandra Taft, or any police officers (other than Ponce or Kemp) or finance department employees about the sick and vacation leave issue.  *Id.*; *See also* 12/29/2011 deposition of Det. Jason Henderson at 13-16, attached as Exhibit "D."

4.      DPS never obtained any finance department records regarding sick and vacation time reported by the chief.  Exhibit "C."

5.      DPS never received or reviewed the Town's personnel policy or the chief's employment contract.  *Id.*

6.      DPS stopped its investigation when the complainants could not identify a specific date a violation occurred and because it received second-hand (and erroneous) information the chief could take any amount of time off without reporting as long as the town manager approved it.  *See* Exhibit "D" at 16, 19; 12/21/2011 deposition of Sgt. Jennifer Pinnow, at 21-22, attached as Exhibit "E;" and Exhibit "A."

7.      DPS "concluded" its so-called investigation by stating it "did not discover any criminal violations committed by" Chief Gilbert.  Exhibit "C."

8.      DPS Det. Jason Henderson testified that there was nothing to investigate because he was not provided with specific dates or time periods when Chief Gilbert was alleged to be absent on vacation or sick time.  Exhibit "D" at 16.

9.      According to Henderson, the majority of the DPS report was focused on an alleged misuse of grant funds – not on the sick and vacation time – because there was never really a true complaint filed regarding the sick and vacation time.  *Id.* at 17-18.

**Chief Gilbert's Threatened Retaliation**

10.      After the DPS investigation, Chief Gilbert obtained a copy of the DPS report and called a department meeting with the Town's police department.  *See* 6/7/2012 deposition of Chief Jeffrey Gilbert at 20-22, attached as Exhibit "F."

11.      Even though Chief Gilbert knew (or at least should have known) the inadequacy of the investigation, he claimed DPS had exonerated him.  *Id.* at 23; *See also* 8/1/2012 deposition of Sgt William Ponce at 41-42, attached as Exhibit "G."

12.      Chief Gilbert then <u>threatened retaliation</u> for any officers involved in the DPS investigation against him, stating he knew the names of the officers that participated and there would be "repercussions."  Exhibit "G" at 42; See also Affidavit of William Ponce at ¶12, attached as Exhibit "O."

13.      Chief Gilbert did not provide a copy of the DPS report that allegedly "exonerated" him to any of the officers.  Exhibit "F" at 22; Exhibit "G" at 42.

14.      The DPS report did <u>not</u> exonerate the Chief; rather, as Detective Henderson testified, "The investigation shows that there was never enough brought forth to even investigate [the sick and vacation time] matter fully."  Exhibit "D" at 19.

15.      Henderson's testimony is corroborated by Sgt Pinnow, who testified that DPS was not able to say one way or the other whether Chief Gilbert failed to report sick and vacation time he took because, "We just did not have enough facts to continue our investigation."  Exhibit "E" at 20.

**The Officers Report Suspected the Suspected Ethical Violations to AZPOST**

16.      In early May 2011, several officers gathered while off duty to draft a letter to AZPOST complaining about Chief Gilbert's conduct.  *See* 8/3/2012 deposition of Lynn Norris at 49-52, attached as Exhibit "H."

17.　　　　　　The letter was a compilation of information and complaints from Conley and nine police officers, including two who were never terminated.  *Id.; See also* 7/30/2012 deposition of Linda Conley at 33-36, attached as Exhibit "I."

18.　　　　　　On May 11, 2011, Plaintiff Frakes, Plaintiff Kemp and Officer Rodriguez and Officer Dominguez – while off duty – delivered the letter to AZPOST.  *See* 3/2/2012 deposition of Felipe Rodriguez at 29, attached as Exhibit "J."

