1

2

3

4

5

6            IN THE UNITED STATES DISTRICT COURT

7              FOR THE DISTRICT OF ARIZONA

8

9    Linda Conley, Hereberto        )
     Dominguez, Yoami Dominguez,    )
     Stephen Frakes, James C. Kemp,  )
10   Reyna Kemp, Michelle Norris,   )   CIV 11-01637 PHX MEA
     William Ponce, Herlan Yeomans, )
11   Eloina Yeomans,                )   ORDER
                                    )
12            Plaintiffs,           )
                                    )
13       v.                         )
                                    )
14                                  )
     Town of Quartzsite, Alex Taft, )
15   Jeffrey Gilbert, Albert        )
     Johnson,                       )
16                                  )
              Defendants.           )
17   _____)

18          All of the parties in this matter have consented to

19   magistrate judge jurisdiction, including the entry of final

20   judgment.  Before the Court are Plaintiffs' motion for judgment

21   as a matter of law with regard to their First Amendment

22   retaliation claim (Count I of the second amended complaint at

23   Doc. 70), and Defendants' motion for judgment as a matter of law

24   in favor of Defendants with regard to all of Plaintiffs' claims

25   (Count II alleges a violation of Arizona's whistleblower

26   statutes and Count III asserts a claim for defamation).[1]  In this

27   _____

28         [1] All Defendants remain in this matter.  The claims brought by
     Plaintiffs Hereberto and Yoami Dominguez were dismissed.  See Doc.
     86 & 109.  Ms. Kemp and Ms. Yeomans, although named as parties, may
     be plaintiffs based solely upon the possibility that Arizona's

order the Court decides Plaintiffs' motion for summary judgment and Defendants' motion for summary judgment insofar as they seek judgment as a matter of law on Plaintiffs' First Amendment claims.  The Court will resolve Defendants' motion for summary judgment on Count II and Count III of the second amended complaint by separate order.  Those claims, if any, remaining after the Court resolves the parties' motions for summary judgment will be tried to the court as a bench trial.

**I Procedural background**

Plaintiffs filed a complaint in the La Paz County Superior Court on July 29, 2011, alleging federal and state law-based claims for relief, and seeking injunctive and monetary relief and an award of attorneys' fees and costs.  See Doc. 1. Plaintiffs obtained temporary restraining orders from the state Superior Court on August 1, 2011, and August 3, 2011, prohibiting Plaintiffs' discharge by the Town of Quartzsite. Defendants removed the matter to federal court on August 19, 2011.  Id.  On September 9, 2011, the Court concluded the state temporary restraining orders had expired.  See Doc. 27. Subsequently, Plaintiffs' employment with the Town of Quartzsite was terminated. Defendants answered the complaint on or about September 13, 2011.  See Doc. 26.  On November 18, 2011, Plaintiffs filed a motion seeking leave to amend the complaint, which was granted on January 5, 2012.  See Docs. 34 & 38.

On February 16, 2012, Defendants filed a motion to dismiss some counts of the first amended complaint at Doc. 30.

community property laws are implicated by the execution of judgment in this matter, but their exact claims have not been pled.

The motion was granted in part and denied in part on May 15, 2012. See Doc. 57. A second amended complaint was docketed on June 13, 2012, which was answered on July 2, 2012. See Doc. 70 & Doc. 74.

The parties have engaged in extensive discovery. On September 28, 2012, Defendants filed a motion for summary judgment. See Doc. 90. On September 28, 2012, Plaintiffs filed a motion for summary judgment. See Doc. 94.[2] The Court heard oral argument on the motions for summary judgment on May 9, 2013, and took the motions under advisement pending a decision by the en banc panel in Dahlia v. Rodriquez, which was issued August 21, 2013. The Court subsequently ordered briefing on the impact of the en banc opinion on the issues presented in this matter, which was completed on September 6, 2013. See Doc. 115 & Doc. 116.

**II  Standard for determining motions for summary judgment**

Rule 56 of the Federal Rules of Civil Procedure provides that judgment shall be entered if the pleadings, depositions, affidavits, answers to interrogatories, and admissions on file show that there is no genuine dispute regarding the material facts of the case and the moving party is entitled to a judgment as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); Giles v. General Motors Acceptance Corp., 494 F.3d 865, 872 (9th Cir. 2007).

---

[2] On June 18, 2012, the Court granted Defendants' motion to strike Plaintiffs' request for a trial by jury. See Doc. 71.

> For purposes of deciding a motion for summary judgment, "genuine" means that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party, and "material" means that the fact is one that might affect the outcome of the suit under the governing law.

United States v. One Parcel of Real Prop., 960 F.2d 200, 204 (1st Cir. 1992). See also Guidroz-Brault v. Missouri Pac. R.R. Co., 254 F.3d 825, 829 (9th Cir. 2001).

The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of any genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986).

When a party moving for summary judgment has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586, 587, 106 S. Ct. 1348, 1356 (1986). The party opposing the motion may not rest upon the mere allegations or denials of his pleadings, but instead must produce some significant, probative evidence tending to contradict the moving party's allegations, thereby creating a genuine question of fact for resolution at trial. Anderson, 477 U.S. at 248, 256-57; 106 S. Ct. at 2510, 2513-14 (holding the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment).

A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." Celotex, 477 U.S. at 323-24, 106 S. Ct. at 2553.  Summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Id., 477 U.S. at 322, 106 S. Ct. at 2552; see also Citadel Holding Corp. v. Roven, 26 F.3d 960, 964 (9th Cir. 1994).  Because plaintiffs bear the burden of proof at trial, a defendant has no burden to negate a plaintiff's claims to prevail on a motion for summary judgment. See Celotex, 477 U.S. at 323, 106 S. Ct. at 2552-53.

Furthermore, the evidence presented in opposition to a motion for summary judgment must be probative and properly supported.  See Zoslaw v. MCA Distrib. Corp., 693 F.2d 870, 883 (9th Cir. 1982).  To successfully rebut a properly supported summary judgment motion, the non-moving party "must point to some facts in the record that demonstrate a genuine issue of material fact and, with all reasonable inferences" made in the nonmoving party's favor, could convince a reasonable jury to find for that party. Reese v. Jefferson Sch. Dist. No. 14J, 208 F.3d 736, 738 (9th Cir. 2000). See also Bias v. Moynihan, 508 F.3d 1212, 1218 (9th Cir. 2007) (stating the non-moving party must present evidence that is significant and probative).  It is not the Court's task to scour the record in search of a genuine issue of triable fact.  See Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1028-29 (9th Cir. 2001).  The non-moving party must "identify with reasonable particularity

the evidence that precludes summary judgment." Keenan, 91 F.3d at 1279.   See also Simmons v. Navajo County, Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

On summary judgment, the Court may not make credibility determinations or weigh conflicting evidence.   See Musick v. Burke, 913 F.2d 1390, 1394 (9th Cir. 1990).   The Court must consider a party's motion for summary judgment construing the alleged facts with all reasonable inferences favoring the non-moving party.   See, e.g., Genzler v. Longanbach, 410 F.3d 630, 636 (9th Cir. 2005).   However, the mere existence of a scintilla of evidence supporting the non-movant's position is insufficient; there must be enough evidence from which a trier of fact could reasonably find for the non-movant.   Anderson, 477 U.S. at 251-52 ("[T]he inquiry...is...whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.").

Each party has filed a motion for summary judgment. The Court must consider each party's motion for summary judgment construing the alleged facts with all reasonable inferences favoring the non-moving party.   See, e.g., Genzler v. Longanbach, 410 F.3d 630, 636 (9th Cir. 2005).

### III Factual background

The record in this matter is voluminous, exhibiting a pattern of small town politics and perceived loyalties and disloyalties.   The Court's review has been extensive.   The following material facts gleaned from that record are not in substantial dispute.

During the time relevant to this matter, Plaintiffs Frakes, Kemp, Ponce, Yeomans, and Norris were employed by Defendant Town of Quartzsite as police officers. Plaintiff Conley was employed by Defendant Town of Quartzsite as a Police Assistant Evidence Technician and certified Arizona Criminal Justice Information System officer, an administrative position. At all times relevant to the complaint, Defendant Taft was the Town Manager and Personnel Officer for Defendant Town of Quartzsite, Defendant Gilbert was Chief of Police for Defendant Town of Quartzsite, which post he assumed in 2005 or 2006, and Defendant Johnson was Assistant Town Manager for Defendant Town of Quartzsite. Defendants Taft, Gilbert, and Johnson are sued in both their individual and official capacities. The Quartzsite Police Department employed approximately fourteen sworn police officers at the time that the Plaintiffs were terminated from their employment.

In May of 2010, at the request of the Mayor of Quartzsite and a former Quartzsite Town Council member, the Arizona Department of Public Safety ("DPS") opened an "inquiry" into criminal allegations[3] that Defendant Gilbert, as the Chief of Police of the Town of Quartzsite, improperly spent federal grant money and was "committing fraud by failing to disclose paid vacation to Town finance director." Doc. 95 (Plaintiffs' Statement of Facts "PSOF"), Exh. C. See also Doc. 91

---

[3] Referencing Arizona Revised Statutes § 38-609, which provides: "A public officer or employee who accepts, retains or diverts for his own use or the use of any other person any part of the salary or fees allowed by law or usage to his deputy, clerk, other subordinate officer or employee, is guilty of a class 5 felony."

(Defendants' Statement of Facts "DSOF"), Exh. 22.  Part of the inquiry was predicated on a handwritten, unsigned note stating that Chief Gilbert used vacation time without reporting the use of the time.  See, e.g., Doc. 95, Exh. C, Attach.[4]

A DPS investigator assigned to the matter testified at his deposition with regard to the scope and the substance of the DPS investigation into the allegations against Chief Gilbert. The officer stated that the scope of the investigation into the Chief's reporting of vacation time was limited because the officer was not provided with the specific dates or time periods that Chief Gilbert was alleged to be absent on vacation or sick time which was allegedly not reported.  See PSOF, Exh. D at 17-19.  The DPS officer stated that the majority of the DPS report was focused on a different allegation, i.e., the alleged misuse of grant funds, rather than the allegation regarding the failure to report use of sick leave and vacation time.  The officer stated this was because there was no "true complainant" regarding the Chief's alleged failure to report his use of sick leave and vacation time.  Id., Exh. D at 18.

Plaintiff Ponce was interviewed as part of the DPS investigation.  Id., Exh. D at 14.  The DPS investigative report, at Exhibit C to Doc. 95 (PSOF), states:

> Henderson spoke with QPD Sergeant William Ponce by telephone.  Ponce denied authoring a letter stating Gilbert was not reporting vacations to Quartzsite's finance department but was aware of the problem.... Ponce said on three or four occasions, Gilbert took paid

---

[4] One of the investigators stated in her deposition that Defendant Gilbert believed the note was authored by Bill Moore.  See DSOF, Exh. 22 at 16.

1        vacations and never submitted a claim, which
2        would reduce the amount of vacation time from
     Gilbert's earned leave balance.

3   Plaintiff Ponce also told the investigator that, when he had

4   asked Defendant Gilbert for leave forms after the Chief had

5   taken a vacation, Defendant Gilbert told Plaintiff Ponce he

6   would "take care of it." <u>Id.</u>, Exh. D at 14.

7      The DPS report states that Plaintiff Kemp called one of

8   the DPS investigators to report that, although "everyone" in the

9   Quartzsite Police Department "knew" Chief Gilbert took paid

10  vacation time without reporting the use of annual leave,

11  Plaintiff Kemp had no independent recollection of specific dates

12  that Defendant Gilbert had used vacation time but failed to

13  report it. <u>Id.</u>, Exh. C. Plaintiff Kemp also told the DPS

14  investigator that he was aware Defendant Taft had opined

15  Defendant Gilbert did not need to report his use of vacation

16  time to the Town of Quartzsite payroll department. <u>Id.</u>, Exh. C.