19.　　　　　　The officers prefaced their statements with words that proved to be prophetic in anticipating the retaliation that later ensued.  They wrote:

> We …write this letter with great hesitation, and only after much discussion and contemplation.  We hesitate because we consider ourselves a team of professional, dedicated, and educated individuals and it goes against our nature to go against the Chief of Police.  *We also hesitate because we fully believe that if this letter does not have the desired result, and we continue to work under administration, **there will most certainly be retaliation**.*

*See* Letter to AZPOST at 1, attached as Exhibit "K" (emphasis added).

20.　　　　　　The AZPOST letter outlined more than a dozen improprieties that Plaintiffs' believed had been committed by Chief Gilbert in his capacity as Chief of Police, including claims that he engaged in selective enforcement, and ran license plates and/or criminal histories on political adversaries and people who associated with political adversaries or those he simply did not like.  Exhibit "K"; Exhibit "O" at 13, 15.

21.　　　　　　Relevant to the terminations of Plaintiffs' employment was the claim that Chief Gilbert did not properly report his use of sick and vacation time:

> Chief Gilbert accrues "sick" and "vacation" time but when he chooses to take time off, which is a substantial amount of time, he doesn't report the time.  He never uses any of his "sick" or "vacation" time.  He doesn't even complete a time sheet, if he does complete one, it has only been recently.

Exhibit "K" at 2.

22.　　　　　　Plaintiffs sent a separate letter to the Mayor and Town Council advising they "met with AZPOST to make a formal complaint against Police Chief Jeff

Gilbert." *See* letter to "Mr. Mayor, Members of the Council, and citizens of Quartzsite," attached as Exhibit "L."

23.    In response to the complaints, the Town hired the Jackson Lewis law firm to conduct an internal investigation into the allegations made against the chief. *See* 2/8/2012 deposition of Albert Johnson at 39-43, attached as Exhibit "M."

24.    Jackson Lewis issued a report to the Town on July 7, 2011. *Id.*

**The Town Investigates the Plaintiffs Who Reported the Chief's Conduct**

25.    On July 19, 2011, town manager Defendant Taft appointed assistant town manager Defendant Johnson to act as personnel officer in the internal investigation of Chief Gilbert. *See* 7/19/2011 Memorandum from Taft to Johnson, attached as Exhibit "N."

26.    On July 20, 2011, the very day after Johnson was appointed to investigate Gilbert, Johnson served Notices of Investigation on the six Plaintiff officers and three officers who have been reinstated; and Conley was served with a Notice of Intent to Dismiss on July 19, 2011. *See* 7/20/2011 Notice of Investigation and Intent to Interview (the officer), attached as Exhibit "P" and Notice of Intent to Dismiss (Conley) from Employment, attached as Exhibit "Q."

27.    The Notices alleged a violation of Town policy by "[e]ngaging in any conduct, on or off the job, that might bring discredit to the Town." *Id.*

28.    The sole factual basis in the Notices to support the suspensions was the statement that Chief Gilbert failed to properly report sick and vacation time, with Johnson claiming:

> "… you made an allegation against Chief Gilbert which you knew or had reason to know was baseless given your knowledge of the existence of the prior DPS investigation ….

*Id.*

29.    Plaintiffs were suspended. *See* Exhibits "P" & "Q."

30.         Shortly thereafter, Defendant Johnson issued a "Notice of Intent to Terminate Employment," repeating the allegation that Plaintiffs made a knowingly false allegation against the chief.  *See* Exhibit "Q" as to Conley; and the Notices of Intent to Terminate Employment of each of the officers, attached collectively as Exhibit "R."

31.         The Notice served on Conley referenced the AZPOST letter, as well as an allegation she told the public the Town was under "Marshall Law."  Exhibit "Q."

32.         The Town also served Amended Notices on some officers, alleging one or two other very minor allegations, each of which were merely a pretext for firing Plaintiffs.  *See* Amended Notices (collectively), attached as Exhibit "S."

33.         Following the notices and pre-termination hearings, Defendant Johnson terminated each of the Plaintiffs.  *See* Notices of Termination, attached collectively as Exhibit "T."