17  The investigator replied that, as Defendant Gilbert's

18  supervisor, Defendant Taft could approve Defendant Gilbert's use

19  of vacation time without reporting such to the payroll

20  department and, accordingly, that Defendant Gilbert would not

21  have perpetrated "fraud or criminal behavior" by failing to

22  report the use of vacation time or sick leave. <u>Id.</u>, Exh. C.

23  There is no indication the DPS investigators reviewed Chief

24  Gilbert's contract or the Town's personnel policies.

25     The DPS issued an investigation report dated June 22,

26  2010, which contained the following conclusion: "This

27  investigation did not discover any criminal violations committed

28  by the Chief of Quartzsite Police Department, Jeff Gilbert."

Id., Exh. C & DSOF, Exh. 10.   The report concluded that, with regard to the alleged misuse of federal grant money, no such misuse had occurred.   DPS Officer Henderson testified at his deposition: "The investigation shows that there was never enough brought forth to even investigate [the sick and vacation time] matter fully." PSOF, Exh. D at 19.   The other DPS investigating officer testified that DPS was not able to determine one way or the other whether Chief Gilbert failed to report his use of sick leave and vacation time because "We just did not have enough facts to continue our investigation."   Id., Exh. E at 20.

In June or July of 2010, at a regular police department meeting, Defendant Gilbert told those at the meeting that the DPS had determined that the allegations against him were unfounded; Plaintiff Ponce testified in his deposition that Defendant Gilbert said the report had "cleared" him of any wrong-doing.   Id., Exh. G at 42.   See also DSOF, Exh. 4 at 35 (deposition of Plaintiff Kemp); Exh. 7 at 42 (deposition of Plaintiff Ponce).   Plaintiffs allege: "Chief Gilbert then threatened retaliation for any officers involved in the DPS investigation against him, stating he knew the names" of those who had "talked against" him and that there would be "consequences" or "hell to pay." PSOF, Exh. G at 42; DSOF, Exh. 4 at 35-36 & Exh. 7 at 42.   It is not clear from the record whether all of the Plaintiffs were present at this meeting. See, e.g., DSOF, Exh. 7 at 42.   The Plaintiffs present at the meeting were not provided with a copy of the DPS report.

In April of 2011, Plaintiff Kemp attended a program sponsored by the Arizona Peace Officer Standards and Training

Board ("AZPOST"). _Id._, Exh. 7 at 42. AZPOST is the agency responsible for certifying sworn police officers in the State of Arizona. The agency has the authority to revoke an Arizona police officer's certification. As a result of the AZPOST training, Plaintiff Kemp concluded that a police officer might lose their certification for failing to report alleged criminal conduct by a superior officer. Plaintiff Kemp stated in his deposition that he became concerned that he could lose his certification if he did not report what he suspected was misconduct by Defendant Gilbert. _Id._, Exh. 4 at 65-72 & 84-85. Plaintiff Kemp further stated that he was most concerned about allegations Defendant Gilbert had run NCIC background checks on "potential candidates for election", because it was "wrong" to invade someone's privacy based on personal dislike. _Id._, Exh. 4 at 67.[5]

On May 10, 2011, a "majority" of Quartzsite police officers, compiled a four-page type-written, unsigned, undated letter, delineating numerous complaints about Chief Gilbert's conduct. PSOF, Exh. K; DSOF, Exh. 8 at 56-64. The letter was hand-delivered to AZPOST on May 11, 2011. A second letter addressed "To whom it may concern" was on the letterhead of the Quartzsite Police Officers Association, signed by Plaintiffs Ponce, Yeomans, Kemp, Norris, Conley, and former Plaintiff Dominguez and three reinstated officers, and further amplified

---

[5] The Court notes that such actions might constitute violations of Arizona Revised Statutes § 41-1750(Q)(2) and 18 U.S.C. § 2721(b)(1) and subject the Town of Quartzsite and the Chief to a variety of sanctions pursuant to 28 C.F.R. §§ 20.25 and 20.38, and 18 U.S.C. § 2724, including criminal charges. _See_ Ariz. Rev. Stat. Ann. § 28-457.

the first letter.  PSOF, Exh. K; DSOF, Exh. 7 at 53-55, 57-58.

The signed letter states that the purpose of the unsigned letter was to request an investigation of Chief Gilbert by AZPOST.  PSOF, Exh. K.

The unsigned letter states:

> We...write this letter with great hesitation, and only after much discussion and contemplation.  We hesitate because we consider ourselves a team of professional, dedicated, and educated individuals and it goes against our nature to go against the Chief of Police. We also hesitate because we fully believe that if this letter does not have the desired result, and we continue to work under the current administration, there will most certainly be retaliation.

Id., Exh. K.

The unsigned "AZPOST letter" outlined what Plaintiffs believed to be improprieties committed by Chief Gilbert in his capacity as police chief, including claims that he engaged in selective law enforcement and ran improper license plate checks and criminal histories on political adversaries, their associates, or individuals he did not like.  Id., Exh. K. Plaintiffs aver that, "relevant to Plaintiffs' terminations was the claim that Chief Gilbert did not properly report his use of sick and vacation time":

> Chief Gilbert accrues "sick" and "vacation" time but when he chooses to take time off, which is a substantial amount of time, he doesn't report the time. He never uses any of his "sick" or "vacation" time. He doesn't even complete a time sheet, if he does complete one, it has only been recently.

Id. at para. 21.

1    The letter states that it was written by a "majority"
2 of police department employees, and avers that morale at the
3 department was then very low.  Id., Exh. K.  The letter states
4 that the signatories had no confidence in Defendant Gilbert's
5 abilities as Chief of Police.  The signatories "question[ed] the
6 leadership abilities" of Defendant Gilbert and averred he was
7 not interested in "day to day" management of the department.
8 Id., Exh. K.  The signatories cited an incident when Defendant
9 Gilbert objected to a police officer using sick leave rather
10 than vacation leave upon the birth of a child; allowing the
11 officers to do this was, the Plaintiffs stated, a department
12 practice.  The letter provided to AZPOST also states Defendant
13 Gilbert was "fixated" on local politics and alleges that he
14 acted for personal gain.  Id., Exh. K.  The letter alleges
15 Defendant Gilbert improperly ran National Crime Information
16 Center ("NCIC") reports on candidates for local political
17 offices if he did not like the candidate.  Id., Exh. K (The
18 letter is also provided at DSOF at Exh. 11).[6]

19    At some time after May 11, 2011, AZPOST referred
20 Plaintiffs' complaints regarding Defendant Gilbert to the Town
21 of Quartzite for investigation.  See, e.g., DSOF, Exh. 7 at 63-
22 65.

23

24 _____

25    [6] The Court finds the allegations may be characterized as: 1.
   threats against Plaintiffs; 2. claims of a lack of leadership; 3.
26 claims of abuse of authority; 4. allegations regarding the Chief's
   "misuse of sick leave/vacation time"; 5. allegations regarding the
27 abuse of access to public records; 6. allegations of selective law
   enforcement; 7. claims of disparate treatment of officers; 8.
28 assertions that the Chief harassed police officers and citizens; 9.
   claims that the Chief did not promote employees based on merit.

Defendant Gilbert testified at his deposition that the Quartzsite police department operated "differently" after the AZPOST letter was written and delivered. DSOF, Exh. 3 at 37-38. Defendant Gilbert stated that there were "some strains on the department." Id., Exh. 3 at 38. Defendant Gilbert stated there was a "strain" between the police officers who had complained to AZPOST about Defendant Gilbert and the few police officers who had not complained. Id., Exh. 3 at 38. Defendant Gilbert stated that, after the AZPOST letter was delivered, he had to be "very careful" about his conversations with the complaining officers. Id., Exh. 3 at 38. Defendant Gilbert stated that raising the complaints "affected" Plaintiffs' work performance, i.e., that they were doing "their minimum job," and "just doing what they needed to do to get by." Id., Exh. 3 at 38 & 42. Defendant Gilbert stated that "people were preoccupied with the issues that were ongoing with the department." Id., Exh. 3 at 42. Defendant Gilbert did not indicate that there were significant workplace disruptions or loss of functioning of the police department caused by Plaintiffs' writing or delivering the AZPOST letter. See id., Exh. 3 at 47 ("there just certainly seemed to be friction, you know, I think, on everybody's part").

Plaintiffs decided to bring their complaints about Defendant Gilbert, as contained in the AZPOST letter, to the attention of the Quartzite Town Council. Id., Exh. 4 at 101-03, Exh. 7 at 70-73, 85, Exh. 8 at 43-45. Plaintiff Ponce distributed copies of the letter provided to AZPOST to the Quartzsite Town Manager and some members of the Quartzsite Town Council between May 11, 2011, and June 1, 2011. Id., Exh. 7 at

65-85.

On May 31, 2011, "members" of the Quartzsite Police Officers Association, "representing approximately 80% of the department," composed a letter addressed to the Mayor of Quartzsite, members of the Quartzsite Town Council, and "citizens of Quartzsite," enumerating complaints against Chief Gilbert and accusing Defendant Taft of delaying, stalling, and obstructing an investigation into their complaints against Chief Gilbert.  PSOF, Exh. L; DSOF, Exh. 4 at 104.  This letter does not mention Chief Gilbert's alleged misuse of leave time.

On June 1, 2011, the Mayor of Quartzsite called a special meeting of the Town Council regarding the complaints about Defendant Gilbert.  See, e.g., DSOF, Exh. 4 at 102, Exh. 7 at 97.  If given the opportunity, Plaintiff Ponce planned to address the Town Council regarding the Plaintiffs' concerns about Defendant Gilbert at the June 1, 2011 meeting.  Id., Exh. 7 at 98-99.  Reports of the number of people at the meeting varied from 70 to approximately 200 people.  Id., Exh. 2 at 49-51, Exh. 7 at 99.  Defendant Assistant Town Manager Johnson stated in his deposition that he was forced to end the meeting and clear the building because the June 1, 2011 meeting could not proceed without a quorum.  Id., Exh. 2 at 49-51.  The Mayor stated the gathering would then proceed as a "town hall," but Defendant Johnson ended the meeting after approximately fifteen minutes.  Id., Exh. 2 at 49-52.  Plaintiff Ponce and Plaintiff Kemp stated in their depositions that Defendant Johnson "shut down" the June 1, 2011 meeting.  Id., Exh. 7 at 99-100; Exh. 4 at 108-12.  Plaintiff Ponce stated that citizens were unhappy

1    that the meeting did not occur.  *Id.*, Exh. 7 at 99-101.

2         Defendant Johnson stated that he and Defendant Taft
3    determined, after the June 1, 2011 "town hall" meeting, that an
4    investigation into the allegations against Chief Gilbert should
5    occur.   DSOF, Exh. 2 at 37-42.   Defendant Johnson stated he
6    considered the Chief's use of sick leave and vacation time to be
7    a personnel issue which should have been resolved "up the chain
8    of  command"  and  believed  this  issue  had  previously  been
9    investigated and resolved via the DPS investigation.  *Id.*, Exh.
10   2 at 32-35.  Defendant Johnson considered other claims, such as
11   the allegations of the Chief's mis-use of the NCIS system, to be
12   allegations of criminal behavior or ethical misconduct but that
13   an anonymous letter without evidence of such misconduct did not
14   warrant investigation.  *Id.*, Exh. 2 at 32-35.  Defendant Johnson
15   stated  in  his  deposition  that,  after  determining  that  an
16   investigation  into  Plaintiffs'  claims  against  Chief  Gilbert
17   should  be  conducted,  a  decision  made  in  conjunction  with
18   Defendant Taft, the state police (DPS) refused to undertake an
19   investigation of any of the allegations in the AZPOST letter
20   except the allegation that the Chief misused the NCIC system,
21   because  they  concluded  the  other  allegations  were  not
22   allegations of criminal misconduct.  *Id.*, Exh. 2 at 40-41.