**Public Matter – Officers Report as Citizens**

34.         Plaintiffs presented their letter to AZPOST in their capacity as citizens.  In their letter to AZPOST, Plaintiffs plainly stated they were doing "the right thing for the Town of Quartzsite, ***its citizens***, and its employees."  Exhibit "K" at 1.

35.         The officers' job duties obligate them to enforce the Town Code and state statutes within the jurisdictional limits of the Town of Quartzsite.   Quartzsite Town Code Section 4-1-5(A), attached as Exhibit "U."

36.         Plaintiffs' job descriptions did not require they report their concerns about Chief Gilbert's conduct to AZPOST, the mayor, or town council.  Exhibit "O" at ¶19; *see also* Quartzsite Town Code Section 4-1-5, attached as Exhibit "U."

37.         The officers did not present this complaint as part of a requested criminal investigation.  Exhibit "O" at 17-19.

38.        None of the ethical duties imposed by the officers' membership in AZPOST create any duty to report this suspected misconduct.  *See* AAC Section R13-5-101, *et seq*.

39.        Chief Gilbert admits the issue of whether he was abusing the public trust by taking sick and vacation time without properly reporting and accounting for it became "a matter of public interest."  *See* Testimony at Kemp's 1/4/2012 Personnel Advisory Board Hearing, Volume I, at 134, attached as Exhibit "V."

**Basis of Johnson's Decision to Terminate Plaintiffs**

40.        The reasons Johnson terminated the officers are for those reasons stated in the notices.  Exhibit "M" at 130.

41.        The sole basis for the Town's termination of Ponce was the allegation regarding the statement about Chief Gilbert's misuse of vacation and sick time. Exhibit "S" at Amended Notice of Investigation of Ponce.

42.        The fact that the issues had gone public was <u>not</u> a factor in Johnson's decision to terminate the Plaintiffs, although he was not happy about it.  Exhibit "M" at 153 & 162.

43.        As to the Plaintiffs other than Ponce, the initial notices also referenced <u>only</u> the report of vacation and sick time as the reason for the adverse action. Exhibit "R."

44.        Even though the Town later added other stated reasons for the adverse action against some of the other officers, it never waivered from its position that the report on sick and vacation time was a reason for terminations.  Exhibit "S."

45.        At the time he terminated Plaintiffs, Johnson was aware that the Town could not terminate or retaliate against an employee for engaging in protected speech. Exhibit "M" at 163-64.

46.          Johnson agrees Plaintiffs retain their rights as public citizens to complain about the things that citizens do.  *Id*. at 167-68.

47.          Johnson did not feel this was a matter of infringing their right to free speech as he agrees everybody has the right to say what they want under the First Amendment because he believed the terminations were justified under the Town code.  *Id*. at 164.

48.          Johnson terminated Plaintiffs and "went after them collectively because they all signed [the AZPOST letter]  … they all authored it as far as we were concerned." *Id*. at 142-43.

49.          Johnson's biggest concern was the officers had been untruthful.  He decided to terminate the Plaintiffs once he determined the statement regarding Gilbert's misuse of sick and vacation time was false.  *Id*. at 129-132.

50.          Johnson believed the statement about the chief's misuse of reporting sick and vacation time was untruthful because he believed Gilbert was exempt from having to report his time taken off at all.  *Id.* at 33, 93, 99, 101, 103, 109.

51.          Johnson does not know whether he would have terminated Plaintiffs if it turned out the allegations were true.  Exhibit "M" at 165-66.

52.          Johnson did not try to assess whether there were different degrees of knowledge or culpability regarding the statement on the chief's use of sick and vacation time, saying "The reason is because they were all at the same meeting." *Id*. at 150.

53.          Johnson did not take into consideration who wrote what parts of the AZPOST letter, and was interested only in whether the officers knew about the 2010 DPS report and attended that meeting.  *Id*. at 126-28.