23        Accordingly,  on  or  about  June  2,  2011,  the  Town  of
24   Quartzsite retained the law firm of Jackson Lewis LLP to conduct
25   an independent investigation of the issues raised in the AZPOST
26   letter about Chief Gilbert.[7]   DSOF, Exh. 2 at 39-44, Exh. 17

27   _____

28        [7] The firm of Jackson Hewitt represents Defendants in this
     matter.

(pages 1 and 48-50 of the report).  The investigation began on June 2, 2011, the day after the June 1, 2011 "town hall" meeting, and encompassed interviews with seventeen witnesses, including Defendant Gilbert, Defendant Taft, and Defendant Johnson.  The portion of the report provided to the Court indicates the law firm investigated at least three of the allegations against Chief Gilbert raised in the AZPOST letter. Id., Exh. 17.[8]

A regular meeting of the Quartzsite Town Council was held June 14, 2011.  See, e.g., DSOF, Exh. 7 at 102.  It was expected that Plaintiffs' complaints about Chief Gilbert would be aired at this meeting.  Id., Exh. 4 at 112.  Plaintiffs were also at the meeting.  See id., Exh. 4 at 118; Exh. 7 at 17; Exh. 8 at 88.  A representative of "AZ COPS" (the parent organization of the Quartzsite Police Officers Association), attended the June 14, 2011 Town Council meeting and spoke in support of Plaintiffs' complaints against Defendant Gilbert.  Id., Exh. 8 at 86-87.  Some attendees wore blue shirts to the meeting as a sign of support for Chief Gilbert and some attendees wore red shirts as a sign of non-support for Chief Gilbert.  Id., Exh. 4 at 112 & Exh. 7 at 114-16 & Exh. 8 at 85-86.  Some or all Plaintiffs wore red shirts to the meeting.  Id., Exh. 4 at 112.

---

[8] The entire report has not been provided to the Court in the record on the parties' motions for summary judgment.  Defendants attached pages 48-50 of the report and the first page of the cover letter accompanying the report as Exhibit 17 to their Statement of Facts at Doc. 91.   The pages provided indicate that the firm investigated claims, inter alia, that Chief Gilbert "Conspired To Get Town Prosecutor Fired," a claim regarding "Complaints About The Way Chief Gilbert Handles Sick Leave Issues," and "Allegations Regarding Improper Use of National Crime Information Center".  Doc. 91, Exh. 17.

-17-

Plaintiff Ponce stated that Chief Gilbert moved over and stood next to the AZ COPS representative while this individual spoke on behalf of the officers at the meeting, in an effort to intimidate the AZ COPS representative. Id., Exh. 7 at 117. The Court has reviewed the video recording of the meeting and reached a similar conclusion. There was contention at the June 14, 2011 Quartzsite Town Council meeting. See, e.g., DSOF, Exh. 2 at 66-68, Exh. 25 (Declaration of Defendant Taft) at Exh. D (a CD video recording of the meeting). According to defendant Johnson, Plaintiffs did nothing to incite trouble at the Town meetings. PSOF, Exh. V at 200. In describing the June 14, 2011 meeting, Plaintiff Kemp stated:

> You could see who supported who based on the colors they were wearing. And when [Mayor] Ed Foster opened the call to the public and [the AZ COPS representative] got up to speak, the rest of the council got up and filed out. At that point, the town people became very angry.

Id., Exh. 4 at 118.

There is no dispute that local politics in Quartzsite were contentious and that Town Council meetings were rambunctious even before Plaintiffs raised issues about Defendant Gilbert's job performance. Plaintiff Kemp stated in his deposition that angry citizens and raised voices were normal at Town Council meetings. Id., Exh. 4 at 108-11. One citizen who was arrested at the June 14th meeting was known to regularly "disrupt" council meetings. Id., Exh. 24 at 98. Plaintiff Yeoman stated in his deposition that citizens were arrested at meetings for yelling, and that one citizen was arrested for calling Defendant Johnson a disparaging name and gesturing

obscenely in his direction.  Id., Exh. 5 at 66-77.  Defendant Johnson referred to these individuals as the "usual suspects".  Id., Exh. 2 at 54-55.

Defendants allow that, from 2008 through the time the Complaint was filed in 2011, there had been six mayors of the Town of Quartzsite and that Town Council meetings were often tumultuous.  PSOF, Exh. X at 241, 254.  Defendant Johnson stated at his deposition that Mayor Foster, who was the Mayor in May and June of 2011, had been censured by the Town Council several times.  DSOF, Exh. 2 at 54-55. According to Mayor Foster he had been arrested or investigated by the Chief eleven times. DSOF, Exh. 24 at 101. Defendant Johnson stated that certain citizens regularly disrupted Town Council meetings and that meetings regularly included verbal assaults on the Town staff.  Id., Exh. 2 at 54-55, 60-62.  See also id., Exh. 24 at 74.  Mayor Foster stated that Defendant Johnson himself had caused disturbances at Town Council meetings because he would order people removed from the meetings.  Id., Exh. 24 at 98.  Defendant Johnson stated in his deposition that he had individuals arrested and removed from the meetings.  Id., Exh. 2 at 58.

On June 21, 2011, the *Palo Verde Times & Quartzsite Times* reported that: "Hostilities have continued in Quartzsite since 10 Quartzsite Police Department employees called for the resignation of Chief Jeff Gilbert and called for an investigation of his conduct by a law enforcement agency."  Id., Exh. 26.  The article stated: "The crowd often became disruptive and unruly, with persons shouting insults at council members or trying to shout down anyone who was speaking."  Id., Exh. 26.

On July 6, 2011, the *Dessert Messenger* reported that:

> The three June meetings of Quartzsite Town Council were full of angry outbursts, arrests, disrespectful communications, an "us vs. them" mentality, and even a few surprises....In a June 12, 2011 press release, Members of the Quartzsite Police Officers Association announced 9 officers and the clerk had expressed a vote of "No Confidence" in the leadership of Police Chief Jeff Gilbert, and have requested his resignation.

Id., Exh. 27.

On July 7, 2011, the law firm Jackson Lewis LLP issued a report regarding the results of their investigation into the allegations against Chief Gilbert.  The report included the following findings:

> [T]he witnesses contend that, even though the Chief accrues sick and vacation leave, he has never submitted paperwork to properly document the use of leave on occasions when he took time off for such purposes. These allegations appear to be without merit....

Id., Exh. 17.

Defendant Johnson was appointed by Defendant Taft to conduct "...the Internal Investigation of Police Chief Jeff Gilbert" on July 19, 2011.  Id., Exh. 2 at 14 & Exh. 18. Defendant Taft's opinion was that, notwithstanding the specific language of the authorization, it included authorization to conduct an investigation of the police officers' conduct as described in the Jackson Lewis report.  Id., Exh. 1 at 51-54. Defendant Gilbert testified he assisted Defendant Johnson's investigation by retrieving information from the Plaintiffs' personnel files at the police department. PSOF, Exh. V at 73.

-20-

Defendant Johnson made the decision to both suspend and to terminate each Plaintiff's employment with the Town of Quartzsite. Id., Exh. 2 at 9-12. Defendant Johnson stated that he was appointed to undertake the investigation because he was "the most neutral party that the town had." Id., Exh. 2 at 15.

Section 1501 of the Town of Quartzsite personnel manual provides:

> Disciplinary actions shall be considered as a constructive means of dealing with an employee's unacceptable conduct or performance and should be appropriate to the seriousness of the infraction or performance deficiency. Disciplinary actions may take the form of admonishment, reprimand, suspension, demotion or dismissal.

On July 19, 2011, a notice of intent to dismiss Plaintiff Conley was issued by Defendant Johnson. PSOF, Exh. Q. The notice alleged Plaintiff had signed a letter on May 26, 2011, knowing some claims in the letter to be false. The notice further alleged Plaintiff Conley had answered the police department's phone and told "the public" the town was under "Marshall (sic) Law" and that this all brought "discredit" to the Town in violation of section 1502 of the Town's personnel manual. The letter set a pre-dismissal meeting the next day, July 20, 2011, at 1:30 p.m. Although notifying Plaintiff Conley of her right to a dismissal meeting, it did not notify her of any administrative rights. On July 20, 2011, an "amended" notice of intent to discipline was issued advising Plaintiff Conley of her administrative rights (to consult an attorney or representative and present evidence in her defense) and setting a pretermination hearing for the very next day, July 21, 2011,

at 3 p.m.  Id., Exh. Q; DSOF, Exh. 20 at 9.

On July 20, 2011, Defendant Johnson issued a "Notice of investigation and intent to interview" letter which was addressed to police officers Dominguez, Frakes, Kemp, Norris, Ponce, Rodriguez, Yeomans, Ruvalcaba, and Villafana.  The letter stated Defendant Johnson was investigating a violation of the town's personnel policy, i.e., that Plaintiffs had "discredited" the community "by recklessly making false accusations" against the Chief of Police to AZPOST.  The notice alleged Plaintiffs knew the allegations regarding the non-reporting of use of sick leave and vacation time to be false, because Plaintiffs knew DPS had investigated these allegations and Plaintiffs had been told the Chief's status allowed him to use leave time without reporting the use of vacation or sick leave, at the discretion of the Town Manager.  The letter also notified the officers of certain administrative rights similar to Plaintiff Conley's notice, including a right of representation and to present evidence in their defense.  See DSOF, Exh. 19; PSOF, Exh. O (Ponce Affidavit) at Exh. D.

On July 27, 2011, a notice of intent to terminate was issued to Plaintiff Ponce.  The notice indicates Plaintiff Ponce could have known, at the time of the AZPOST letter, that the allegation regarding the Chief's mis-use of sick leave and vacation time was "false" but that Plaintiff went to AZPOST with this accusation anyway, thereby misleading AZPOST.  The notice also indicates that Plaintiff Ponce, having been "advised" that the DPS investigation "cleared" the Chief regarding the accusation regarding vacation and sick leave, still went to

members of the town council and Mr. Lizarraga with these allegations, thereby misleading Mr. Lizarraga. The notice contends that, by signing the letter addressed to the Mayor, Town Council, and citizens of Quartzsite, he made a recklessly false statement regarding the Chief. Plaintiff Ponce's pretermination hearing was set for August 1, 2011, at 8:30 a.m. PSOF, Exh. O at Exh. E. Defendant Johnson terminated Plaintiff Ponce's employment effective August 1, 2011. Id., Exh. O at Exh. F.

As noted previously, on August 1, 2011, and on August 3, 2011, Plaintiffs obtained temporary restraining orders from the La Paz County Superior Court reinstating the employees and preventing any further terminations. On September 9, 2011, this Court determined the temporary restraining orders had expired.

A notice of intent to terminate Plaintiff Frakes, a notice of intent to terminate Plaintiff Kemp, a notice of intent to terminate Plaintiff Norris, and a notice of intent to terminate Plaintiff Yeomans, were all issued by Defendant Johnson on September 15, 2011, setting pretermination hearings for each officer, in mere hours, on September 16, 2011. Id., PSOF, Exh. R; DSOF, Exh. 20.