54.          Although Johnson first claimed he made no attempt to distinguish level of culpability for making the statement regarding the chief's misuse of reporting sick and vacation time, he later accepted back for employment Officers Ruvalcaba, Rodriguez, and

Villafana claiming the six terminated officers "were the ones that had the most to do with the letter" and "the three that were reinstated were the ones that were just generally pissed off that the situation had gotten as out of control as it had and that they had been led down the wrong road, they had been misled…" *Id*. at 137, & 148-49.

55.	Officers Rodriguez, Ruvalcaba, and Villafana were all involved in authorship of parts of the AZPOST letter.  Exhibit "J" at 17-23; *see also* 3/2/12 Deposition of Alejandro Ruvalcaba at 8-14, attached as Exhibit "CC."

56.	Johnson did not terminate Officer Rodriguez because he felt Rodriguez was "led down the path with these other officers, " didn't know what he signed, and didn't see the completed document although he did not ask Rodriguez about his knowledge of the specific statement regarding the chief's use of sick and vacation time.  Exhibit "M" at 137-38.

57.	Johnson did not fire Ruvalcaba because even though he knew of the letter, Ruvalcaba claimed not to know the contents of the AZPOST letter, felt he had "very little to do with the whole situation" and had come to the chief and said, "I don't want any part of this shit." *Id*. at 140-41.

58.	Johnson did no further investigation to determine whether Ruvalcaba was being accurate when he said he did not know about the contents of the letter. *Id*. at 142-43.

59.	Johnson accepted Ruvalcaba's statement he was not aware of the complete contents of the letter but not the other officers' similar representations because Ruvalcaba came forward and he felt Ruvalcaba was taken advantage of.  *Id*. at 143.

60.	Villafana was not terminated for the same reasons. *Id*. at 147.

**Additional Charges Against Some of the Plaintiffs**

61.	As to officer Plaintiff Frakes, the Town included the following additional allegations in its Amended Notice: absence without approved leave and falsification

of town records.  Specifically, Frakes was charged with falsely completing a timecard and being absent without approved leave on May 11, 2011.  Exhibit "S" at Amended Notice of Frakes.

62.     Johnson claimed that on May 11, 2011 Frakes turned in a timecard that said he was working and in Phoenix.  Johnson then corrects himself and says that Frakes reported "I was going to do a trade off.  We do it all the time."  Exhibit M at 174.  By that, he thought Frakes meant that he would put in extra hours.  *Id*.

63.     This issue concerning Frakes was brought up by the Task Force which submitted a timecard to Gilbert at the very beginning when they were trying to figure out whether they needed to start an investigation or not, but was not included in the initial notice of investigation.  *Id*. at 174.

64.     Johnson admits that there were several remedies for this alleged violation by Frakes which could have included administrative leave or something in the personnel file.  *Id*. at 175.

65.     Johnson cannot say whether he would have terminated Frakes simply for the additional infraction claiming "I sort of hesitate to say what I could or could not do because I don't know exactly what they could or could not say under Brady."  *Id*. at 174-176.

66.     As to officer Plaintiff Kemp, the Town included the following additional allegations in its Amended Notice: absence without approved leave and abusing sick leave privileges.  Exhibit "S" at Amended Notice of Kemp.

67.     Plaintiff Norris was also charged with falsely denying during her interview that she had written all or part of the four page AZPOST letter.  The actual tape of the interview refutes this charge.  *See* Transcript of Norris Pre-Termination Hearing attached as Exhibit "BB."

68.         Norris was also charged with not being at her home which was her assigned place of duty during suspension.  Specifically, Johnson testified that on August 29 he picked up a message at 8:10 AM to call Michelle.  He returned her call several times between 8:30 and 11:08 but no one answered.  There was no message. Exhibit M at 171.  Johnson then told the town attorney who suggested that he go down to Norris' home.  He and Sergeant Schultz went to Norris' house, but nobody was home.  *Id*. at 171.  They then went next door to her parent's house and were told Shelly was in Phoenix.  *Id*. at 171.  He later learned that she had a doctor's appointment.  *Id*. at 171-72. Shelly later called him at around 11:20 to tell him she was at the doctor.  Johnson says "She did not get prior approval, approval was, I think, the big issue."  *Id*. at 172.  He characterized that action as malingering.  *Id*. at 172.  If you are sick you are required to turn in sick pay.  *Id*. at 172.