In making the termination decisions, Defendant Johnson, a non lawyer or law enforcement officer, was concerned that the Plaintiffs had been untruthful and that this could prevent them from testifying in court when required by their jobs as police officers. However, this concern originated with a Deputy County Attorney, not Defendant Johnson. DSOF, Exh. 2 at 150-52 & Exh. 4. Dishonesty is typically considered to be a terminable

offense for a police officer as their name might be placed on a "Brady" list.  Id., Exh. 2 & Exh. 4.  Defendant Johnson stated in his deposition that he did not consult Defendant Gilbert regarding the decision to terminate Plaintiffs.  Id., Exh. 2 at 10-13.   But Defendant Johnson did state that, prior to his appointment, he sat in on one or two meetings with Defendants Taft and Gilbert where the problems with the police department were discussed.  Id., Exh. 2 at 15.  Defendant Johnson stated that, at the time he terminated Plaintiffs, he was aware the Town could not terminate or retaliate against an employee for engaging in protected speech but believed the "discredit" the Plaintiffs brought to the Town outweighed their free speech rights and justified their termination.  Id., Exh. 2 at 163-64.[9]

**IV Analysis**

Plaintiffs move for summary judgment on their First Amendment retaliation claim.  Defendants have moved the Court for summary judgment on Plaintiffs' First Amendment claims, and have also moved for summary judgment on Plaintiffs' remaining additional claims.  Defendants argue they are entitled to judgment as a matter of law on Plaintiffs' section 1983 First Amendment retaliation claim because: (1) Plaintiffs did not engage in protected speech under the First Amendment; (2) Plaintiffs have failed to proffer any evidence to meet their burden of establishing municipal liability; and (3) Plaintiffs cannot meet their burden of showing that the individual

---

[9] Arizona Revised Statutes § 38-532(A) and section 1507 of the Town of Quartzsite Personnel Policy specifically prohibit retaliating against a municipal employee for engaging in protected speech.

Defendants violated Plaintiffs' clearly established constitutional rights.

To establish a prima facie case of First Amendment retaliation, plaintiffs must prove that (1) they engaged in constitutionally protected speech; and (2) their protected speech was a substantial or motivating factor in the defendant's decision to terminate their employment. See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S. Ct. 568 (1977).

> "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, [](2009)[]. A public official is entitled to qualified immunity unless (1) "the facts alleged, taken in the light most favorable to the party asserting the injury, show that the official's conduct violated a constitutional right;" and (2) the right at issue "was clearly established 'in light of the specific context of the case' at the time of the alleged misconduct." Clairmont v. Sound Mental Health, 632 F.3d 1091, 1100 (9th Cir. 2011) (quoting Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151 [](2001)). We exercise our discretion to consider prong one of the qualified immunity analysis first....
> The First Amendment shields public employees from employment retaliation for their protected speech activities. See Garcetti v. Ceballos, 547 U.S. 410, 417, 126 S.Ct. 1951, [](2006); Connick v. Myers, 461 U.S. 138, 140, 103 S.Ct. 1684, [](1983). Out of recognition for "the State's interests as an employer in regulating the speech of its employees," Connick, 461 U.S. at 140, 103 S.Ct. 1684, however, we must "arrive at a balance between the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees," Pickering v. Bd. of

-25-

Educ., 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).[10] We strike this balance when evaluating a First Amendment retaliation claim by asking "a sequential five-step series of questions." Eng, 552 F.3d at 1070. First, we consider whether the plaintiff has engaged in protected speech activities, which requires the plaintiff to show that the plaintiff: (1) spoke on a matter of public concern; and (2) spoke as a private citizen and not within the scope of her official duties as a public employee.

If the plaintiff makes these two showings, we ask whether the plaintiff has further shown that she (3) suffered an adverse employment action, for which the plaintiff's protected speech was a substantial or motivating factor. If the plaintiff meets her burden on these first three steps, thereby stating a prima facie claim of First Amendment retaliation, then the burden shifts to the government to escape liability by establishing either that: (4) the state's legitimate administrative interests outweigh the employee's First Amendment rights; or (5) the state would have taken the adverse employment action even absent the protected speech. See Robinson v. York, 566 F.3d 817, 822 (9th Cir. 2009); Eng, 552 F.3d at 1070; see also Lakeside-Scott v. Multnomah Cnty., 556 F.3d 797, 803 (9th Cir. 2009).

Karl v. City of Mountlake Terrace, 678 F.3d 1062, 1068 (9th Cir. 2012) (some internal citations omitted).

If all of the undisputed material facts, taken in the light most favorable to Plaintiffs, fail to establish any one of

---

[10] In Pickering, a teacher wrote a letter to a local newspaper criticizing the school board and the superintendent's handling of past bond issue proposals, which included both substantially correct and erroneous statements of fact. See 391 U.S. at 564, 88 S. Ct. at 1733. The Court held that the teacher's erroneous statements, which were critical of his employer but did not impede the teacher's performance or interfere with the school's operation, could not serve as the basis for his dismissal. Id. at 572–75, 88 S. Ct. at 1735–38. The Court explained that, "in a case such as this, absent proof of false statements knowingly or recklessly made by him, a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment." Id. at 574, 88 S. Ct. at 1737.

the five requirements stated in <u>Robinson</u>, <u>Eng</u>, and <u>Karl</u>, Plaintiffs' First Amendment claims fail as a matter of law and the Court need not examine the quantum of evidence on the other four factors. <u>See</u> <u>Dahlia v. Rodrigues</u>, ___ F.3d ___, 2013 WL 4437594 at *5 n.4 (Aug. 21, 2013)(stating this in an appeal of a motion to dismiss); <u>Desrochers v. City of San Bernardino</u>, 572 F.3d 703, 708-09 (9th Cir. 2009).

**A. Did Plaintiffs engage in speech protected by the First Amendment?**

The Court notes the extensive argument that has been made with regard to establishing whether Defendant Gilbert was or was not required to report his use of sick leave and vacation time, whether or not he actually did so, whether or not each Plaintiff knew or should have known that he was not required to do so as a result of the DPS investigation or otherwise, and whether or not an actual violation of policy or law occurred as a result of his reporting or not reporting his use of vacation and sick leave time.

In <u>Johnson v. Multnomah County</u>, 48 F.3d 420, 424 (9th Cir. 1995), the Ninth Circuit Court of Appeals held that even recklessly false statements are not per se unprotected by the First Amendment when they substantially relate to matters of public concern. "Instead, the recklessness of the employee and the falseness of the statements are to be considered in light of the public employer's showing of actual injury to its legitimate interests, as part of the <u>Pickering</u> balancing test [the fourth step of the requisite analysis]." <u>Id.</u> (holding that an employee's accusations of mismanagement and possible criminal

conduct against her immediate supervisor constituted speech of

public concern even though the statements were recklessly

false).[11]

> The "matter of public concern" test attempts
> to identify those cases in which the First
> Amendment protection of the speech is so
> insubstantial that the employer need show no
> countervailing interest at all before the
> employer may repress it. The County argues
> that recklessly false statements, like speech
> regarding the minutiae of internal personnel
> disputes, enjoy so little First Amendment
> protection that the public employer need show
> no injury to its legitimate interests before
> taking adverse actions in retaliation.
> ***
> [W]hile false statements are not deserving,
> in themselves, of constitutional protection,
> "erroneous statement is inevitable in free
> debate, and ... it must be protected if the
> freedoms of expression are to have the
> breathing space that they need ... to
> survive." New York Times Co. v. Sullivan, 376
> U.S. 254, 271-72, 84 S. Ct. 710, 721,
> [](1964)[]. For this reason, constitutional
> protection is afforded some false statements.
> In determining the level of protection to
> such statements, the Supreme Court has
> traditionally balanced the interest in
> creating a "breathing space" for speech
> against the competing governmental interests
> associated with preventing injurious false
> statements.

Johnson, 48 F.3d at 423-24 (some internal quotations and

citations omitted). Accordingly, knowingly false or "recklessly

false" speech receives some First Amendment protection. Id. at

426. See also Thomas v. City of Beaverton, 379 F.3d 802, 809

(9th Cir. 2004) (holding that a statement need not be

---

[11]   The Ninth Circuit reached no conclusion as to whether
statements that had been proven to be knowingly false would be
protected because the parties in Johnson did not assert that the
plaintiff had made a knowingly false statement. See 48 F.3d at 422
n.3.

objectively and knowingly true to be protected speech).

Whether speech is knowingly or recklessly false is a matter of law properly determined on summary judgment because, for purposes of qualified immunity, the inquiry is not whether the terminated employee actually made false statements knowingly or recklessly, but whether a reasonable municipal official could believe the employee had knowingly made a false statement or made the statement with reckless disregard for the truth. See, e.g., Kodish v. Oakbrook Terrace Fire Prot. Dist., 604 F.3d 490, 504 (7th Cir. 2010) ("Speech of public importance only loses its First Amendment protection if the public employee knew it was false or made it in reckless disregard of the truth."); See v. City of Elyria, 502 F.3d 484, 494-95 (6th Cir. 2007); Stanley v. City of Dalton, 219 F.3d 1280, 1290 n.18 (11th Cir. 2000).[12] Accordingly, the burden is not on Plaintiffs to prove that their speech was objectively true, but on Defendants to provide evidence not only that the content of Plaintiffs' speech was false, but that it was made with intentional or reckless disregard for the truth. See Westmoreland v. Sutherland, 662

---

[12]
A prosecutor's statement to a magazine about homicide rates within his jurisdiction is not protected by the First Amendment when it was admittedly false, admittedly made without any belief of a basis in fact, and made to promote sales of the prosecutor's novel. Hustler Magazine v. Falwell, 485 U.S. 46, 52 [](1988) (noting that speech is not protected when "made with knowledge that it was false or with reckless disregard of whether it was false or not")[].... A government employee who purposefully or recklessly misinforms the public about a fact specifically related to his area of employment responsibility in order to profit monetarily should not be rewarded by a money judgment from a federal court when he is demoted. ... Reuland v. Hynes, 460 F.3d 409, 421 (2d Cir. 2006) (Winter, J., dissenting).

-29-

F.3d 714, 718, 722 (6th Cir. 2011).  Such matters are properly decided on summary judgment where there is no disputed fact regarding whether, at the time of the adverse employment decision taken in retaliation for the protected speech, the defendant was aware the plaintiff knew of or was recklessly indifferent to the accuracy of their speech.  Id.

The Court concludes, as explained more fully infra, that Plaintiffs' statements regarding the Chief's leave practices could not reasonably be characterized as recklessly false, let alone intentionally false. Likewise, Defendant Taft's and Defendant Johnson's actions concluding that Plaintiffs' statements were recklessly or intentionally false were not reasonable.  The employees were merely expressing their belief of the facts as they then thought them to be and were requesting an impartial investigation.

**1. Did Plaintiffs speak on a matter of "public concern"?**

> Whether an employee's speech addresses a matter of public concern is a pure question of law that must be determined "by the content, form, and context of a given statement, as revealed by the whole record." Connick, 461 U.S. at 147–48 & n.7, 103 S. Ct. 1684. Of these three factors, the content of the speech is generally the most important. Clairmont, 632 F.3d at 1103. "[S]peech that deals with 'individual personnel disputes and grievances' and that would be of 'no relevance to the public's evaluation of the performance of governmental agencies' is generally not of 'public concern.'" Coszalter v. City of Salem, 320 F.3d 968, 973 (9th Cir. 2003) (quoting McKinley v. City of Eloy, 705 F.2d 1110, 1114 (9th Cir. 1983)).  By contrast, "[s]peech involves a matter of public concern when it can fairly be considered to relate to 'any matter of political, social, or other concern to the

community.'" <u>Johnson v. Multnomah Cnty.</u>, 48
F.3d 420, 422 (9th Cir. 1995) (quoting
<u>Connick</u>, 461 U.S. at 146, 103 S.Ct. 1684).