69.         Johnson also charged Norris with not being at her home on August 12 where she was seen by a council person at a gas station.  Jerry Lukkasson allegedly called the town manager who then called Johnson.  *Id*. at 173.

70.         Johnson does not know whether he would have fired Norris simply for the two infractions of not being at her house which on administrative leave.  *Id*. at 169-173.

71.         As to several of the Plaintiffs, Johnson admitted he didn't know whether he would have disciplined them for those other reasons.  Exhibit "M" at 169-77.

72.         If the only infraction was that Plaintiffs attended the court hearing without permission, then Johnson would not terminate them.  *Id*. at 133.

**The Extent of Johnson's Investigation**

73.         Prior to terminating plaintiffs, Johnson did not interview Gilbert, anyone in the finance department, Dan Field, Detective Henderson, or Sergeant Pinnow as part of his investigation.  *Id.* at 98-100.

74.         Before firing Plaintiffs, Johnson never independently verified how much time Chief Gilbert took off in any given year. Exhibit "M" at 100-01 & 109.

75.         Before firing Plaintiffs, Johnson never even attempted to ascertain how much time off Gilbert reported to the finance department.  Exhibit "M" at 100-01.

76.         Johnson did not believe Gilbert was obligated to report time off to the Finance department. *Id*. at 101.

77.         Before firing plaintiffs, Johnson did not try to investigate "how much time beyond an ordinary week [Gilbert] had worked", saying "I don't know that it was documented how much time he took off." *Id*. at 109.

78.         Johnson does not know how Taft could know how much time Gilbert worked beyond an ordinary work week, saying "I can't answer that question." *Id*. at 106.

79.         Johnson does not know that Chief Gilbert did not abuse the privilege in reporting the amount of extra time he had taken off prior to the decision to terminate the employees; saying "Well, I don't know that the chief took that much time off.  I think he took off – I think he took off a couple of weeks here and there over the course of several years." *Id*. at 108.

80.         Johnson agrees it is a true statement that Chief Gilbert accrues sick and vacation time and that he does take time off.  *Id*. at 119

81.         Johnson does not know whether Gilbert took off a "substantial amount of time," or what that necessarily means.  *Id*. at 119-120.

82.         As for the statement "he doesn't report the time," he denies it is a false statement; saying instead "we have been over this repeatedly. It is not required." *Id*. at 120-21.

83.         Johnson does not know who wrote that portion of the AZPOST letter about the misuse of sick and vacation time, nor did he investigate or take into

1   consideration who wrote what parts of the AZPOST letter, and was interested only in whether

2   the officers knew about the 2010 DPS report and attended that meeting.  *Id*. at 125-28.

3   **Disruption Alleged To Have Been Caused By the AZPOST Letter**

4         84.      Johnson cannot say whether the fact the statement in the AZPOST

5   letter about Gilbert's misuse of sick and vacation time affected police operations.  *Id*. at 157.

6         85.      Gilbert never reported any problem with police operations to either

7   Johnson or Taft.  Exhibit "M" at 14-17; 6/7/2012 deposition of Alex (Alexandra) Taft at 59,

8   attached as Exhibit "W."

9         86.      When first asked how the letter "disrupted police operations," Gilbert

10   testified. "Well number one … I had to be very careful as far as what my conversations were

11   with them." Exhibit "F" at 38.

12         87.      When asked to describe what affect this speech had on the public

13   health, safety, and welfare, Gilbert said, "I think in general there was a preoccupation on

14   everybody's part, but I think the department was operating, you know."  Exhibit "F" at 52-53.