<u>Karl</u>, 678 F.3d at 1069 (emphasis added).

Plaintiffs contend they spoke on a matter of public concern, while Defendants argue that Plaintiffs' speech was primarily concerned with their individual personnel disputes with Chief Gilbert.   Defendants also contend that, because Plaintiffs' speech regarding Chief Gilbert's use of sick leave and vacation time was recklessly false in light of the DPS investigation, the speech was not, as a matter of law, protected speech.

There is no disputed issue of material fact with regard to this issue of law, i.e., the form, content, and context of the allegedly protected "speech," as revealed by the entire record.

The "form" of the speech was via an unsigned letter, which Plaintiffs later acknowledged they had participated in authoring, which was provided to AZPOST, and a letter signed by Plaintiffs as affirming their belief in the accusations made about Chief Gilbert in the AZPOST letter, which letters were provided to the Quartzsite Town Council and the public via the local media.   The content of the letters involved matters of "political, social, or other concern to the community," i.e., malfeasance by the Chief of Police.   The context of the speech was that employees of the department believed there was malfeasance by the Chief that Plaintiffs believed needed to be investigated.

Although the parties have focused on the "part" of the unsigned letter that focused on the Chief's use of sick leave and vacation time because this was the asserted reason for Plaintiffs' termination (that this allegation was false), the other allegations in the unsigned and signed letters are certainly relevant to establishing the context of the "speech" for which Plaintiffs were allegedly terminated.   The letter contained allegations which undoubtedly were or should have been of great concern to the citizens of Quartzsite, such as the assertions that arrest warrants were not executed and that legally restricted information was improperly gathered on citizens.   Additionally, although the Chief's reporting of sick leave or vacation time can be characterized as a "minor" infraction of city policy and procedures, it is also a matter of public concern because such reporting affected the amount of the Chief's ultimate compensation or pension benefits.   See Keyser v. Sacramento City Unified Sch. Dist., 265 F.3d 741, 747 (9th Cir. 2001).

Accordingly, as a matter of law, the Plaintiffs' "speech" was on matters of public concern.   See Huppert v. City of Pittsburg, 574 F.3d 696, 706 (9th Cir. 2009)("[A]n investigation into corruption at a public department is most certainly a matter of public concern.   The same is true for corruption within or concerning the police force.")[13]; McKinley

---

[13] "When the employee addresses issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government, that speech falls squarely within the boundaries of public concern." Id. (internal quotation

-32-

v. City of Eloy, 705 F.2d 1110, 1114 (9th Cir. 1983) ("the competency of the police force is surely a matter of great public concern").   Compare Desrochers, 572 F.3d at 712-13.[14]

   **2. Did Plaintiffs speak as private citizens and not within the scope of their official duties as public employees?**

   Plaintiffs bear the burden of establishing the relevant speech was uttered in their capacities as private citizens and not in their capacities as public employees.   See, e.g., Garcetti v. Ceballos, 547 U.S. 410, 421-22, 126 S. Ct. 1951, 1959-60 (2006); Eng v. Cooley, 552 F.3d 1062, 1071 (9th Cir. 2009).   This is a mixed question of law and fact.   See, e.g., Gibson v. Office of Att'y Gen., 561 F.3d 920, 925 (9th Cir. 2009).   "While the Supreme Court [in Ceballos] did not delineate a 'comprehensive framework' for determining when speech is pursuant to an employee's job function, it provided guidance for

_____

marks and citations omitted). We have said that "[u]nlawful conduct by a government employee or illegal activity within a government agency is a matter of public concern." Thomas v. City of Beaverton, 379 F.3d 802, 809 (9th Cir. 2004). Furthermore, "misuse of public funds, wastefulness, and inefficiency in managing and operating government entities are matters of inherent public concern." Johnson v. Multnomah County, 48 F.3d 420, 425 (9th Cir. 1995). It is clear to us that an investigation into corruption and misconduct at the local Public Works Department-typically a municipal department created to provide multiple public services to community members-is a matter of public concern. Cf. Robinson, 566 F.3d at 823.
Huppert, 574 F.3d at 703-04.

   [14] In Desrochers, the court found:
    Rather, the sergeants complain about their superiors'- especially Kimball's - personalities; the grievances amount to a laundry list of reasons why Desrochers, Lowes, and perhaps other SBPD employees found working for Kimball to be an unpleasant experience.
    In short, they thought their boss was a bully and said so. 572 F.3d at 713 & n.11.

-33-

lower courts to follow when making such a decision." Huppert, 574 F.3d at 706. "[S]tatements are made in the speaker's capacity as citizen if the speaker had no official duty to make the questioned statements, or if the speech was not the product of performing the tasks the employee was paid to perform." Posey v. Lake Pend Oreille Sch. Dist. No. 84, 546 F.3d 1121, 1127 n.2 (9th Cir. 2008)(internal citations and quotation marks omitted). Compare Huppert, 574 F.3d at 706.

In Freitag v. Ayers, the Ninth Circuit determined that the plaintiff's reports of sexual harassment, and complaints to her superiors within the prison system about the harassment, were examples of unprotected speech. The Ninth Circuit also found, however, that the plaintiff's communication outside the prison system, to her state senator and the appointed inspector general with regard to the failure of the prison system to address her complaints of sexual harassment, were found to be communications protected by the First Amendment. The Ninth Circuit reasoned that "[the plaintiff's] right to complain both to an elected public official and to an independent state agency is guaranteed to any citizen in a democratic society regardless of his status as a public employee." 468 F.3d 528, 546 (9th Cir. 2006).

Defendants contend that Plaintiffs' speech was not that of a private citizen:

> Here, the undisputed evidence shows that the Plaintiffs' speech was animated by a dislike for the Chief and a desire to protect themselves and improve their personal work environment; matters that do not relate to a public concern.
> For instance, Kemp, Frakes, Ponce, and

-34-

Norris testified that they complained to AZ POST because they were required to do so to avoid losing their certification as police officers. [SOF 37-43, 52-57] Kemp was, perhaps, the most blunt about it, admitting that he participated in the complaint, "to cover [his own] ass." Thus, the undisputed evidence shows that Plaintiffs were acting within the scope of their duties as police officers, and for the purpose of preserving their own jobs – and not as "citizens." For these reasons alone, the Court should conclude that their speech was unprotected. <u>Garcetti v. Ceballos</u>, 547 U.S. 410, 421 (2006) ("We hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."). Moreover, in a particularly candid admission, one Plaintiff testified that he did not care about what AZPOST did with his complaint–hardly the sentiment of someone who was attempting to raise issues of public concern.

Doc. 90 at 8.

In the recent en banc decision in <u>Dahlia v. Rodriguez</u>, the Ninth Circuit Court of Appeals restated that the proper inquiry as to whether a plaintiff is acting as a private citizen or reporting pursuant to official duties "is a practical one," which does not focus on a plaintiff's formal job description as a police officer. <u>See</u> ___ F.3d ___, 2013 WL 4437594 at *7 (Aug. 21, 2013), <u>citing</u> <u>Garcetti</u>, 547 U.S. at 424-25, 126 S. Ct. at 1961-62. The en banc panel specifically overruled its prior decision in <u>Huppert v. City of Pittsburgh</u>, to the extent <u>Huppert</u> had "improperly relied on a generic job description and failed to conduct the 'practical,' fact specific inquiry required by

1  <u>Garcetti</u>."[15]

2          The <u>Dahlia</u> en banc panel identified a three-prong
3  analysis for determining whether a plaintiff speaks as a public
4  servant or private citizen:  The first factor in the analysis is
5  whether the employee reported their complaints through the chain
6  of command.  In this matter, Plaintiffs reported their complaints
7  about the Chief outside the chain of command, i.e., to AZPOST,
8  to the Town Council, and to the public via the media.  <u>See</u>
9  <u>Dahlia</u>, 2013 WL 4437594 at *10 ("[w]hen a public employee
10 communicates with individuals or entities outside of his chain
11 of command it is unlikely that he is speaking pursuant to his
12 duties.").

13         The second factor identified by the <u>Dahlia</u> court looks
14 at the content of the speech, i.e., whether the speech takes the
15 form of a "routine report" ordinarily prepared by the plaintiff
16 in the scope of their employment.  In this matter, the speech was
17 not in the form of speech undertaken as part of any plaintiff's
18 job duties.  <u>Id.</u>

19         The third prong of the analysis evaluates whether the
20 plaintiff spoke "in direct contravention to his supervisor's
21 orders," in which case it may be concluded that the speech was
22 not made as part of the plaintiff's professional duties.  <u>Id.</u>,
23 2013 WL 4437594 at *11.  "Indeed, the fact that an employee is
24 threatened or harassed by his supervisors for engaging in a
25 particular type of speech provides strong evidence that the act

26 ━━━━━━━━━━━━━━━

27         [15] The decision in <u>Dahlia</u> is specific to a prior holding that
   California's police officers were unique for purposes of First
28 Amendment retaliation claims because of specific provisions of
   California state law not relevant to this matter.

of speech was not, as practical matter, within the employee's job duties..." Id.  In this matter, the record indicates that Chief Gilbert in effect told the police officers present at the June or July 2010 department meeting that they would be retaliated against for raising issues about his behavior to an outside investigative agency.

The Court concludes that the undisputed material facts establish that Plaintiffs spoke as private citizens and not as public employees.[16]

**3. Did Plaintiffs suffer an adverse employment action, for which Plaintiffs' protected speech was a substantial or motivating factor?**

The parties are in agreement that Plaintiffs were terminated because of their statements regarding Chief Gilbert's failure to report his use of sick leave and vacation time, which Defendants contend they determined was recklessly false because the DPS investigation into this issue had indicated no evidence to support a claim of malfeasance by Chief Gilbert.

Accordingly, Plaintiffs were all terminated from their employment based on their protected speech as private citizens, i.e., Plaintiffs were terminated because of their statement regarding Chief Gilbert's failure to report his use of sick leave and vacation time, which the Court has found to be protected

---

[16] Arizona Revised Statutes Annotated § 41-1828.01(A) states that a law enforcement agency "may" report to the board any peace officer misconduct in violation of the rules for retention at any time and "shall" report the misconduct upon the peace officer's termination, resignation or separation from the agency. The statute is silent as to any individual officer's duty to report such conduct. The AZPOST regulations (R13-4-101 et seq) are also silent as to an individual officer's duty to report malfeasance.

1 speech.   Even if Plaintiffs' speech on this issue were not the
2 sole reason for Plaintiffs' termination, under the "mixed motive"
3 analysis established by <u>Mt. Healthy</u>, the question is whether the
4 employer "would have reached the same [adverse employment]
5 decision even in the absence of the [employee's] protected
6 conduct." <u>Ulrich v. City & Cnty. of S.F.</u>, 308 F.3d 968, 976-77
7 (9th Cir. 2002), <u>citing</u> <u>Mt. Healthy</u>, 429 U.S. at 287, 97 S. Ct.
8 at 568; <u>Thomas</u>, 379 F.3d at 808.   In their motion for summary
9 judgment and response to Plaintiffs' motion for summary judgment
10 Defendants do not urge in any manner that Plaintiffs would have
11 been terminated absent their involvement in the AZPOST letter.

12 **4.   Did Defendant Town of Quartzsite's legitimate**
13 **administrative interests outweigh Plaintiffs' First Amendment**
14 **rights?**

15 If a plaintiff meets their burden of establishing that
16 they engaged in protected speech as a private citizen and that
17 they suffered an adverse employment action predicated at least
18 in part by their protected speech, then the burden shifts to the
19 defendant to escape liability by establishing that the
20 defendant's legitimate administrative interests outweighed the
21 plaintiff's First Amendment rights to utter the protected speech.
22 This portion of the analysis is referred to as the "Pickering"
23 test.