15         88.      Gilbert claims the letter created "tension between the officers" which

16   he later agreed was really a "collegiality" issue.  Exhibit "V" at 115-17.

17         89.      There was already "fractures" within the department as a result of the

18   2010 DPS investigation.  Exhibit "V" at 47, 110-112.

19         90.      There is no evidence the individual officers' job performance was

20   affected by making the complaint.  Exhibit "J" at 37-40

21         91.      Gilbert has no first hand knowledge any of the individual officers'

22   job performance was affected by the AZPOST letter stating "I didn't see them on a regular basis

23   …. So I really couldn't say on day to day."  Exhibit "F" at 41.

24         92.      Gilbert could not list a single specific instance for any of the plaintiffs

25   that showed their job performance was affected.  Exhibit "F" at 42.

26

93.        Gilbert speculates that some officers were only "doing their minimum job" was based on third-hand information he received from another supervisor "who believed" several officers were less productive because they were "busy talking about the problems." Exhibit "F" at 39-41; Exhibit "V" at 117-120.

94.        The only police procedure changed during this time was that Gilbert requested Sergeant Ponce to start recording start times for officers who worked on a county task force. Exhibit "F" at 45-47.

95.        According to Gilbert, citizens were being disruptive at two meetings in June 2011 by talking loud, voicing their opinions, and speaking out of turn. Exhibit "F" at 79-85.

96.        Acrimony at Quartzsite Town meetings is nothing new; as there are a number of known "troublemakers" (as Johnson and Taft refer to them) who have been disruptive at these meetings before to the point of being arrested. Exhibit "M" at 58-60; *See* Testimony at Kemp's 1/5/2012 Personnel Advisory Board Hearing (Day 2), Volume II, at 241, 259, attached as Exhibit "X."

97.        Taft admits there were problems within the town council dating back to 2008 pointing to the fact there have been six (6) mayors since then. Exhibit "X" at 241, 259.

98.        Defendants blame the officers by claiming these meetings would not have been so disruptive if Plaintiffs had filed an internal "grievance" as opposed to notifying AZPOST or the Mayor. Exhibit "V" at 63, 76-78,134-39, 199, 201; Exhibit "X" at 230-32; Exhibit "W" at 61-66.

99.        The Town grievance procedure would have the officers taking their complaint to Gilbert first and then Taft, someone closely allied with Gilbert. Exhibit "B" at pp. 41-43.

1  100.   Plaintiffs themselves never even spoke at the two town meetings.

2 Exhibit "F" at 51; Exhibit "J" at 40-41; Exhibit "V" at 127, 130-32; and 3/2/2012 deposition of

3 Vice Mayor Barbara Cowell at 29-31, attached as Exhibit "AA."

4  101.   Taft doesn't even recall anyone talking about the officers or their

5 complaints at the town meetings in June 2011.  Exhibit "X" at 242-43.

6  102.   The only "fact" Defendants can cite to is that some citizens were

7 wearing t-shirts and hats showing support for the officers.  Exhibit "V" at 121-22; Exhibit "X" at

8 229-30.

9  103.   Taft admits there were several known troublemakers who "usually"

10 caused trouble and complained."  Exhibit "X" at 241.

11  104.   The "chaos at one meeting was created predominately" by a Town

12 citizen, Mike Roth, not the Plaintiffs.  Exhibit "V" at 140; Exhibit "X" at 238.

13  105.   Roth and Jones were not arrested because of anything related to the

14 officers' complaints.  Exhibit "M" at 48.

15 **Gilbert's Reporting Obligations**

16  106.   The chief's contract pertaining to sick and vacation time states:

17   The position of police chief is an appointed position and is therefore exempted
   from the fair labor standards act and the accrual of overtime and compensatory.
18   However, the town recognizes that the [chief] must devote additional time
   outside of normal office hours to conduct town business.  *As a result, **there may**
19   **be times** that [the chief] as an unclassified employee takes informal time off*
   *without the necessity of reporting such time to payroll* after notifying the Town
20   Manager of his intentions to do so.