24 Resolution of the Pickering balancing test is a matter
25 of law properly decided on summary judgment. <u>See</u>, <u>e.g.</u>, <u>Eng</u>, 552
26 F.3d at 1071.   Additionally, because Defendants have asserted
27 qualified immunity from liability, the Pickering balancing test
28 is amended: the question becomes whether the outcome of the

1  Pickering test so clearly favors Plaintiffs that it would have
2  been patently unreasonable for Defendants to conclude that the
3  First Amendment did not protect Plaintiffs' speech.  See, e.g.,
4  Gilbrook v. City of Westminster, 177 F.3d 839, 867 (9th Cir.
5  1999).

6          To meet their burden on the Pickering test Defendants
7  must establish that their "legitimate administrative interests"
8  outweighed Plaintiffs' First Amendment rights.  See Clairmont v.
9  Sound Mental Health, 632 F.3d 1091, 1106-08 (9th Cir. 2011).
10 Asserted   administrative   interests   which   are   "weak   and
11 unsupported" do not outweigh legitimate free speech rights.  Id.
12 at 1106.   Additionally, the employer must show "injury to its
13 legitimate interests." Johnson, 48 F.3d at 427 (emphasis added).
14 A  public  employer  "does  not  have  a  legitimate  interest  in
15 covering  up  mismanagement  or  corruption  and  cannot  justify
16 retaliation  against  whistleblowers  as  a  legitimate  means  of
17 avoiding  the  disruption  that  necessarily  accompanies  such
18 exposure." Id.

19              These interests include promoting efficiency
20              and integrity in the discharge of official
              duties and maintaining proper discipline in
21              the  public  service.  Connick,  461  U.S.  at
              150-51,  103  S.  Ct.  1684....  Cases  that
22              analyze   whether   the   government's
              administrative   interests   outweighed   the
23              plaintiff's  right  to  engage  in  protected
              speech  examine  disruption  resulting  both
24              from  the  act  of  speaking  and  from  the
              content of the speech.

25 Id. (emphasis added).

26              In  balancing  the  competing  interests,  this
              court  has  considered  a  host  of  factors.  We
27              have  inquired  whether  the  speech  (1)
              impaired discipline or control by superiors;
28              (2)  disrupted  co-worker  relations;  (3)

> eroded a close working relationship premised
> on personal loyalty and confidentiality; (4)
> interfered with the speaker's performance of
> his or her duties; or (5) obstructed routine
> office operations. <u>See</u> <u>Fazio v. City &
> County of San Francisco</u>, 125 F.3d 1328, 1331
> n.1 (9th Cir. 1997).... Moreover, this court
> has weighed (6) whether the speaker directed
> the statement to the public or the media, as
> opposed to a governmental colleague, <u>id.</u> at
> 981; (7) whether the speaker served in a
> high-level, policy-making capacity; and (8)
> whether the statement was false or made with
> reckless disregard of the truth, <u>see</u> <u>Moran
> v. Washington</u>, 147 F.3d 839, 849-50 (9th
> Cir. 1998) (considering those last two
> factors). Because the Pickering balance
> necessarily involves a fact-sensitive
> inquiry involving the totality of the
> circumstances, no single factor is
> dispositive.

<u>Gilbrook</u>, 177 F.3d at 867-68.

When determining whether Plaintiffs' speech disrupted the workplace, the Court also reviews "the manner, time, and place in which" the protected speech occurred. <u>Connick v. Myers</u>, 461 U.S. 138, 152-53, 103 S. Ct. 1684, 1693 (1983). In <u>Connick</u>, the fact that the speech took place at the office was found to support the determination that the speech disrupted the efficiency of the workplace. <u>Id.</u>, 461 U.S. at 153, 103 S. Ct. at 1093-94. The Supreme Court contrasted the situation in <u>Connick</u> with that in <u>Pickering</u>, where the employee's speech occurred during their free time away from the workplace.

The Court may weigh the level of disruption against the value of the free speech. A showing of actual disruption will weigh more heavily against free speech. Additionally, the burden on the defendants to demonstrate a workplace disruption is heavier in cases where the speech involved unlawful activities rather than political or policy differences. <u>See</u> <u>Keyser</u>, 265

1  F.3d at 748-49.   To prove that an employee's speech interfered
2  with working relationships, the defendant must demonstrate
3  "actual, material and substantial disruption, or reasonable
4  predictions of disruption in the workplace." Robinson v. York,
5  566 F.3d 817, 824 (9th Cir. 2009) (internal quotation marks
6  omitted).

7          In Connick, the Supreme Court characterized the public
8  employee's speech as "causing a mini-insurrection" and as "an act
9  of insubordination which interfered with working relationships."
10 461 U.S. at 151, 103 S. Ct. at 1192.   In Robinson the plaintiff
11 police officer sued for retaliation after he was disciplined for
12 failing to follow the proper channels of communication in making
13 complaints about department corruption, discrimination and
14 misconduct. See 556 F.3d at 822.   The court noted that "[e]ven
15 in a police department, the complained-of disruption must be real
16 and not imagined." Id. at 824 (citation and quotation marks
17 omitted).   In Robinson the court denied qualified immunity based
18 on an insufficient showing of "disruption" as well as the clearly
19 established law that "[a]n employer's written policy requiring
20 speech to occur through specified 'channels' [is] insufficient
21 to justify retaliation motivated by protected speech." Id. at
22 826.

23         The "administrative interest" proffered by Defendants
24 as outweighing Plaintiffs' free speech rights in calling
25 attention to what they perceived to be malfeasance by Chief
26 Gilbert is: maintaining the integrity of the Quartzsite Police
27 Department by terminating employees who perpetuated a falsehood
28 with regard to the Chief's use of sick leave and vacation time,

resulting   in   disruption   within   the   police   department,   the
disruption   of   Town   Council   meetings,   expense   to   the   Town   with
regard   to   the   investigation   of   the   matter   by   a   private   law   firm
and   bringing   "discredit"   to   the   Town   of   Quartzsite.[17]

Analyzing   the   factors   stated   in   <u>Gilbrook</u>,   as   a   result
of   Plaintiffs'   speech:   Chief   Gilbert's   discipline   or   control   over
Plaintiffs   was   minimally   impaired   and   co-worker   relations   were
somewhat   disrupted;   No   "close   working   relationship   premised   on
personal   loyalty   and   confidentiality"   was   eroded   because   none
existed   prior   to   the   speech;   The   speech   did   interfere,   to   a
minimal   degree,   with   Plaintiffs'   performance   of   their   duties   and
slightly   obstructed   routine   office   operations;   The   statements
were   made   anonymously   to   AZPOST   and   were   also   made   to   the   Town
Council   and   to   the   media,   rather   than   being   initiated   through   the
"chain   of   command";   Plaintiffs   were   not   high-level,   policy-making
employees.

As   noted   supra,   whether   Plaintiffs'   speech   involved
knowingly   or   recklessly   false   statements   is   evaluated   as   part   of
the   Pickering   test   and   when   considering   whether   Defendants   are
entitled   to   qualified   immunity.   With   regard   to   the   statements
in   the   AZPOST   letter   asserting   the   Chief   failed   to   report   the   use
of   sick   leave   and   vacation   time,   Plaintiff   Ponce   stated   his
belief   that   the   Chief   was   obliged   to   and   did   not   report   his   use
of   leave   time   came   from   inquiries   Plaintiff   Ponce   received   from
the   Town's   finance   section.   Plaintiff   Ponce   was   responsible   for

---

[17] The   assertion   that   firing   the   officers   for   dishonesty   was
necessary   because   of   Brady   concerns   is   belied   by   the   fact   that   three
of   the   officers   were   re-hired   after   the   initiation   of   litigation.

obtaining the payroll documents, including leave slips, from employees in the police department, including the Chief. Plaintiff Ponce stated he was contacted by the Town of Quartzsite finance department on at least six occasions when the department requested the Chief's leave slips. Each time Plaintiff inquired of the Chief regarding leave slips, Defendant Gilbert said he would take care of "it", but did not produce the forms. Defendant Gilbert did not tell Plaintiff Ponce that he was exempt from submitting leave forms, but he did claim to Plaintiff Kemp that he was exempt from submitting vacation leave forms.

Pursuant to sections 1301-1305 of the Town of Quartzsite's personnel policy manual, town employees were guaranteed a variety of holiday, vacation and sick benefits. Unclassified employees, such as the Chief, could be granted administrative leave, i.e., "comp time," but only as approved by the Mayor or Town Manager. Unclassified employees, such as the Chief, could be awarded annual leave as determined by the Town Council at the time of their hire. The town's policies provided a number of financial benefits which, under certain circumstances and upon an annual basis or at separation or retirement, could enrich the employee significantly. The value of the benefits was based upon account balances of unused leave. All employees were informed of the benefits when starting employment. According to Dan Field, the Town's former attorney, prosecutor, and Town Manager, Defendant Gilbert should have been reporting all his leave time, pursuant to the terms of his contract and the Town's personnel rules, because when it came time to calculate the Chief's benefits upon retirement or termination "unused" sick or

leave time would increase the amount of benefits due to the Chief.   See PSOF, Exh. Y. Defendants Taft and Johnson have testified that even after the extensive investigation it is impossible to determine what leave the Chief actually took. DSOF. Exh. 1 at 39 and Exh. 2 at 101.

According to Defendant Taft, Chief Gilbert was to submit advance vacation leave forms.   DSOF, Exh. 1 at 32. Defendant Johnson's view was that Chief Gilbert did not need to report vacation or sick leave at all.  Id., Exh. 2 at 103.   Yet Defendant Johnson, also an exempt employee, maintained his own personal time sheets of leave taken because in the past, unrelated to the Chief's conduct two Town employees had been unjustly enriched upon leaving employment by abusing the leave system.  Id., Exh. 2 at 10.

At a minimum, the Chief's assertions that the DPS investigation had exonerated him of all allegations of misconduct clearly misrepresented the outcome of the DPS investigation to the Plaintiffs.   The Chief's contract itself is but a poorly drafted form contract which does not resolve the inconsistencies between section 5(a) of the contract and sections 1301-1305 of the Town of Quartzsite personnel policy manual which section 5(b) of the contract mandates be applied to the Chief.

Under these circumstances it was reasonable for Plaintiffs to reject the Chief's statements of self-proclaimed innocence.  Plaintiffs' statement in the AZPOST letter regarding the Chief's leave practices could not be characterized as reckless, let alone intentionally false.  Accordingly, the claims were not made with reckless disregard for the truth because

1  Plaintiffs, at the time the statements were made, believed the
2  Chief had not properly reported his use of sick or vacation time.
3        Defendants contend that the content of Plaintiffs'
4  speech interfered with the working relationship between the Chief
5  and his employees.  The record on summary judgment is devoid of
6  evidence of such disruption in the workplace, i.e., the police
7  department, as a result of Plaintiffs' speech.  Chief Gilbert
8  stated in his deposition that he had to be careful in his
9  conversation with Plaintiffs and that Plaintiffs did the
10 "minimum" amount of work possible to get by after making the
11 complaints to AZPOST, and that there was "tension" between the
12 complainants and police department officers and staff who had not
13 complained.  Chief Gilbert did not testify that service to the
14 public was interrupted, that officer safety was compromised, that
15 arguments or fights occurred in the workplace, or that any other
16 substantial disruption in the police department occurred.
17 Defendants have not demonstrated actual, material and substantial
18 disruption of the workings of the Quartzsite Police Department
19 which was caused by Plaintiffs' speech.  There is insufficient
20 evidence in the record to conclude that the proper day-to-day
21 functioning of the police department was jeopardized by the
22 actions of Plaintiffs.  Compare Desrochers, 572 F.3d at 712-13.