21   All other provisions relating to vacation, sick leave, retirement contributions,
   holidays and other fringe benefits and working conditions as they now exist, or
22   hereafter may be amended, also shall apply to the [chief] as they do to other
   employees of the town, including the accrual of vacation and sick leave and
23   payment thereof upon termination of employment.

24 Exhibit "A" at 3.

25  107.   Under this agreement, the chief accrues sick and vacation time and

26 has the same obligation to report sick and vacation time taken.  *Id.*

108.        Sick and vacation time earned and taken must be accurately documented because accumulated time can be cashed in.  Exhibit "X" at 244-46.

109.        Sick time, which is not vested, is cashed out annually; while vacation time is a vested right that accrues up to a certain limit.  *Id.*

110.        Gilbert will be paid for unused vacation time when his employment ends.  *Id.* at 248.

111.        The formal process is that the individual submits a written leave request form to their supervisor.  Exhibit "F" at 57-58.

112.        If the supervisor approves the time off, the leave request form is taken to the finance department, which properly records the time on payroll.  *Id.* at 58.

113.        Falsely reporting sick or vacation time is a dischargeable offense. Exhibit "S" at Amended Notice re Kemp; Exhibit "V" at 195-96.

114.         Johnson believes that Gilbert has absolutely no duty to report any amount of time taken off to the finance department because he is an "exempt" employee. Exhibit "V" at 208.

115.        Gilbert and Taft interpret Gilbert's contract to mean that if Gilbert works any amount of time beyond 40 hours in a given week, then – with the permission of Taft – Gilbert can take off a similar amount of time without reporting it and having it deducted from sick or vacation time.  Exhibit "F" at 57-60; Exhibit "V" at 91-96; Exhibit "W" at 16-20; Exhibit "X" at 243-48.

116.        Procedurally, Gilbert would contact Taft and tell her he wanted to take time off without reporting it.  Exhibit "F" at 58-60.

117.        Taft believed the decision whether to approve the request was totally in her discretion and, as long as she approved it, the time does not need to be reported to finance.  Exhibit "W" at 26, 35.

118.     Taft works in a different building than Gilbert, but claims to know how many hours Chief Gilbert works in any given week.  Exhibit "W" at 59.

119.     Former Town Manager Dan Field disagrees with both of these interpretations, saying that Gilbert was obligated to report any time taken off, and only in an exceptional circumstance, would he as town manager think of telling Gilbert to take time off and not report it.  In other words, he expressly rejected Taft and Gilbert's interpretation.  See 6/20/2012 deposition of Daniel Field at 13-16, attached as Exhibit "Y."

120.     Field testified that not reporting "informal time off" was truly reserved for exceptional circumstances; for example, if someone worked through the evening, he might tell that person to take a day off.  *Id.* at 15.

121.     The informal time off was not to be used on any consistent basis, nor to compensate the chief for working more than 40 hours a week, since that was expected given his position as a salaried employee.  *Id.* at 13-16.

122.     A salaried employee like Gilbert is expected to work until he gets the job done, whatever that amount of time may be.  *Id.* at 10.

**Time Taken Off By Gilbert**

123.     Gilbert does not punch a clock or otherwise document the number of hours he works.  Exhibit "M" at 91-93.

124.     There are no records that document how many hours Gilbert worked on a given week. Exhibit "F" at 61; Exhibit "W" at 21-22.

125.     Both Gilbert and Taft agree that Gilbert has taken "informal time" off, at least to some degree.  Exhibit "F" at 60-61; Exhibit "W" at 22-25.

126.     Gilbert recalled only one instance where Taft approved informal time off. Exhibit "F" at 61;

127.     Taft could not even give an estimate of how much informal time off she has granted Gilbert.  Exhibit "W" at 22-23.