23            Likewise, while the grievances state that
              Kimball's actions "made it difficult for [the
24            sergeants'] teams to function" and impacted
              the SBPD "in a negative way," a reader
25            struggles in vain to discover where or how
              the proper functioning of the police
26            department was jeopardized by the actions of
              Kimball, Mankin, Billdt, or Boom. Cf., e.g.,
27            Gilbrook, 177 F.3d at 866 (involving
              statements which addressed "the fire
28            department's ability to respond effectively

-45-

> to life-threatening emergencies"). There are
> no accounts of failed law enforcement
> efforts, no descriptions of botched
> investigations, and no discussion of duties
> the SBPD was unable to perform in a competent
> fashion due to the actions of the sergeants'
> supervisors. Cf., e.g., Hyland v. Wonder, 972
> F.2d 1129, 1139 (9th Cir. 1992) (involving
> speech on the "inept, inefficient, and
> potentially harmful administration of a
> governmental entity"). Desrochers and Lowes
> do not allege that anyone failed to do his
> job, or even that someone did his job poorly.
> Cf., e.g., Gillette, 886 F.2d at 1197-98
> (involving speech criticizing police officers
> for using excessive force on a particular
> occasion).

Id.

In this matter, even construing the evidence in favor of Defendants, it appears the Chief's behavior, including his response to Plaintiffs' protected speech, caused the breakdown in the working relationships within the police department.[18]

Additionally, although this is not workplace disruption, it is abundantly clear from the evidence that any "disruption" with regard to the functioning of the Town of Quartzsite or the conduct of Town Council meetings, for the most part, existed prior to Plaintiffs' allegations against the Chief and, indeed, the Chief's behavior at Town Council meetings itself caused unwarranted "disruption." The record in this matter is replete with examples of disruptions at Town Council meetings, including the regular arrests of the same individuals, Defendant Johnson,

---

[18] Defendant Gilbert stated in his deposition that after the letter was submitted to AZPOST there were some strained relationships within the department but that employees continued to do their jobs. The Chief stated in his deposition that he could not remember any specific problem with regard to the functioning of the department after the submission of the letter, although he stated there was some public mistrust toward the department after the contents of the letter became public. See Doc. 91, Exh. 3 at 52-54.

-46-

with the concurrence and assistance of the Chief, having people arrested and removed from the meetings, and regular verbal assaults by speakers directed at Town of Quartzsite staff.

Defendants have not established that any legitimate administrative interest, i.e., protecting the integrity of its police officers particularly with regard to their veracity in testifying in criminal matters, was impacted by the protected speech. Whether or not the Chief violated the exact terms and conditions of his employment contract and whether the DPS investigation "exonerated" the Chief of the allegation of abuse, there is no indication in the record that any specific Plaintiff's credibility as a witness was challenged as a result of making supposedly "false" statements regarding the administration of the department. Furthermore, with regard to Plaintiff Conley, her public questioning of the Chief's integrity could not be said to affect her credibility as a witness in a criminal proceeding, she being an administrative employee.

Defendants have not shown an actual injury to a legitimate interest in avoiding actual "disruption" in the workplace caused by Plaintiffs' protected speech. See Johnson, 48 F.3d at 427, quoted in Keyser, 265 F.3d at 748 ("it would be absurd to hold that the First Amendment generally authorizes corrupt officials to punish subordinates who blow the whistle simply because the speech somewhat disrupted the office.").

Defendants have not met their burden of establishing a legitimate administrative interest which outweighed Plaintiffs' right to bring potential misconduct in the Quartzsite police department to the public's attention. Defendant Johnson's

1  assertion that the "disrespect" brought upon the Town of

2  Quartzsite by the plaintiffs' actions outweighed the plaintiffs'

3  protected speech is not supported factually or legally.

4  **B. Are the individual Defendants entitled to qualified**

5  **immunity from Plaintiffs' section 1983 claims?**

6  A public official who is a defendant in a section 1983

7  case is entitled to qualified immunity unless (1) "the facts

8  alleged, taken in the light most favorable to the party asserting

9  the injury, show that the official's conduct violated a

10 constitutional right;" and (2) the right at issue "was clearly

11 established 'in light of the specific context of the case' at the

12 time of the alleged misconduct." Clairmont, 632 F.3d at 1100.

> To determine whether a government official is
> entitled to qualified immunity, we ask two
> questions: whether the official violated a
> statutory or constitutional right, and
> whether that right was clearly established at
> the time of the challenged conduct....
>
> For purposes of qualified immunity, we
> resolve *all factual disputes in favor of the
> party asserting the injury.*

Ellins v. City of Sierra Madre, 710 F.3d 1049, 1064 (9th Cir.

2013)(internal citations omitted and emphasis added).

> "Whether the law was clearly established is
> an objective standard; the defendant's
> 'subjective understanding of the
> constitutionality of his or her conduct is
> irrelevant.'" Clairmont, 632 F.3d at 1109
> (quoting Fogel v. Collins, 531 F.3d 824, 833
> (9th Cir. 2008)). Qualified immunity is
> designed "to ensure that before they are
> subjected to suit, officers are on notice
> their conduct is unlawful." Saucier, 533 U.S.
> at 206, 121 S.Ct. 2151.

Karl, 678 F.3d at 1073-74. See also Moran v. Washington, 147

F.3d 839, 845 (9th Cir. 1998)("[T]he inquiry into whether or not

a claimed right was clearly established must focus upon the right not in a general, abstract sense, but rather in a practical, particularized sense.").

An identical fact-pattern need not have been presented to a federal court for a municipal actor to have had "fair warning" that their conduct was unconstitutional. See Bull v. City & Cnty. of S.F., 595 F.3d 964, 1003 (9th Cir. 2010); White v. Lee, 227 F.3d 1214, 1238 (9th Cir. 2000) ("Closely analogous preexisting case law is not required to show that a right was clearly established."). The Ninth Circuit has concluded that the First Amendment right to free speech with regard to matters of public concern regarding the speaker's workplace, in that matter a police department, was clearly established at the time of the events giving rise to this matter. See Ellins, 710 F.3d at 1064.

As stated supra, Defendants may lay claim to qualified immunity only if a "reasonable" official could have believed Plaintiffs' statements were knowingly or recklessly false. See City of Elyria, 502 F.3d at 495. A municipal official who reasonably believes that an employee deliberately or recklessly made false statements unprotected by the First Amendment could reasonably conclude that the employee could be disciplined for making the statements without running afoul of the constitution. See id. at 494-95. The inquiry is not whether the employee actually made false statements knowingly or recklessly, but whether a reasonable official could believe, even mistakenly believe, that the employee had made knowingly or recklessly false statements. See, e.g., Hunt v. County of Orange, 672 F.3d 606, 615-16 (9th Cir. 2012); Levine v. City of Alameda, 525 F.3d 903,

-49-

906 (9th Cir. 2008) ("In this case, although defendants violated [the plaintiff's] due process rights by failing to provide a hearing, qualified immunity applies because [the defendant] reasonably believed that his conduct was lawful."); <u>Diaz-Bigio v. Santini</u>, 652 F.3d 45, 55-56 (1st Cir. 2011); <u>Springer v. Henry</u>, 435 F.3d 268, 280 (3d Cir. 2006); <u>Gustafson v. Jones</u>, 290 F.3d 895, 913 (7th Cir. 2002); <u>Gossman v. Allen</u>, 950 F.2d 338, 342 (6th Cir. 1991).

> *[W]e need only decide whether a reasonable official could believe that [the plaintiff] knowingly or recklessly made false statements. If an official reasonably believes that an employee made statements with knowledge of, or reckless indifference to, their falsity, the official would conclude that the employee could be fired without offending the First Amendment. Qualified immunity would therefore attach.*

<u>Gossman</u>, 950 F.2d at 342 (emphasis added). As the Supreme Court has noted, "the court should ask whether the [official] acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed five years after the fact." <u>Hunter v. Bryant</u>, 502 U.S. 224, 228, 112 S. Ct. 534, 537 (1991).

At the time of Plaintiffs' termination, Defendant Taft was the Town Manager and Personnel Manager, and Defendant Johnson was the Assistant Town Manager. Defendant Johnson, a subordinate, terminated Plaintiffs' employment, with the assent of Defendant Taft, his superior and the town's Personnel Manager–Defendant Taft signed Plaintiff Kemp's termination letter after reviewing the record. <u>See</u> DSOF, Exh. 1 at 80. Plaintiffs were terminated after being "threatened" by Defendant Gilbert that those who

1  spoke out against him would be subject to retaliation.[19]
2  Defendants Taft and Johnson concurred in the termination of
3  Plaintiffs. DSOF. Exh. 1 at 80 and Exh. 2 at 9.

4         A municipal officer, such as Defendant Gilbert, who is
5  not the final decision maker regarding an adverse employment
6  decision taken in retaliation for the exercise of free speech,
7  can still be liable if he "'set[s] in motion a series of acts by
8  others which the actor knows or reasonably should know would
9  cause others to inflict the constitutional injury.'" Gilbrook,
10 177 F.3d at 854, quoting Johnson v. Duffy, 588 F.2d 740, 743-44
11 (9th Cir. 1978). See also Levine, 525 F.3d at 907 (stating this
12 standard upon review of a motion to dismiss).

13        Defendants argue:

14        As an initial matter, the record is devoid
          of any evidence that Town Manager Alex Taft
15        or Chief Gilbert were involved in the
          termination of Plaintiffs' employment.
16        Instead, the undisputed evidence shows that
          Assistant Town Manager Al Johnson was the
17        sole decision maker, and that Johnson never
          consulted Taft or Gilbert on the subject.
18        [SOF 1, 179-84, 195-98] While Plaintiffs may
          contend that Taft and Gilbert must have been
19        involved in a purported conspiracy to
          retaliate against them, it is well-settled
20        that a party cannot rely on unsupported and
          self-serving speculation to defeat summary
21        judgment. See, e.g., Villiarimo v. Aloha
          Island Air, Inc., 281 F.3d 1054, 1061 (9th
22        Cir. 2002) (stating that "this court has
          refused to find a genuine issue where the
23        only evidence presented is uncorroborated and
          self-serving testimony") (internal citation
24        omitted); Villodas v. Healthsouth Corp., 338

25

---

26        [19] All three individual Defendants are sued in both their
     individual and official capacities; a suit against a municipal officer
27   in their official capacity is, in essence, a suit against the
     municipality. See, e.g., Hafer v. Melo, 502 U.S. 21, 25, 112 S. Ct.
28   359, 361-62 (1991); Kentucky v. Graham, 473 U.S. 159, 165-66, 105 S.
     Ct. 3099, 3105 (1985).

> F. Supp. 2d 1096, 1104-05 (D. Ariz. 2004)
> (same).
>
> Even if Taft and Gilbert were involved in
> the termination decisions (which they were
> not) all three individual defendants are
> immune from liability as a matter of law. As
> public officials, the individual defendants
> are entitled to qualified immunity unless
> Plaintiffs prove that they violated "clearly
> established statutory or constitutional
> rights of which a reasonable person should
> have known." Harlow v. Fitzgerald, 457 U.S.
> 800, 818 (1982).

Doc. 90 at 17.