128.        There are no records which document how much informal time off Gilbert has taken.  Exhibit "F" at 61; Exhibit "W" at 21-22.

**Dan Field's Observations of Time Taken Off By Gilbert**

129.        Gilbert has been Quartzsite's chief of police since 2005-06. Exhibit "V" at 43; Exhibit "F" at 5.

130.        Field was the town manager from the time Gilbert started in 2005-06 until 2009.  *See* 6/20/12 Deposition of Daniel Field, at 5-7, attached as Exhibit "Y."

131.        Field saw Gilbert take off large amounts of time.  Exhibit "Y" at 13-21.

132.        Field assumed the chief was submitting some type of written leave request for time he was taking off.  *Id*. at 13-14.

133.        Field received a number of complaints about the chief not being available, including complaints from council member and police officers, which Field mentioned to the chief.  Id. at 13-21.

134.        Field knew the chief would take weeks off at a time to drive his wife to Florida or travel to Kentucky and visit family.   Id. at 12-21.

**Plaintiff Ponce Observations of Time Gilbert Has Taken Off**

135.        Plaintiff Ponce observed the chief taking significant periods of time off, including frequently taking 2-3 days at a time, full weeks when he traveled to Florida or Kentucky, and at least a month in Florida.  Exhibit "O" at 7.

136.        On several occasions, Ponce fielded calls from council members, the town manager, and former town manager, complaining they could not locate the chief.  *Id*. at 9-10.

137.        More than six times, the finance department asked Ponce to obtain leave request forms from the chief when they knew he'd taken time off.  *Id*. at 6.

138.        Gilbert told Ponce not to worry and that he would take care of it. *Id.*

139.        When Ponce told the finance department employees, they just shook their heads. *Id.*

140.        Several times, former finance employees told Ponce that the chief took time off without submitting a leave request form. *Id.* at 5.

141.        The finance employees expressed concern over this because of possible audits, and said that the chief yelled at them if they asked him to submit forms. *Id.*

**Leave Request Forms on File for Gilbert**

142.        Defendants have not produced any leave request forms for any time taken in 2006 and Gilbert did not identify any time reported time off from his payroll records.   *See* Defendants' First Supplemental Response to Plaintiffs' Request for Production, Response to Document Request No. 5, attached as Exhibit "Z"; Exhibit "F" at 63-67.

143.        There are no leave request forms for any time taken in 2007 and Gilbert did not identify any reported time off from his payroll records.   Exhibit "Z"; Exhibit "F" at 63-67.

144.        In August 2008, one leave request form was submitted for 40 hours, but was not approved by Alex Taft until August 2009.   Exhibit "Z."

145.        In May 2009, 80 hours were reported and in August-September 2009, Alex Taft approved 40 hours of non-reportable time.   Exhibit "Z."

146.        In July 2009, 12 hours were reported. Exhibit "Z."

147.        In 2010, one leave request form seeking 16 hours of time off was reported.   Exhibit "Z."

148.        Gilbert's payroll records for 2010 show additional time being deducted, but no leave request forms were submitted.   Exhibit "Z"; Exhibit "F" at 63-67.

1    149.         In 2011, up to the time of the officers' letter, Gilbert reported 24

2  hours of time off.  Exhibit "Z."

3         Dated this 28th day of September, 2012.

4                        SCHNEIDER & ONOFRY, P.C.

5

6                        By s/Charles D. Onofry
                            Charles D. Onofry
7                           Luane A. Rosen
                            Dee R. Giles
8                           3101 N. Central Avenue, Suite 600
                            Phoenix, Arizona  85012-2658
9                           Attorneys for Plaintiffs

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

☒   I hereby certify that on September 28, 2012, I electronically transmitted the attached document to the Clerk's office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Justin Scott Pierce
Jackson Lewis LLP
2398 E. Camelback Road, Suite 1060
Phoenix, AZ  85016-3451
Attorneys for Defendants

s/Danijela Bakovic