The record is not devoid of evidence that Defendant Gilbert or Defendant Taft had any part in the termination of Plaintiffs. The investigation undertaken by Defendant Johnson was at the specific request of Defendant Taft. When completed, Defendant Taft concurred in the findings and the employees' terminations. Defendant Taft signed Plaintiff Kemp's termination letter. Defendant Gilbert had publicly complained to all that Plaintiffs' assertions about him were false and threatened Plaintiffs with retaliation which ultimately occurred. Defendant Gilbert attempted to intimidate the AZCOP representative and interfere with the representative's support of the officers before the Town council. Defendant Gilbert assisted in the investigation by retrieving information from the Plaintiffs' personnel files in the police department. Accordingly, Defendant Gilbert, Defendant Taft, and Defendant Johnson are all liable in their personal capacities for violation of Plaintiffs' First Amendment rights.

### D. Municipal liability

Defendant Johnson's act of terminating each Plaintiff's employment was ratified by his superior, Defendant Taft, the Town Manager and Personnel Officer.  Defendant Taft herself terminated Plaintiff Kemp.  Additionally, Defendant Gilbert's act of threatening Plaintiffs with retaliation if they exercised their right to free speech was effectively ratified by the acts of Defendant Taft and Defendant Johnson.

In <u>Monell v. New York City Department of Social Services</u>, the Supreme Court held that local governments can be held liable for constitutional torts caused by official policies. 436 U.S. 658, 694, 98 S. Ct. 2018, 2037 (1978).  Municipal liability is limited "to acts that are, properly speaking, acts of the municipality—that is, acts which the municipality has officially sanctioned or ordered." <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 480, 106 S. Ct. 1292, 12098 (1986) (quotation marks omitted).  Accordingly, Plaintiffs can establish municipal liability for violation of their First Amendment rights accruing to Defendant Town of Quartzsite by: (1) showing that a Town of Quartzsite employee committed the alleged constitutional violation pursuant to a formal town policy or longstanding town practice; (2) showing that the town official committing the constitutional tort had final policy-making authority with regard to the challenged action; or (3) by showing that an official with final policy-making authority ratified a subordinate's unconstitutional act and the basis for the act.  <u>See Gillette v. Delmore</u>, 979 F.2d 1342, 1346-47 (9th Cir. 1992).

A municipal policy may be established by even "the

single act of a policymaker" if that official has final policymaking authority. See, e.g., Pembaur v. City of Cincinnati, 475 U.S. 469, 480, 106 S. Ct. 1292, 1298-99 (1986). The official must have final policymaking authority to bind the municipality to his actions. Id., 475 U.S. at 483, 106 S. Ct. at 1300. A policymaker is one who, on the relevant issue, has the final authority to make a decision from several available alternatives. Id., 475 U.S. at 483-84, 106 S. Ct. at 1300. A municipality can be liable for the harm caused by an official with this authority because the municipal agent's status cloaks him with the municipality's authority. Id., 475 U.S. at 481, 106 S. Ct. at 1299; City of St. Louis v. Praprotnik, 485 U.S. 112, 122, 108 S. Ct. 915, 923 (1988). Final policymaking authority is a question "to be resolved by the trial judge before the case is submitted to the jury." Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737, 109 S. Ct. 2702, 2724 (1989).

Whether an official has final policymaking authority to bind the municipality is a question of state law. See, e.g., Praprotnik, 485 U.S. at 123-24, 108 S. Ct. at 924. "When determining whether an individual has final policymaking authority, we ask whether he or she has authority 'in a particular area, or on a particular issue.'" Lytle v. Carl, 382 F.3d 978, 983 (9th Cir. 2004). For example, when the adverse employment action is a transfer, a court should note whether the defendant was a "final policymaker" in regard to transfers of subordinate employees. Id. In making these determinations, the Court must consider whether the official's discretionary decision is "constrained by policies not of that official's making" and

whether the official's decision is "subject to review by the municipality's authorized policymakers." Praprotnik, 485 U.S. at 127, 108 S. Ct. at 926.  See also Delia v. City of Rialto, 621 F.3d 1069, 1083-85 (9th Cir. 2010).  A municipal agent's ability to make policy must not be confused with the ability to make decisions.  See Praprotnik, 485 U.S. at 126, 108 S. Ct. at 925-26 (cautioning that "[i]f the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from respondeat superior liability."); Delia, 621 F.3d at 1083-84.

Arizona governmental entities have no inherent power and possess only those powers delegated to them by law. Braillard v. Maricopa County, 224 Ariz. 481, 487,232 P.3d 1263, 1269 (App. 2010). Pursuant to A.R.S. §9-240(B)(12) a town council shall have the power to hire, regulate and remove police officers.  However, A.R.S. §9-303(B) specifies that the town manager shall have and exercise those powers and duties as specified. Sections 1501, 1506, 1703 and 1801 of the Town of Quartzsite's personnel policy vests complete and ultimate authority in the Town Manager to deal with personnel matters. Section 1801 states:

> The Town Manager is responsible for administration of the rules and regulations set forth in this policy. In order to establish uniform administration of these rules, the Town Manager may publish a comprehensive administration manual which serves as the official communication for implementing policy, establishing procedures, and issuing regulations, orders and announcements.

Section 1603 further indicates the Town Manager's ultimate decision is final.  Defendant Johnson testified that the Town

1   Council had nothing to do with personnel matters.   DOSF, Exh. 2

2   at 115.  It is clear from the above that the Town council has

3   delegated to the Town Manager all those powers found in A.R.S.

4   §9-240(B)(12) and all personnel matters.

5          If the Town Council delegated to Defendant Taft only the

6   discretion to hire and fire employees, then there is no municipal

7   liability.  If the Town Council delegated its power to establish

8   "final employment policy" to the Town Manager, Defendant Taft's

9   decisions, and Defendant Johnson's decisions by delegation, would

10  give rise to municipal liability.  See Pembaur, 475 U.S. at 483

11  n.12, 106 S. Ct. at 483 n.12; Gillette, 979 F.2d at 1236-37;

12  Fiorenzo v. Nolan, 965 F.2d 348, 351 (7th Cir. 1992) ("[A]

13  municipality is not liable merely because the official who

14  inflicted the alleged constitutional injury had the discretion to

15  act on its behalf; rather, the official in question must possess

16  final authority to establish municipal policy with respect to the

17  challenged action.").

18         Defendants assert:

19             In fact, the Town Council exercised its
               authority by adopting, through a resolution,
20             a merit system and a comprehensive Personnel
               Policy that sets forth the appropriate
21             grounds for disciplinary action and states
               that employees may only be dismissed "for
22             cause." [SOF 204-05, 207] Furthermore, the
               Personnel Policy expressly states that it may
23             only be amended by the Town Council. [SOF
               206] In other words, Johnson's authority to
24             discipline or terminate employees was
               constrained by policies that were implemented
25             by the Town Council, thus confirming that he
               does not qualify as a final policymaker. ....
26              As further evidence that Johnson did not
               have policymaking authority, his decision to
27             discharge Plaintiffs was subject to appeal to
               the Town's Personnel Advisory Board (and
28             subsequently the Town Manager) for a

-56-

1

> determination of whether good cause existed
> for the terminations under the Town's
2
> policies. [SOF 208]

3
Doc. 90 at 2.
4

> Defendants further contend:
5

6
> It is not surprising that Plaintiffs have
> chosen to ignore Monell, since they cannot,
> as a matter of law, meet the requirements for
7
> municipal liability. As discussed in detail
> in Defendants' Motion for Summary Judgment,
8
> there is no evidence whatsoever that the Town
> has a longstanding custom or policy of
9
> violating employees' First Amendment rights.
> Likewise, the record is devoid of any
10
> evidence that the termination decision was
> committed or ratified by an individual with
11
> the authority to create personnel policies
> for the Town, as required to satisfy
12
> Plaintiff's burden. Gillette v. City of
> Eugene, 979 F.2d 1342, 1349 (9th Cir. 1992)
13
> ("Municipal liability does not
> attach...unless the decision maker possesses
14
> final authority to establish policy with
> respect to the action ordered."). Instead,
15
> the undisputed evidence shows that Assistant
> Town Manager Al Johnson made the termination
16
> decision, and that Johnson did not have final
> policymaking authority, as defined by the
17
> Ninth Circuit. Rather, the policymaking
> authority resided exclusively with the Town
18
> Council.

19
Doc. 98 at 17.

20
> In their response to Defendants' motion for summary

21
judgment, Plaintiffs argue:

22
> Defendants acknowledge that Defendant
> Johnson ("Johnson") was the decision maker
23
> and that he terminated Plaintiffs, yet they
> also allege that the Town is not liable
24
> because Johnson was not a final policymaker.
> A determination as to who is the final
25
> policymaker is one that turns on the specific
> action ordered, not general policy. Municipal
26
> liability exists here for three reasons: (1)
> Johnson's action was taken pursuant to the
27
> Town's formal personnel policy; (2) Johnson
> was the final policymaker about the
28
> employment of these Plaintiffs; and (3) Town

> Manager Taft upheld and ratified Johnson's decisions.
> ***
> Defendant Taft, as Town Manager, had direct responsibility and final policymaking authority for employment-related disciplinary decisions, CSOF at ¶ 273-275, and the option of delegating authority over personnel matters to others, CSOF at ¶ 274. Taft appointed Johnson, pursuant to her authority, to investigate and make employment decisions related to Plaintiffs. CSOF at ¶ 280. Town Code expressly prohibits the Town Council from interfering in the Town Manager's personnel decisions against employees that are not officers. CSOF at ¶ 275. Johnson was, therefore, the final policymaker as to Plaintiffs' employment. Defendants suggest that Johnson was not the final policymaker because his authority was constrained by policies implemented by the Town.
> This argument completely misses the mark—Johnson decided to terminate Plaintiffs because he believed they violated Section 1502(O).

Doc. 100 at 2-3.

As Town Manager and Personnel Officer for the Town of Quartzsite, Defendant Taft, and Defendant Johnson by delegation, had policy-making authority with regard to the termination of police department employees who were found to be terminable pursuant to the Town personnel policies. Defendant Taft terminated Plaintiff Kemp's employment and ratified both Defendant Johnson's act in terminating the other Plaintiffs and the basis for the act, i.e., the determination that Plaintiffs had violated personnel policies by making allegedly untrue statements about the Chief of Police which allegedly brought disrespect to the community and called into question the credibility of the plaintiff police officers as witnesses in criminal proceedings.

Plaintiffs' employment was terminated by Defendants Taft and Johnson, citing policy of the Town of Quartzsite, after an investigation undertaken by the Town at the behest of Defendant Johnson and Defendant Taft, regarding Plaintiffs' accusations against Defendant Gilbert.   Defendant Johnson was the primary town official committing the constitutional tort as ratified by Defendant Taft, an official with final policy-making authority. Accordingly, Plaintiffs have established the Town of Quartzsite's liability for the violation of Plaintiffs' constitutional rights.

**V Conclusion**

Viewing the facts in the light most favorable to Defendants, Plaintiffs are entitled to judgment as a matter of law against all Defendants with regard to their claims in Count I that they were retaliated against for the exercise of their First Amendment right to freedom of speech.

Accordingly,

**IT IS ORDERED that** Defendants' motion for summary judgment (Doc. 90) is **denied** insofar as it seeks judgment in favor of Defendants with regard to Count I of the complaint at Doc. 70.

**IT IS FURTHER ORDERED that** Plaintiffs' motion for summary judgment (Doc. 94) is **granted.**   Judgment in favor of Plaintiffs Linda Conley, Stephenn Frakes, James Kemp, Michelle Norris, William Ponce, and Herland Yeomans, and against all Defendants shall be entered with regard to Count I of the complaint at Doc. 70.

The Clerk of the Court shall enter separate judgment with regard to Count I only of the second amended complaint at

-59-

1  Doc. 70 accordingly.

2          DATED this 20th day of November, 2013.

3

4  _____

                 Mark E. Aspey

5          United States Magistrate Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28